463

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      )
                               )
      v.                       )   Criminal No. 17-234
                               )
ORLANDO BELL,                  )
                               )
          Defendants.          )   Washington, D.C.
_____    )   October 29, 2018


TRANSCRIPT OF JURY TRIAL
VOLUME III
BEFORE THE HONORABLE TREVOR N. McFADDEN
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Government:       NIHAR R. MOHANTY, AUSA
                          KEVIN L. ROSENBERG, AUSA
                          U.S. Attorney's Office
                          555 Fourth Street, NW
                          Washington, D.C.  20530

For the Defendant:        CHRISTOPHER MICHAEL DAVIS, ESQ.
                          Davis & Davis
                          1350 Connecticut Avenue, NW
                          Suite 202
                          Washington, DC 20036


Court Reporter:           PATRICIA A. KANESHIRO-MILLER, RMR, CRR
                          U.S. Courthouse, Room 4700A
                          333 Constitution Avenue, NW
                          Washington, D.C.  20001

—464—

E X A M I N A T I O N S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| WALTER O'NEAL II | 467 | 489 | 493 | |
| BENJAMIN BULLINGTON | 495 | 499 | | |

E X H I B I T S

| GOVERNMENT EXHIBIT | PAGE |
|--------------------|------|
| 104C | 503 |
| 105C | 503 |
| 106C | 503 |
| 107C | 503 |
| 221A | 503 |
| 236 | 498 |
| 303A | 503 |
| 401 | 475 |
| 401A | 481 |
| 401B | 504 |
| 402 | 483 |
| 402A | 488 |
| 402B | 504 |
| 403 | 472 |
| 410 | 496 |
| 411 | 503 |

P R O C E E D I N G S

(9:37 a.m.)

(Jury not present)

THE DEPUTY CLERK:  Your Honor, we have Criminal Case 17-234-7, United States of America versus Orlando Bell.

Counsel, please come forward to identify yourselves for the record.

MR. ROSENBERG:  Good morning, Your Honor.  Kevin Rosenberg and Nihar Mohanty on behalf of the United States.

THE COURT:  Good morning, gentlemen.

MR. DAVIS:  And Christopher Davis on behalf of Orlando Bell, who is seated at counsel table.

THE COURT:  Good morning gentlemen.

I saw kind of the back-and-forth over the jury instructions.  I think we're pretty close.  My suggestion is we just kind of have a final powwow once all the evidence is in, to make sure we're all on the same page.

Mr. Rosenberg, do you have an updated, retyped indictment?

MR. MOHANTY:  We do, Your Honor.  And I apologize for the delay in getting this done.  There was some confusion between our office and the Clerk's Office on how to best do this.

Ms. Chaclan tells me that -- and I have the retyped indictment that corrects, pursuant to the Court's Order on

1    Wednesday, October, 24th, Count 38 to reflect that Count 38

2    is relating to Count 37, per the Court's October 24th Order.

3         I would file this, Your Honor, and ask that it be

4    referred to as Document Number 38RS, and if the docket could

5    be amended to reflect that this is sort of the indictment we

6    have been pursuing the whole trial.

7         THE COURT:  Okay.  It will so reflect.

8         MR. MOHANTY:  Thank you.

9         THE COURT:  I think we're ready to bring in the jury.

10        (Jury present)

11        THE COURT:  Good morning, folks.  Welcome back.  I

12   hope you all had a good weekend.

13        I should have mentioned on Thursday that just because

14   we did not sit on Friday, I didn't want you to think that all

15   of the attorneys and I were off playing golf.  All the

16   matters that kind of back up during the week when we're in

17   trial we were all attending to on Friday.

18        We're ready to resume this morning with the

19   government's case.

20        One other thing I wanted to mention to you, I

21   understand one or more of you may have had difficulty hearing

22   one of the witnesses on Thursday.  I'm sorry about that.  If

23   you have any additional issues with either not being able to

24   hear a witness or not understanding what a witness is saying,

25   please feel free to raise your hand or speak up.

1    Unfortunately, it is difficult for us to do anything about it

2    afterwards.  You might be able to chat with your fellow

3    jurors once you begin deliberating, but please let me know if

4    you can't hear anybody for the remainder of the trial.

5            With that, Mr. Rosenberg, the government may call its

6    next witness.

7            MR. ROSENBERG:  Yes, Your Honor.  The government

8    calls Detective Walter O'Neal to the witness stand.

9                            WALTER O'NEAL II,

10           having been duly sworn, was examined and testified as

11   follows:

12                         DIRECT EXAMINATION

13           BY MR. ROSENBERG:

14   Q.      Good morning, sir.

15   A.      Good morning.

16   Q.      How are you doing?

17   A.      Very well.

18   Q.      Could you please state and spell your name for the

19   record.

20   A.      Yes.  My name is Detective Walter O'Neal,

21   O-'-N-E-A-L, II.  I'm a detective with the Prince William

22   County Police Department.

23   Q.      What unit are you assigned to with the Prince William

24   County Police Department?

25   A.      I am currently assigned to the Special Investigations

1  Bureau, our Vice and Narcotics Division.

2  Q.      What does that unit do?

3  A.      That unit is primarily tasked with investigating

4  narcotics and vice-related crimes.

5  Q.      How long have you been with that unit?

6  A.      At this point, coming up in October, it will make a

7  year this month.

8  Q.      Before your assignment to the narcotics unit, what

9  unit were you working with or what police agency were you

10  working for?

11  A.      Prior to that, I was with the Stafford County

12  Sheriff's Office from 2010 to November of 2015.  Then, I

13  joined the Prince William County Police Department in

14  November or 2015, where I'm currently employed.

15  Q.      Did you back in 2017 get involved with an

16  investigation involving an individual by the name of Orlando

17  Bell?

18  A.      I did, yes.

19  Q.      How did you get involved in that investigation?

20  A.      This investigation was actually one of my first

21  investigations on the narcotics unit.  It was handed over to

22  me by Detective White, who is also a member of the narcotics

23  task force.

24  Q.      Were you involved at all in working with the FBI in

25  an investigation focusing on drug trafficking in Birney Place

1       in Southeast, Washington, D.C.?

2       A.      No, I was not.

3       Q.      At this time were you even aware that there was an

4       investigation into the Birney Place Parkchester Apartments?

5       A.      No, I was not.

6       Q.      Okay.  So how did this investigation get handed off

7       to you?

8       A.      Detective White had conducted a controlled purchase a

9       few weeks prior, before I got involved.

10              MR. DAVIS:  Objection.  Move to strike.

11              THE COURT:  It will be overruled.

12              I take it you're merely laying a foundation for what

13      he is doing.

14              MR. ROSENBERG:  We're just going to focus on, yes,

15      two dates with respect to Mr. O'Neal.

16              THE COURT:  Okay.

17              BY MR. ROSENBERG:

18      Q.      So aside from what your fellow detective may have

19      done, what sort of came into your -- what came into your

20      hands as far as an investigation and what you were going to

21      do and what you wanted to do?

22      A.      I had conducted two controlled purchases with

23      Mr. Bell myself.

24      Q.      When you say yourself, did you personally actually

25      buy any drugs?

1    A.       I did not.  We used a confidential informant.

2    Q.       Who was the confidential informant?

3    A.       His name was Malvin Johnson.

4    Q.       And what was his motivation for doing this for you?

5    A.       I believe Mr. Johnson had pending charges in Fairfax

6    County, if I remember correctly.

7    Q.       So how did you initiate your controlled buys of

8    narcotics?

9    A.       At that point, Mr. Johnson conducted a controlled

10   phone call where he contacted Mr. Bell to begin the motion of

11   setting up the purchase.

12   Q.       Are you present with him when he makes these phone

13   calls?

14   A.       For some of them, yes.

15   Q.       So what was the first date when you made

16   these -- when you initiated a controlled purchase of drugs?

17   A.       That would have been November 2nd, 2017.

18   Q.       And was the purchase arranged in your presence,

19   negotiated in your presence?

20   A.       Yes, it was.

21            MR. DAVIS:  Objection.  That's a compound question.

22            THE COURT:  Can you break that down.

23            MR. ROSENBERG:  Sure.

24            BY MR. ROSENBERG:

25   Q.       Can you please describe to the jury how the phone

1    call happened to arrange this purchase.

2    A.        Prior to the meeting, we meet with our confidential

3    informant.  The confidential informant is searched to make

4    sure he has got no contraband before we begin.  At that

5    point, he's outfitted with an audio and listening device, and

6    then we have the informant make a phone call from there,

7    essentially.

8    Q.        What is the point of searching the informant before

9    the deal happens?

10   A.        Just to ensure that they don't bring any additional

11   contraband with them.  So that way any evidence that is

12   collected is not contaminated whatsoever.

13   Q.        Okay.  So for the November 2nd deal, was there a

14   location set for this transaction?

15   A.        Yes.

16   Q.        Where was it?

17   A.        That would have been the Costco in Manassas,

18   Virginia, which is in Prince William County.

19   Q.        At this point, I'm going to show you a series of

20   photographs marked Government's Exhibit 403 and ask if you

21   recognize these photographs.

22             Do you recognize Government's 403, page 1?

23   A.        I do.

24   Q.        What about page 2?

25   A.        I do.

1    Q.    Page 3?

2    A.    I do.

3    Q.    Page 4?

4    A.    Yes.

5    Q.    Page 5?

6    A.    Yes.

7    Q.    Page 6?  It is a blank page.  It's not a trick

8    question.

9          Your Honor, at this time -- first, are these overhead

10   photos and maps fair and accurate depictions of both the

11   Costco as well as Washington, D.C., and Prince William

12   County?

13   A.    It is.

14         MR. ROSENBERG:  Your Honor, at this time, the

15   government would request to move into evidence and publish to

16   the jury Government's Exhibit 403.

17         MR. DAVIS:  No objection.

18         THE COURT:  Without objection, 403 is in and may be

19   published.

20         (Government 403 admitted in evidence)

21         BY MR. ROSENBERG:

22   Q.    If we could just scroll to page 3, please.

23         What are we looking at here on page 3?

24   A.    It looks like an overall map depicting -- I see

25   Washington, D.C., there -- a bunch of roadways.  And in the

1    target there would be the Manassas, Virginia area.

2    Q.      On this map, what is Prince William County's sort of

3    jurisdiction?  Where do you guys work?

4    A.      We are approximately just shy of maybe 40 miles south

5    of Washington D.C.

6    Q.      All right.  And then you talked about the deal being

7    arranged at the Costco in Manassas.  If we could maybe scroll

8    to page 2.

9            Hat is this overhead shot right here?

10   A.      That would be an overhead view of the Costco there in

11   Manassas, Virginia.

12   Q.      So what time of day was this purchase set up on

13   November 2nd, 2017?

14   A.      This would have been approximately 1:00 in the

15   afternoon.

16   Q.      Any reason that you picked the Costco of all places

17   in your territory?

18   A.      Costco is just -- it is an easier way for us to kind

19   of control the situation.  We can hide surveillance units

20   amongst the folks there shopping at the Costco, so on and so

21   forth.

22   Q.      Walk us through this transaction.  What happens after

23   you make the controlled phone call?

24   A.      After the controlled phone call is made, we have

25   surveillance units that are in place throughout the parking

1     lot.  That way they can observe what is going on and make

2     sure we have eyes on the informant and the deal as best as

3     possible.  Once the CI is searched, the CI was driven over to

4     the Costco by another detective, where he was dropped off,

5     and the deal was going to take place there.

6     Q.      Before you drop him off, is he given some type of

7     recording device?

8     A.      He is, yes.

9     Q.      Have you reviewed the audio from that recording

10    device?

11    A.      I have, yes.

12    Q.      Earlier today did you look at a rough transcript of

13    the audio from this November 2nd, 2017 transaction?

14    A.      I did, yes.

15    Q.      And was it -- absent a few unintelligible words, was

16    it an accurate transcription of the recording?

17    A.      It was.

18            MR. ROSENBERG:  Your Honor, at this time, the

19    government would request to move into evidence and publish to

20    the jury 401B, along with an accompanying -- no, 401, along

21    with an accompanying transcript, which would be found at

22    401D, and we could pass the binders out to the jury.

23            MR. DAVIS:  No objection.  And the transcripts are

24    not evidence.

25            MR. ROSENBERG:  Exactly.

1    THE COURT:  Without objection, 401 will be admitted.

2    Where is the transcript?

3    MR. ROSENBERG:  401D.

4    THE COURT:  401D will be marked for identification

5    but is not being put into evidence.

6    (Government 401 admitted in evidence)

7    THE COURT:  Ladies and gentlemen, while you're

8    getting the binders, let me just clarify, the detective

9    referenced a buy that his predecessor handled.  He didn't say

10   who the buy was involved with, and I don't want you to

11   speculate about that.  The only point is the detective

12   explaining why he got involved in the case.

13   Mr. Rosenberg, you may continue.

14   MR. ROSENBERG:  Thank you, Your Honor.

15   BY MR. ROSENBERG:

16   Q.    Just one more time, the transcript of this is found

17   at tab 22.

18   At this time, we would publish 401 to the jury.

19   (Audiotape played)

20   BY MR. ROSENBERG:

21   Q.    Detective O'Neal, did you hear anybody talk about

22   baking soda just then?

23   A.    I did, yes.

24   Q.    Who were the speakers there?

25   A.    That would have been the informant, Malvin Johnson,

1     and Mr. Bell.

2     Q.     Which is the voice that is saying, "That looks like

3     baking soda"?

4     A.     That would have been Malvin Johnson.

5     Q.     Who is the voice saying, "No, that's not baking

6     soda"?

7     A.     That would have been Orlando Bell.

8     Q.     Okay.  Throughout this recording, who is the voice

9     you hear stronger in the conversation?

10    A.     You can certainly hear Malvin Johnson stronger.

11          (Audiotape played)

12          BY MR. ROSENBERG:

13    Q.     Detective, do you have one of those transcript

14    binders in front of you?

15    A.     I do.

16    Q.     Were you following along?

17    A.     I was.

18    Q.     Are some of the voices attributed incorrectly in

19    there?

20    A.     Yes.

21    Q.     Okay.  The voice that you can hear much clearer, as

22    you said, that belongs to --

23    A.     Malvin Johnson.

24    Q.     And is he the CI?

25    A.     He is.

1    Q.      Were you doing surveillance in the parking lot at

2    this time?

3    A.      I was in what we call the command vehicle, but it

4    acts as surveillance, yes.

5    Q.      What's that mean, command vehicle?

6    A.      That's where the supervisor is there, and we kind of

7    run the operation from that particular vehicle.

8    Q.      And is that in the parking lot?

9    A.      It was.

10   Q.      So what did you see when this deal started to

11   commence?

12   A.      At that particular point, we had our eye on the

13   informant to see where he was going to be standing in the

14   parking lot.  I was able to observe a Jeep Liberty pull up

15   and the informant get into that vehicle, and then the vehicle

16   drove past me as it exited the park lot.

17   Q.      And what color was that Jeep Liberty, if you

18   remember?

19   A.      I want to say it was like a bluish-gray.

20   Q.      And how did the vehicle drive by you in the parking

21   lot?

22   A.      Pretty slow.  The parking lot was pretty busy that

23   time of day.

24   Q.      Was it light or dark outside when the vehicle drove

25   by?

478

```
 1        A.        It was still daylight.

 2        Q.        Any tinted windows?

 3        A.        No.

 4        Q.        Who did you see inside the Jeep Liberty as it drove

 5   by?

 6        A.        I was able to observe the informant sitting in the

 7   passenger seat and a subject that appeared to be Mr. Bell in

 8   the driver's seat.

 9        Q.        Did you get -- how long do you think you were able to

10   observe the car driving by you with the two individuals

11   inside?

12        A.        Probably a good five or six seconds.

13        Q.        And the individual that was driving the vehicle, do

14   you see him seated in court today?

15        A.        I do.

16        Q.        All right.  Can you please point to him and describe

17   what he is wearing for the record.

18        A.        It would be the defendant, Mr. Bell, there with his

19   blue jacket and green shirt.

20                  MR. ROSENBERG:  Your Honor, if the record could

21   reflect he has identified the defendant.

22                  MR. DAVIS:  No objection.

23                  THE COURT:  The record will so reflect.

24                  BY MR. ROSENBERG:

25        Q.        Let me ask you this:  Did the car ever leave the
```

1     parking lot?

2     A.      It did, yes.

3     Q.      And where did it go?

4     A.      From that point, I believe it made a right onto

5     Ashton Avenue, which is there next to the Costco.

6     Q.      If we could just briefly pull up 403-2.  Or 403,

7     page 2.

8             Which one of these -- is Ashton Avenue visible on

9     this map?

10    A.      Yes, it is.

11    Q.      Is it where I drew the red line?

12    A.      It is, yes.

13    Q.      Did it leave this general area, or what did it do?

14    A.      From my knowledge, it did not leave the general area

15    of the Costco, no.

16    Q.      Where were you parked when the Jeep Liberty drove

17    past you?

18    A.      If I had a laser pointer, I'd show it to you.  I was

19    in a parking space probably at the -- this bottom corner here

20    of the building.  On the left-hand side, bottom corner.

21    There's parking spaces along the road there, and you can see

22    an entrance right there.  I was probably two or three spaces

23    away from that entrance along that row of parking there next

24    to Ashton.

25    Q.      You're referring to this row right here?

1    A.        Yes, in that area.

2    Q.        Okay.  Is that where you saw Mr. Bell and the

3    informant drive past you?

4    A.        I did.  The vehicle drove on that ramp that is right

5    there next to the mark that you just made.

6    Q.        Where did the informant go after the deal was

7    completed?

8    A.        The vehicle returned to the parking lot, and the

9    informant was dropped off right at the front entrance of the

10   Costco.

11   Q.        What did you do?

12   A.        At that point, we directed the undercover to pick him

13   up, and we followed him out of the parking lot.

14   Q.        Did you retrieve anything from the informant?

15   A.        I did.

16   Q.        What did you retrieve?

17   A.        We retrieved some crack cocaine.

18   Q.        I'm going to show you what's marked as Government's

19   Exhibit 401A, and ask if you recognize it.

20             Permission to approach the witness, Your Honor?

21             THE COURT:  You may approach.

22             BY MR. ROSENBERG:

23   Q.        Detective, What Are We Looking At Here in 401A?

24   A.        This would have been the evidence that was collected

25   -- what was handed to me by the informant after the deal was

1    completed.  It's a bag of crack cocaine.

2    Q.      How much did the informant buy that crack cocaine

3    for?

4    A.      $150.

5    Q.      Was the informant searched again after the buy was

6    completed?

7    A.      Yes, he was.

8    Q.      What is the purpose of that follow-up search?

9    A.      That is to ensure that he didn't pinch anything off

10   or steal anything, hold any money, or introduce any other

11   contaminants to the evidence.

12   Q.      Does that crack cocaine look like it is in the same

13   or substantially same condition as when you retrieved it from

14   the informant?

15   A.      It does, yes.

16           MR. ROSENBERG:  Your Honor, permission to move into

17   evidence Government's Exhibit 401A.

18           MR. DAVIS:  No objection.

19           THE COURT:  Without objection, 401A is in.

20           MR. ROSENBERG:  Thank you.

21           (Government 401A admitted in evidence)

22           BY MR. ROSENBERG:

23   Q.      And was that crack cocaine sent to a Virginia drug

24   testing lab to confirm that it was crack cocaine?

25   A.      Yes, it was.

1    Q.      Now, as far as your investigation went, what did you

2    do -- after this operation for the day was completed, what

3    did you do next in your drug investigation?

4    A.      Completed all the necessary paperwork, reports, so on

5    and so forth, and sometime later a second deal was arranged.

6    Q.      So on November 11, 2017, did you initiate another

7    controlled purchase of crack cocaine?

8    A.      Yes, I did.

9    Q.      And who was the target of this purchase?

10   A.      The target would have been again Mr. Orlando Bell.

11   Q.      Okay.  Can you summarize for the jury again how you

12   went about arranging the transaction and surveillance and

13   walk them through the operation.

14   A.      Yes.  It would have been the same set of facts as

15   last time.  The informant was met with, searched prior to the

16   deal, outfitted with a recording and listening device, and

17   then driven to the same location where the deal took place,

18   and he was searched after the deal.

19   Q.      Was he searched beforehand?

20   A.      Correct, yes.

21   Q.      And for these controlled transactions, did you have

22   any video recording equipment?

23   A.      For these, no, we did not.

24   Q.      Do you even have video recording equipment with the

25   Prince William County --

1  A.      We do.  It just takes some time to get those things

2  set up.

3  Q.      And was there a recording made of the November 11,

4  2017 transaction?

5  A.      Yes, there was.

6  Q.      Did you also review that recording and a transcript

7  along with it before you testified today?

8  A.      Yes, I did.

9          MR. ROSENBERG:  Your Honor, at this time, we would

10  move into evidence and request to publish to the jury

11  Government's Exhibit 402 and direct them to the transcript

12  associated with this November 11th transaction.

13          MR. DAVIS:  No objection.

14          THE COURT:  402 is admitted and may be published to

15  the jury.

16          (Government 402 admitted in evidence)

17          THE COURT:  What transcript are you referring to?

18          MR. ROSENBERG:  It is at tab 23, Your Honor.

19          (Audiotape played)

20          BY MR. ROSENBERG:

21  Q.      When you begin this recording, you use the target

22  name of "Dreads."  Is that right?

23  A.      Yes.

24  Q.      Why are you identifying somebody as Dreads and not by

25  their legal name?

```
 1    A.        That was the nickname that Mr. Bell had been

 2    identified as from the informant.

 3    Q.        Had you already at this point viewed like a driver's

 4    license photo for the target?

 5    A.        I had, yes.

 6    Q.        Did you identify the driver's license photo as the

 7    person who had appeared on November 2nd?

 8    A.        I did.

 9              (Audiotape played)

10              BY MR. ROSENBERG:

11    Q.        Detective, were you at the Costco for this

12    transaction, as well?

13    A.        Yes, I was.

14    Q.        Where were you positioned, if you remember?

15    A.        This would have been in a different parking space

16    closer to probably Sudley Manor.

17    Q.        Were you in one of the main parking areas?

18    A.        Yes.

19    Q.        Could we pull up Government's Exhibit 403 one more

20    time, please.

21              Go to page 4.

22              All right.  So when you dropped the source off, where

23    did you drop him off for these deals?

24    A.        This would have been at the front entrance of the

25    Costco where your arrow is pointing there.
```

1    Q.      And where would you have been parked for your

2    surveillance?

3    A.      For this particular deal, I would have been parked in

4    this line of parking here on Sudley Manor.  We were in one of

5    these parking spaces kind of close to the bottom right

6    portion of your arrow.

7    Q.      Okay.  So how many rows in are we talking?

8    A.      Looking at the main entrance there, if I remember

9    correctly, we were probably on that second row -- that row

10   there along the Sudley Manor parking road area.

11   Q.      All right.  Did anyone come in to pick up the source?

12   A.      Yes.

13   Q.      Who came in to pick up the source?

14   A.      That would have been the same vehicle from the first

15   deal driven by Mr. Bell.

16   Q.      And was somebody else in the automobile, as well?

17   A.      Yes.

18   Q.      What happened after Mr. Bell drove into the parking

19   lot?

20   A.      At that particular point, the vehicle began to drive

21   around the parking lot.  I can't remember exactly which row

22   it came down, but the vehicle actually came directly towards

23   us.

24   Q.      What time of day was this sale?

25   A.      This one would have been between 5 p.m. and 6 p.m.

486

1   Q.       So what were the lighting conditions like at the

2   time?

3   A.       It was pretty dark at that time of day that time of

4   year.

5   Q.       Were you able to see who was inside the Jeep when it

6   drove by you?

7   A.       I was.

8   Q.       Who was inside the Jeep?

9   A.       I could see the driver, Mr. Bell, an unidentified

10  male passenger, and then the informant would have been in the

11  back seat.

12  Q.       Where did the car go?  Where did the Jeep go?

13  A.       The vehicle just kind of took a lap around the

14  parking lot and went back to the front entrance.

15  Q.       What happened then?

16  A.       At that particular point, the informant exited the

17  vehicle, the vehicle drove off, and we directed the

18  undercover to pick up the informant.

19  Q.       Did you recover any crack cocaine from the informant?

20  A.       Yes, I did.

21  Q.       Was the informant searched again?

22  A.       Yes, he was.

23  Q.       What was the purpose of searching him the second

24  time?

25  A.       Just to make sure he didn't steal any of the

1    narcotics, add anything to it, or contaminate the evidence

2    whatsoever.

3            MR. ROSENBERG:  Permission to approach the witness,

4    Your Honor?

5            THE COURT:  You may approach.

6            BY MR. ROSENBERG:

7    Q.      I'm going to show you what has been marked for

8    identification purposes as Government's Exhibit 402A.

9            Do you recognize what is inside Government's Exhibit

10   402A?

11   A.      I do.

12   Q.      What is that?

13   A.      This would have been several individual packages of

14   crack cocaine.

15   Q.      And where did you get that?

16   A.      This would have been handed to me after the deal by

17   the informant.

18   Q.      And does it look like it is in the same or

19   substantially same condition as when you retrieved it from

20   the defendant?

21   A.      Yes, it does.

22           MR. ROSENBERG:  Your Honor, at this time, the

23   government would request to move into evidence Government's

24   Exhibit 402A.

25           MR. DAVIS:  No objection.

1      THE COURT:  Without objection, 402A is in.

2      (Government 402A admitted in evidence)

3      BY MR. ROSENBERG:

4   Q.      So, Detective, where did your investigation go from

5   here?

6   A.      At that point, we lost contact with Mr. Bell.  The

7   informant was unable to get in contact with him.

8   Q.      At some point, did you learn that there was a --

9      MR. DAVIS:  Objection.

10      THE COURT:  Let's try a non-leading question.

11      MR. ROSENBERG:  Sure.

12      BY MR. ROSENBERG:

13   Q.      What investigative steps did you take next?

14   A.      At that particular point, again, after the paperwork

15   was completed, reports completed, there was nothing else we

16   could do at that point.  We had no contact with either party.

17   Q.      Did you ever reach out to any other law enforcement

18   agencies?

19   A.      I did, yes.

20   Q.      Who did you reach out to?

21   A.      I ended up reaching out to the Washington

22   Metropolitan Police Department.

23   Q.      Do you remember who?

24   A.      I was put in contact with I believe it was Scott

25   Brown.

1    Q.      All right.  And then were you in contact with anybody

2    also, any other law enforcement agencies about this?

3    A.      No.

4            MR. ROSENBERG:  One brief moment, Your Honor.

5            (Pause)

6            MR. ROSENBERG:  No further questions at this time.

7            THE COURT:  Okay.  Mr. Davis.

8            MR. DAVIS:  Thank you, Your Honor.

9                          CROSS-EXAMINATION

10           BY MR. DAVIS:

11   Q.      Detective, I'm going to retrieve these --

12   A.      Okay.

13   Q.      -- exhibits from you.

14           Detective, 401A --

15           THE COURT:  Do you want this published, sir?

16           MR. DAVIS:  Yes.

17           BY MR. DAVIS:

18   Q.      I'm showing you what was actually moved into evidence

19   as Government Exhibit Number 401A.  This is the crack cocaine

20   that you just testified about that the undercover --

21   actually, that CI gave you; correct?

22   A.      Correct.

23   Q.      And that was on November 2nd; correct?

24   A.      Yes.

25   Q.      That came out to be just about a gram of cocaine

1    base; correct?

2    A.      Correct.

3    Q.      And then I'm showing you what has been moved into

4    evidence as Government's Exhibit Number 402A.  And that,

5    likewise, is what the confidential informant gave you on

6    November 11th, which weighed out to just shy of one gram of

7    cocaine; correct?

8    A.      Right.

9    Q.      Now, you mentioned a UC at one point in the

10   beginning, that a UC had done something.  A UC is a police

11   officer; correct?

12   A.      Yes.

13   Q.      Okay.  Now, we don't have anything in reference to

14   what that UC did in this courtroom today; do we?

15   A.      No.

16   Q.      In terms of drugs?

17   A.      No.

18   Q.      Now, a CI, a confidential informant, that would be

19   Malvin Johnson here; correct?

20   A.      Yes.

21   Q.      Did Malvin have a nickname?

22   A.      Not that I was aware of, no.

23   Q.      How did you meet Malvin Johnson?  Would it be fair to

24   say that you arrested him?

25   A.      I did not, no.

1    Q.      Did someone in your department arrest him?

2    A.      I do not know.

3    Q.      How did he show up within your neck of the woods, so

4    to speak?

5    A.      The circumstances behind that I am unaware of.

6    Q.      He just showed up at the police station, and he said

7    he would buy crack cocaine for your --

8    A.      No.  Mr. Johnson was not my informant.  So I'm not

9    sure how he began to work with Detective White.  I do not

10   know the circumstances of how those two met.  But he was

11   already working for Detective White when I came to the unit.

12   Q.      And detective White is someone from your division --

13   A.      Yes.

14   Q.      -- in Prince William County; correct?

15   A.      Correct.

16   Q.      So you know nothing about him?

17   A.      Essentially, no.

18   Q.      And he is not here today; is he?

19   A.      No.

20   Q.      Do you know what charges he had pending in Fairfax?

21   A.      I was told, but I don't recall.

22   Q.      Do you know what he was picked up for by Detective

23   White?

24   A.      I'm not sure if he was arrested by Detective White or

25   not, but I do remember I was told, but I don't recall.

1    Q.      Do you know he has a lengthy criminal history in

2    Alabama?

3    A.      I was told of that, yes.

4    Q.      So, really, you know very little about this man;

5    correct?

6    A.      Correct.

7    Q.      Did you drop him off on both occasions on

8    November 2nd and November 11th in the parking lot of Costco?

9    A.      I did not, no.

10   Q.      Did he drive there himself?

11   A.      No, he did not.

12   Q.      Someone else dropped him off?

13   A.      I did, yes.

14   Q.      You dropped him off at Costco?

15   A.      At the Costco, no.

16   Q.      Now, was this your first narcotics case in Prince

17   William County?

18   A.      As a part of the task force, yes.

19   Q.      Now, after these two incidents with this informant

20   which you have testified about, did you take his case to the

21   Commonwealth Attorney and have him indicted?

22   A.      No.

23   Q.      And when did you talk to Scott Brown in D.C.?  What

24   month?

25   A.      This was probably December of 2017.

1    Q.      And did you ever testify before a grand jury here in

2    the District of Columbia?

3    A.      I did not, no.

4    Q.      Did you actually see an exchange between the CI and

5    Mr. Bell?

6    A.      No.

7    Q.      And how long were they gone from the parking lot?

8    A.      For the November 2nd deal?

9    Q.      That's correct.

10   A.      Roughly two minutes, give or take.

11   Q.      And the best you can tell us about the CI is he is

12   working something off; correct?

13   A.      Yes.

14   Q.      Can you tell us how it worked out for him?

15   A.      No, I do not.  I don't know.

16   Q.      Did you print these little bags of drugs?

17   A.      No, I did not.

18           MR. DAVIS:  I have no further questions.

19           THE COURT:  Redirect.

20                       REDIRECT EXAMINATION

21           BY MR. ROSENBERG:

22   Q.      Detective, are you aware of whether or not

23   Mr. Johnson has met with a defense investigator as part of

24   this case?

25   A.      I was told he was, yes.

1     Q.    Okay.  Were you in the parking lot -- well, were you

2    in the parking lot when Malvin Johnson got dropped off for

3    these deals?

4    A.    I was.

5    Q.    Did you observe that?

6    A.    I did.

7    Q.    You referred to a UC, undercover police officer.

8    What was his role in the investigation?

9    A.    His role was to drive Mr. Johnson to the Costco.

10    Q.    Okay.  Now, you never saw any exchanges; is that

11    accurate?

12    A.    Correct.

13    Q.    Before Mr. Johnson was dropped off, did he have

14    money?

15    A.    He had the money that I had given him, yes.

16    Q.    Okay.  Did he have any crack cocaine?

17    A.    No.

18    Q.    After he got out of Mr. Bell's car, did he have any

19    money?

20    A.    No.

21    Q.    Did he have any crack cocaine?

22    A.    Yes.

23    MR. ROSENBERG:  No further questions, Your Honor.

24    THE COURT:  Thank you, Detective.  Appreciate your

25    testimony here today.

1          (Witness excused)

2          THE COURT:  Does the government have additional

3     witnesses?

4          MR. DAVIS:  We just recall briefly Agent Bullington.

5          THE COURT:  Okay.  Agent Bullington.

6                    BENJAMIN BULLINGTON,

7          having been duly sworn, was examined and testified as

8     follows:

9                    DIRECT EXAMINATION

10         BY MR. ROSENBERG:

11    Q.    Good morning, Agent Bullington.

12    A.    Good morning.

13    Q.    Can you please state and spell your name one more

14    time for the record.

15    A.    Benjamin Bullington.  B-E-N-J-A-M-I-N

16    B-U-L-L-I-N-G-T-O-N.

17    Q.    Agent Bullington, do you know who Lorenzo Moore is?

18    A.    Yes.

19    Q.    Okay.  And was he interviewed on January 23, 2018,

20    after he was arrested?

21    A.    I believe so, yes.

22    Q.    And was that interview recorded?

23    A.    Yes.

24         MR. ROSENBERG:  Your Honor, pursuant to a joint

25    request, we would request to move into evidence Government's

1    Exhibit 410, which is a videotaped interview of Mr. Moore

2    from January 23, 2018.

3              MR. DAVIS:  That's correct, Your Honor.

4              THE COURT:  All right.  410 is in.

5              (Government 410 admitted in evidence)

6              BY MR. ROSENBERG:

7    Q.    Just a follow-up on some of the cellphones here,

8    Agent Bullington.

9              In connection with the Park Police arrest, did you

10   apply for a search warrant to look through some cellphones?

11   A.    Yes.

12   Q.    And were you able to -- well, what did you find?

13   A.    I was able to identify the phone that Mr. Bell was

14   using to call our wire target during the course of our

15   wiretap of Wayne Holroyd.

16   Q.    And how were you able to do that?

17   A.    Through an administrative subpoena to the service

18   provider of the phone number that was calling our wire

19   target, Wayne Holroyd.  And the return that came back from

20   the service provider provided the --

21   Q.    Well, I'm actually going to direct you to something

22   else.

23   A.    Okay.

24   Q.    Did you look in the phones?

25   A.    Yes.

1    Q.      Okay.  Did you know what phone number was calling

2    Mr. Holroyd during this investigation?

3    A.      Yes.

4    Q.      Okay.  And were you able to find the identifiers on a

5    phone that matched that phone number?

6    A.      Yes.

7    Q.      Okay.  How did you do that?

8    A.      Well, the phone number matched the phone number

9    calling our wire target, particularly the phone number that

10   was used to call our wire target during the course of the

11   March 8th stop, which we spoke about.  Also, electronic

12   serial number matched the phone that had that same phone

13   number at the time of the stop.

14   Q.      Okay.  Agent Bullington, I'm going to show you for

15   identification purposes what has been marked as Government's

16   Exhibit 236.

17          Is anything on your screen?

18   A.      Yes.

19   Q.      What are we looking at here?

20   A.      This is the phone number or -- I'm sorry -- this is

21   the physical phone that I searched with the phone number

22   202 -- it is actually difficult to see in this photo.

23   Q.      Do you recognize the last four digits?

24   A.      Yes.

25   Q.      What are the last four digits there?

1      A.       3539.

2      Q.       And do you know where this phone was taken?

3      A.       This phone was seized from Mr. Bell on the March 8th

4      stop by United States Park Police.

5      Q.       Is this the same phone number that was making the

6      calls that we listened to earlier in the trial on the wire

7      intercepts?

8      A.       Yes.

9               MR. ROSENBERG:  Your Honor, permission to move into

10     evidence and publish to the jury Government's Exhibit 236.

11              MR. DAVIS:  No objection.

12              THE COURT:  Without objection, 236 is in and may be

13     published.

14              (Government 236 admitted in evidence)

15              BY MR. ROSENBERG:

16     Q.       Agent Bullington, did you go through this phone and

17     look at any call logs, as well?

18     A.       Yes.

19     Q.       And what did those call logs show you?

20     A.       Showed contact with Wayne Holroyd, Foots, in the

21     phone.

22     Q.       The contact was saved under what name?

23     A.       Foots, I believe it was, or Foot.

24     Q.       Do you remember seeing the phone calls?

25     A.       I'm sorry?

1    Q.      Just explain to the jury what you saw for the phone

2    calls again.

3    A.      Just phone calls leading up to -- within the time

4    frame of the stop on March 8th.

5    Q.      Okay.  Between this phone and the wire target?

6    A.      Correct.

7            MR. ROSENBERG:  Your Honor, no further questions at

8    this time for Agent Bullington.

9                        CROSS-EXAMINATION

10           BY MR. DAVIS:

11   Q.      Agent Bullington, did you dump all the cellphones

12   that you recovered?

13   A.      I tried to, yes.  Some were locked.  You know, Apple

14   iPhones, that type of thing.  What I could, I did.

15   Q.      That is pretty much standard operating procedure when

16   you seize phones from a suspect or a defendant that's been

17   arrested, or target that has been arrested, you dump their

18   cellphones; correct?

19   A.      Yes.

20   Q.      How did you get into Mr. Bell's cellphone?  Did he

21   give you the code for that?

22   A.      I can't remember the exact technique.  I believe it

23   had to bypass the pin code.

24   Q.      It was an iPhone; correct?

25   A.      This phone?

1    Q.      Yes.

2    A.      No, this phone was not.

3    Q.      It was an Android?

4    A.      Correct.

5    Q.      Thank you.

6    A.      Uh-huh.

7            THE COURT:  You may step down, Agent Bullington.

8            THE WITNESS:  Thank you.

9            (Witness excused)

10           MR. ROSENBERG:  Your Honor, subject to the admission

11   of the government's evidence, as well as just reading a few

12   of the stipulations into the record, the government rests its

13   case.

14           THE COURT:  Okay.  Go ahead and read them now, sir.

15           MR. ROSENBERG:  Sure.

16           The parties stipulate and agree that if the -- let's

17   see.

18           "The parties in this case, the United States of

19   America and defendant, Orlando Bell, hereby agree and

20   stipulate to the following facts as if they were proven

21   beyond a reasonable doubt at trial.

22           "First, the drugs seized in this case were sent to

23   the United States Drug Enforcement Administration and the

24   Commonwealth of Virginia, Department of Forensic Sciences,

25   for chemical analysis.  The parties stipulate that Tiffany

501

1    VanDeMark, Joseph Dembowski, and Tara Remagen are forensic

2    chemists employed by the Drug Enforcement Administration, and

3    are qualified by education, training, and experience to

4    render an expert opinion concerning the identity of the

5    substances seized in this case that were sent to the DEA and

6    identified in this stipulation.  The parties stipulate that

7    Melanie T. Byers is a forensic chemist employed by the

8    Commonwealth of Virginia, Department of Forensic Sciences,

9    and is qualified by education, training, and experience to

10   render an expert opinion concerning the identity of the

11   substances seized in this case that were sent to the

12   Department of Forensic Sciences and are identified in this

13   stipulation.

14        "The parties stipulate and agree that if these

15   forensic scientists, forensic chemists, were called to

16   testify at trial, they would state under oath that the

17   following government exhibits contain the following

18   controlled substances:

19        "Government's Exhibit 104B is a mixture and substance

20   that contains 24.41 grams of cocaine base.

21        "Government's Exhibit 105B is a mixture and substance

22   that contains 26.02 grams of cocaine base.

23        "Government's Exhibit 106B is a mixture and substance

24   that contains 12.85 grams of cocaine base.

25        "Government's Exhibit 107B is a mixture and substance

1    that contains 25.8 grams of cocaine base.

2          "Government's Exhibit 221 is a mixture and substance

3    that contains 6.27 grams of cocaine base.

4          "Government's Exhibit 303 is a mixture and substance

5    that contains 21.28 grams of cocaine base.

6          Government's Exhibit 401A is a mixture and substance

7    that contains 1.17 grams of cocaine base.

8          "Government's Exhibit 402A is a mixture and substance

9    that contains .9896 grams of cocaine base.

10          "The parties further stipulate that Government's

11   Exhibit 104C, 105C, 106C, 107C, 221A, 303A, 401B, and 402C,

12   each entitled 'Chemical Analysis Report' contained the

13   chemical analysis of the contents of the above-referenced

14   exhibits.  And Exhibits 104C, 105C, 106C, 107C, 221A, 303A,

15   401B, and 402C are admissible."

16          And that concludes the government's case, Your Honor.

17          THE COURT:  Ladies and gentlemen, the government and

18   the defendant may stipulate -- that is, agree -- to certain

19   facts.  You should consider any stipulation of fact to be

20   undisputed evidence.

21          Mr. Rosenberg, does that stipulation have an exhibit

22   number?

23          MR. ROSENBERG:  We can call that Government's

24   Exhibit 411, or Joint Exhibit 411.

25          THE COURT:  Okay.  411 is in.

1          (Joint 411 admitted in evidence)

2          THE COURT:  And I think you referenced certain

3    additional exhibits that I need to move in.

4          MR. ROSENBERG:  Yes, Your Honor.

5          THE COURT:  Okay.

6          MR. ROSENBERG:  Those will be 104C.

7          THE COURT:  104C is in.

8          (Government 104C admitted in evidence)

9          MR. ROSENBERG:  Yes.  105C.

10         THE COURT:  105C is in.

11         (Government 105C admitted in evidence)

12         MR. ROSENBERG:  106C.

13         THE COURT:  106C is in.

14         (Government 106C admitted in evidence)

15         MR. ROSENBERG:  107C.

16         THE COURT:  107C is in.

17         (Government 107C admitted in evidence)

18         MR. ROSENBERG:  221A.

19         THE COURT:  221A is in.

20         (Government 221A admitted in evidence)

21         MR. ROSENBERG:  303A.

22         THE COURT:  303A is in.

23         (Government 303A admitted in evidence)

24         MR. ROSENBERG:  401B and 402 --

25         THE COURT:  Sorry.  Say that last one again.

1          MR. ROSENBERG:  401B.

2          THE COURT:  401B is in.

3          (Government 401B admitted in evidence)

4          MR. ROSENBERG:  402B.

5          THE COURT:  402B is in.

6          (Government 402B admitted in evidence)

7          THE COURT:  Ladies and gentlemen, that concludes the

8    government's evidence.  We're going to take a break now, and

9    I'll call you back when we're ready to continue.  Thank you.

10         (Jury not present)

11         THE COURT:  Mr. Davis, do you have a motion?

12         MR. DAVIS:  I do, Your Honor.

13         At this time, I would make a motion for judgment of

14   acquittal based on sufficiency for all charges for which

15   Mr. Bell has been charged.  I would renew all motions and

16   objections made both before trial and during trial.

17         THE COURT:  Okay.  Based upon the following evidence,

18   viewed in the light most favorable to the government, a

19   rational jury could find guilt beyond a reasonable doubt.

20   Specifically, I think the jury has heard evidence that the

21   defendant was purchasing crack cocaine from accomplices in

22   D.C. and then selling it to a confidential informant in

23   Virginia; that at the time of his first arrest, that he had

24   crack cocaine on his person as well as a firearm.  I think

25   the evidence submitted by the government would allow a

1    reasonable jury to conclude that the defendant possessed the

2    crack cocaine with the intent to distribute it; and that the

3    firearm was in furtherance of that crime.

4           I also find that there is sufficient evidence for the

5    conspiracy count; specifically, there is evidence through the

6    wiretaps, testimony from Mr. Moore, and evidence from the

7    drug trafficking expert that could lead a reasonable jury to

8    conclude there was a conspiracy between Mr. Bell,

9    Mr. Holroyd, Mr. Moore, and others to distribute and possess

10   with intent to distribute a controlled substance.

11          I think there is also sufficient facts, as I

12   suggested, to show possession of a firearm in furtherance of

13   a drug trafficking crime based on the traffic stop that

14   occurred on or about March 8, 2017, and the evidence relating

15   to that count.

16          Therefore, I will deny the defense motion for

17   judgment of acquittal.

18          Mr. Davis, have you had an opportunity to discuss

19   with your client whether or not he wishes to testify?

20          MR. DAVIS:  This has been an ongoing conversation for

21   about three months now.  We've had extensive opportunity to

22   discuss this, and I can accurately represent to the Court

23   that Mr. Bell has made a decision, and he has decided to

24   exercise his right not to testify.

25          THE COURT:  Okay.  Mr. Bell, I just need to ask you a

 1           couple of questions about your decision.

 2                   Sir, first of all, do you understand that you have an

 3           unconditional right to testify or not testify at trial?

 4                   THE DEFENDANT:  Yes, sir.

 5                   THE COURT:  Do you understand that you alone control

 6           this decision whether to testify?

 7                   THE DEFENDANT:  Yes, sir.

 8                   THE COURT:  Have you had adequate time to discuss

 9           this decision with your counsel?

10                   THE DEFENDANT:  Yes, sir.

11                   THE COURT:  Have you voluntarily decided not to

12           testify?

13                   JUROR:  Yes, sir.

14                   THE COURT:  All right.  And I see you have signed

15           this.  Is this your signature there, sir, indicating that

16           you've decided not to testify?

17                   THE DEFENDANT:  Yes, sir.

18                   THE COURT:  I will go ahead and sign this, as well.

19                   Thank you, sir.  You may have a seat.

20                   Let's talk about the jury instructions.

21                   Let's go through a couple of little changes.  First,

22           on 2.104, I am taking out the paragraph on judicial notice.

23           I don't think I took judicial notice of anything.  So, on

24           page 26, let's take out that paragraph.

25                   Statements of counsel.  As I indicated on Thursday, I

1    am willing to give that additional language requested by the

2    government.  We'll take out the parentheses and, of course,

3    the highlight.

4          We will keep in right of defendant not to testify,

5    instruction 220.8.

6          We've added in, at defense request, the accomplice

7    testimony, 220.2.

8          Witness with a plea agreement, it looks like there

9    might have been a typo there, page 40.

10         MR. DAVIS:  You're talking about the first paragraph,

11   Your Honor?

12         THE COURT:  Yes.

13         MR. DAVIS:  I think the last sentence of the first

14   paragraph goes.

15         THE COURT:  I agree.  We will strike that first

16   sentence.

17         Are the parties otherwise comfortable with that

18   instruction?

19         MR. ROSENBERG:  Yes, Your Honor.

20         THE COURT:  Okay.  On 2.216, we'll have alternative A

21   include Lorenzo Moore's name and strike alternative B.

22         You moved in a video.

23         MR. ROSENBERG:  Yes.  That was sort of at Mr. Davis'

24   request.

25         MR. DAVIS:  It is a video interview of Mr. Moore when

1    he was arrested.

2              THE COURT:  Are we going to play that for the jury?

3              MR. DAVIS:  I'm not going to play the whole thing.

4    I'm going to play some segments from it, two-minute segments

5    from it a couple of times.

6              THE COURT:  So 2.217, is that applicable?  That's

7    evaluation of a prior consistent statement of a witness.

8              MR. DAVIS:  I don't think so because he really

9    doesn't reference Mr. Bell at all.  So I don't see how it

10   would be relevant.  You're leaving in inconsistent

11   alternative A; correct?

12             THE COURT:  Correct, yes.

13             MR. DAVIS:  From my perspective, I don't think 2.217

14   is necessary, but I will listen to the United States.

15             MR. ROSENBERG:  There is a lot of consistency --

16             MR. DAVIS:  Actually, he was selling drugs.

17   Actually, yes, it's true.

18             You should keep it in.  We're coming from different

19   sides here, I think that's what the problem was.

20             THE COURT:  Okay.  We will include in 2.217 and put

21   in Lorenzo Moore as the witness.

22             MR. DAVIS:  Yes.

23             THE COURT:  And so is this substantive evidence?  I'm

24   trying to figure out whether it is both to help you in

25   evaluating the credibility of the witness and as evidence in

1        this case.

2                MR. DAVIS:  Give me a moment to check that.

3                MR. ROSENBERG:  I think it is just to impeach because

4        it wasn't under oath.

5                MR. DAVIS:  You're talking about the inconsistent?

6                THE COURT:  We're on 2.217.  This would not be

7        impeachment.  It would help you in evaluating the credibility

8        of the witness.  It's been moved in by the defense.  Well,

9        it's been moved in jointly.

10               MR. ROSENBERG:  Technically, Your Honor, I'm not sure

11       that this was really admitted under the 801 exception for

12       prior consistent statement after a witness has been impeached

13       for credibility as for like recent fabrication, which I think

14       is when the witness's -- the witness's prior statement can be

15       admitted for substantive evidence.  So I think we would

16       strike the "and as evidence in this case," and solely leave

17       it for evaluating the credibility of the witness.

18               THE COURT:  Okay.  So, in the second sentence, "If

19       you find that the earlier statement is consistent with the

20       witness's present testimony in Court, you may consider this

21       consistency in judging the credibility of the witness here at

22       trial, but you may not use it as proof that what was said in

23       the earlier statement was true."

24               MR. ROSENBERG:  I think that's accurate.

25               MR. DAVIS:  That's accurate.

1          THE COURT:  We will strike the "both and."

2          2.218 is staying in with Lorenzo Moore, impeachment

3    of proof by conviction of a crime witness.

4          We will take out 2.220, impeachment by proof of

5    conviction of a crime defendant.

6          Are the binders going back to the jury?

7          MR. ROSENBERG:  I don't think they should.

8          MR. DAVIS:  I would ask, if they want to listen to a

9    tape and use the binders, maybe we bring them out and have

10   them -- well, I guess we can send them back.  If Your Honor

11   gave them a strong instruction not to read the transcripts

12   and only use them when they're listening to the tapes, I

13   would be happy with that.  I just don't want them reading the

14   transcripts back there.  And I, too, do not want to bring

15   them out every time they want to listen to something.  Just

16   so they know.

17         MR. ROSENBERG:  Yeah, like a reminder that we have

18   been saying the audio is the evidence, this is just an aid.

19         MR. DAVIS:  Yeah, maybe at the end, right before we

20   send them back, we tell them we're going to send them back as

21   an aid.  Or they can request them if they want.  It doesn't

22   matter.

23         MR. ROSENBERG:  I kind of like the idea of just

24   reminding them that the audio is the evidence, these are

25   aids.  We'll send them back with you.

1          MR. DAVIS:  That's fine.  And you have an instruction

2     to that effect in there.  But just to remind them that

3     they're not to sit there and read them.

4          THE COURT:  Okay.  I'm just thinking about where this

5     should go.

6          So I'm going to take out that last sentence on

7     page 51 because we are going to send the tapes back with

8     them.  I don't think anybody wants to be bringing them out

9     here and for us to be assembling every time they listen to

10     one of those.  I'm going to insert a sentence at the end of

11     the first paragraph saying that you will have the binders,

12     the transcript binders, but you're reminded that those

13     transcripts are not evidence, that they're only an aid to you

14     in listening to the tapes.

15          Mr. Davis, are you comfortable with that?

16          MR. DAVIS:  I'm comfortable with that.

17          THE COURT:  Okay.  We'll add that.  Do you have a

18     clean laptop for us to use, Mr. Rosenberg?

19          MR. MOHANTY:  We do, Your Honor.

20          THE COURT:  Obviously, let Mr. Davis take a look at

21     it before we send it back.

22          Okay.  Let's talk about the government's proposed

23     instruction for conspiracy to distribute and possess with

24     intent to distribute a controlled substance.

25          I know you all have toyed with it a bit.  My instinct

1     is to take out the first highlighted sentence on page 62

2     saying, "The specific amount of any controlled substance

3     involved is not an element of the offense of conspiracy,"

4     because I think that is discussed elsewhere, but then keep in

5     the paragraph on page 63 that is highlighted.

6          Mr. Davis, do you want to --

7          MR. DAVIS:  The only problem I have with that is we

8     have essentially repeated page 70 to 71 on the *Pinkerton*

9     theory, so they're basically getting charged twice on a

10    *Pinkerton* theory.  I would think that we could only charge

11    them once.  Otherwise, it is kind of hammering into their

12    heads.

13         THE COURT:  What do you say to that, Mr. Rosenberg?

14    Are we just duplicating ourselves here?

15         MR. ROSENBERG:  We are kind of duplicating ourselves.

16    I think that it is more appropriate to have -- you know, if

17    we had to choose between the two, I think it is more

18    appropriate to have the highlighted paragraph that goes into

19    the conspiracy count included and then do away with the

20    *Pinkerton* count if we believe that we are just repeating

21    ourselves.  The *Pinkerton* count really does reference the

22    count one.  We're not asking for *Pinkerton* liability with

23    reference to the March 8th arrest.

24         THE COURT:  Okay.  So why don't we leave in page 63

25    and take out the *Pinkerton* liability instruction.

513

1          MR. ROSENBERG:  Yes.

2          THE COURT:  Just so you know, I'm going to get rid of

3    the bold and highlighting and italics language on the copy

4    that goes back to the jury.  This is all going to look the

5    same.

6          My clerk has been drafting language for the

7    possession of a controlled substance to make clear that that

8    is a lesser included offense.

9          I guess we would insert that right after possession

10   of a controlled substance with intent to distribute, 6.201.

11         THE LAW CLERK:  The way the Red Book recommends it,

12   the Red Book recommends that you read the lesser included

13   offense instruction first, and you warn them that I'm about

14   to give you this, and you read those two, and then you

15   instruct them on how to choose between them.

16         THE COURT:  Okay.  So we might play with the order on

17   that a little bit.

18         MR. DAVIS:  Can we put March 8, 2017 in there because

19   we're not referencing the counts in the indictment.  I don't

20   want to confuse the jury and think that they can -- I want

21   them to distinguish between the substantive offense and the

22   conspiracy.  I think it is particularly important on the

23   924(c) because he was not indicted for possession of a

24   firearm during the course of the conspiracy.  He was indicted

25   for the firearm for the March 8, 2017 possession with intent

1     to distribute.

2              THE COURT:  So it looks like we have got that in the

3     current version of possession of a firearm in furtherance of

4     a drug trafficking crime.  Do you disagree?

5              MR. DAVIS:  That's on page 66?

6              THE COURT:  Yes.

7              MR. ROSENBERG:  Second paragraph.

8              MR. DAVIS:  Yes, it is there.

9              THE COURT:  And I think you had it on the new

10    possession, which is misspelled, possession of a controlled

11    substance, instruction 6.200.

12             Was there somewhere else you wanted to add it?

13             6.201, possession of a controlled substance with

14    intent to distribute, does that relate to the March 8th

15    event, arrest?

16             MR. DAVIS:  It does, yes.  That's the infamous count

17    37 that we were --

18             THE COURT:  Okay.  So maybe right before 1, "on or

19    about March 8, 2017, the defendant possessed a detectable

20    amount," does that make sense?

21             MR. DAVIS:  That would work.

22             THE COURT:  Okay.  Anything else on those?

23             MR. DAVIS:  I sent over a verdict sheet.

24             THE COURT:  Yes.

25             MR. DAVIS:  Is that acceptable?

1          THE COURT:  I want to clean it up.  I'm generally

2     okay with it, but I don't want, like, a foreman's signature

3     at the bottom of each page.  I have also put in 3A and 3B.

4     So how we have it, after you consider PWID, 3A, you consider

5     the drug trafficking if you find him guilty on PWID, and then

6     3B if you find him not guilty.

7          Why don't we take a break.  We're going to finish up

8     the instructions, print out copies for each of you to take a

9     final look at.  You all can get ready for your closings.

10    We'll come back in.  You'll play the portion that you wish to

11    play.

12          MR. DAVIS:  I won't even do it during the defense

13    case.  I will just play little clips during closing.  I'm not

14    going to put on a case.

15          THE COURT:  Okay.  Are you comfortable with that?

16          MR. ROSENBERG:  Yes, that's fine.

17          THE COURT:  So I will do the jury instructions, and

18    then we'll go right to closings.

19          Anything else?

20          MR. ROSENBERG:  No, Your Honor.

21          (Recess taken)

22          (Jury not present)

23          THE COURT:  All right.  You all have seen our updated

24    copy of the instructions?

25          Anything further from either side?

1          MR. ROSENBERG:  No, Your Honor.

2          MR. DAVIS:  No, Your Honor.

3          THE COURT:  All right.  We will bring out the jury.

4     I will instruct.  And who is doing closing for the

5     government?

6          MR. MOHANTY:  I am, Your Honor.

7          THE COURT:  And I will turn it over to you,

8     Mr. Mohanty.

9          Actually, I will first ask the defense if you have

10    any evidence.

11         MR. DAVIS:  No, Your Honor.

12         THE COURT:  Well, I will ask in front of the jury.

13         (Jury present)

14         THE COURT:  Welcome back, ladies and gentlemen.

15    Thanks for your patience.  You may be seated.

16         Mr. Davis, does the defense wish to offer any

17    evidence?

18         MR. DAVIS:  No, Your Honor.

19         THE COURT:  And I understand you will play certain

20    portions of a video that was previously admitted in your

21    closing argument.

22         MR. DAVIS:  That is correct.

23         THE COURT:  Ladies and gentlemen, you have heard all

24    of the evidence that will be presented in this case.  All

25    that is left is for me to instruct you and then for you to

1        hear the closing arguments from counsel.

2            I will provide you with a copy of my instructions.

3    During your deliberations, in fact, I will provide you with a

4    number of copies of my instructions.  During your

5    deliberations, you may, if you want, refer to these

6    instructions.  While you may refer to any particular portion

7    of the instructions, you are to consider the instructions as

8    a whole, and you may not follow some and ignore others.  If

9    you have any questions about the instructions, you should

10   feel free to send me a note.  Please return your instructions

11   to me when the verdict is rendered.

12           My function is to conduct this trial in an orderly,

13   fair, and efficient manner; to rule on questions of law; and

14   to instruct you on the law that applies in this case.

15           It is your duty to accept the law as I instruct you.

16   You should consider all of the instructions as a whole.  You

17   may not ignore or refuse to follow any of them.

18           Your function, as the jury, is to determine what the

19   facts are in this case.  You are the sole judges of the

20   facts.  While it is my responsibility to decide what is

21   admitted as evidence during the trial, you alone decide what

22   weight, if any, to give to that evidence.  You alone decide

23   the credibility or believability of the witnesses.

24           You should determine the facts without prejudice,

25   fear, sympathy, or favoritism.  You should not be improperly

1    influenced by anyone's race, ethnic origin, or gender.

2    Decide the case solely from a fair consideration of the

3    evidence.

4         You may not take anything I may have said or done as

5    indicating how I think you should decide this case.  If you

6    believe that I have expressed or indicated any such opinion,

7    you should ignore it.  The verdict in this case is your sole

8    and exclusive responsibility.

9         If any reference by me or the attorneys to the

10   evidence is different from your own memory of the evidence,

11   it is your memory that should control during your

12   deliberations.

13        During the trial, I have permitted those jurors who

14   wanted to do so to take notes.  You may take your notebooks

15   with you to the jury room and use them during your

16   deliberations if you wish.  As I told you at the beginning of

17   the trial, your notes are only to be an aid to your memory.

18   They are not evidence in the case, and they should not

19   replace your own memory of the evidence.  Those jurors who

20   have not taken notes should rely on their own memory of the

21   evidence.  The notes are intended to be for the note-taker's

22   own personal use.

23        During your deliberations, you may consider only the

24   evidence properly admitted in this trial.  The evidence in

25   the case consists of the sworn testimony of the witnesses,

1    the exhibits that were admitted into evidence, and the facts

2    and testimony stipulated to by the parties.

3           During the trial, you were told that the parties had

4    stipulated -- that is, agreed -- to certain facts.  You

5    should consider any stipulation of fact to be undisputed

6    evidence.

7           During the trial, you were told that the parties had

8    stipulated -- that is, agreed -- to the testimony of what

9    Tiffany VanDeMark and Tara Remagen, both lab technicians at

10   the Drug Enforcement Administration, would have given had

11   they testified in this case.  You were also told that the

12   parties had stipulated -- that is, agreed -- to the testimony

13   of what Melanie Byers, a forensic technician at the

14   Commonwealth of Virginia Department of Forensic Sciences,

15   would have given if she had testified in this case.  You

16   should consider this stipulated testimony to be exactly what

17   they would have said had they testified here.

18          When you consider the evidence, you are permitted to

19   draw, from the facts that you find have been proven, such

20   reasonable inferences as you feel are justified in the light

21   of your experience.  You should give any evidence such weight

22   as in your judgment it is fairly entitled to receive.

23          The statements and arguments of the lawyers are not

24   evidence.  They are only intended to assist you in

25   understanding the evidence.  Similarly, the questions of the

1    lawyers are not evidence.

2          You have heard testimony about witnesses meeting with

3    attorneys and investigators before they testified.  You are

4    instructed that it is perfectly proper for a lawyer or

5    investigator to interview a witness in preparation for a

6    trial.

7          The indictment is merely the formal way of accusing a

8    person of a crime.  You must not consider the indictment as

9    evidence of any kind.  You may not consider it as any

10   evidence of the defendant's guilt or draw any inference of

11   guilt from it.

12         Every defendant in a criminal case is presumed to be

13   innocent.  This presumption of innocence remains with the

14   defendant throughout the trial unless and until the

15   government has proven he is guilty beyond a reasonable doubt.

16   This burden never shifts throughout the trial.  The law does

17   not require the defendant to prove his innocence or to

18   produce any evidence at all.  If you find the government has

19   proven beyond a reasonable doubt every element of a

20   particular offense with which the defendant is charged, it is

21   your duty to find him guilty of that offense.  On the other

22   hand, if you find the government has failed to prove any

23   element of a particular offense beyond a reasonable doubt, it

24   is your duty to find the defendant not guilty of that

25   offense.

1        The government has the burden of proving the

2   defendant guilty beyond a reasonable doubt as to each count

3   or charge against him.  Some of you may have served as jurors

4   in civil cases, where you were told that it is only necessary

5   to prove that a fact is more likely than not true, which we

6   call the preponderance of the evidence.  In criminal cases,

7   the government's burden must be more powerful than that.  It

8   must be beyond a reasonable doubt.

9        Proof beyond a reasonable doubt is proof that leaves

10  you firmly convinced of the defendant's guilt.  There are

11  very few things in this world that we could know with

12  absolute certainty, and in criminal cases the law does not

13  require proof that overcomes every possible doubt.  If, based

14  on your consideration of the evidence, you are firmly

15  convinced that the defendant is guilty of the crime charged,

16  you must find him guilty.  If, on the other hand, you think

17  there is a real possibility that a defendant is not guilty,

18  you must give him the benefit of the doubt and find him not

19  guilty.

20       There are two types of evidence from which you may

21  determine what the facts are in this case:  direct evidence

22  and circumstantial evidence.  When a witness, such as an

23  eyewitness, asserts actual knowledge of a fact, that

24  witness's testimony is direct evidence.  On the other hand,

25  evidence of facts and circumstances from which reasonable

1    inferences may be drawn is circumstantial evidence.

2           Let me give you an example.  Assume a person looked

3    out a window and saw that snow was falling.  If he later

4    testified in court about what he had seen, his testimony

5    would be direct evidence that snow was falling at the time he

6    saw it happen.  Assume, however, that he looked out a window

7    and saw no snow on the ground and then went to sleep and saw

8    snow on the ground after he woke up.  His testimony about

9    what he had seen would be circumstantial evidence that it

10   snowed while he was asleep.

11          The law says that both direct and circumstantial

12   evidence are acceptable as a means of proving a fact.  The

13   law does not favor one form of evidence over another.  It is

14   for you to decide how much weight to give any particular

15   evidence, whether it is direct or circumstantial.  You are

16   permitted to give equal weight to both.  Circumstantial

17   evidence does not require a greater degree of certainty than

18   direct evidence.  In reaching a verdict in this case, you

19   should consider all of the evidence presented, both direct

20   and circumstantial.

21          One of the questions you were asked when we were

22   selecting this jury was whether the nature of the charges

23   would affect your ability to reach a fair and impartial

24   verdict.  We asked you this question because you must not

25   allow the nature of a charge to affect your verdict.  You

1  must consider only the evidence that has been presented in

2  this case in reaching a fair and impartial verdict.

3        The lawyers in this case sometimes objected when the

4  other side asked a question, made an argument, or offered

5  evidence that the objecting lawyer believed was not proper.

6  You must not hold such objections against the lawyer who made

7  them or the party he represents.  It is the lawyer's

8  responsibility to object to evidence that they believe is not

9  admissible.

10        If, during the course of the trial I sustained an

11  objection to a lawyer's question, you should ignore the

12  question, and you must not speculate as to what the answer

13  would have been.  If, after a witness answered a question, I

14  ruled that the answer should be stricken, you should ignore

15  both the question and the answer, and they should play no

16  part in your deliberations.

17        In determining whether the government has proved the

18  charges against the defendant beyond a reasonable doubt, you

19  must consider the testimony of all of the witnesses who have

20  testified.

21        You are the sole judges of the credibility of the

22  witnesses.  You alone determine whether to believe any

23  witness and the extent to which a witness should be believed.

24  Judging a witness's credibility means evaluating whether the

25  witness has testified truthfully and also whether the witness

1   accurately observed, recalled, and described the matters

2   about which the witness testified.

3        You may consider anything that in your judgment

4   affects the credibility of any witness.  For example, you may

5   consider the demeanor and the behavior of the witness on the

6   witness stand, the witness's manner of testifying, whether

7   the witness impresses you as a truthful person, whether the

8   witness impresses you as having an accurate memory and

9   recollection, whether the witness has any motive for not

10   telling the truth, whether the witness had a full opportunity

11   to observe the matters about which he or she testified,

12   whether the witness has any interest in the outcome of this

13   case, or friendship or hostility toward other people

14   concerned with this case.

15        In evaluating the accuracy of a witness's memory, you

16   may consider the circumstances surrounding the event,

17   including any circumstances that would impair or improve the

18   witness's ability to remember the event, the time that

19   elapsed between the event and any later recollections of the

20   event, and the circumstances under which the witness was

21   asked to recall details of the event.

22        Inconsistencies or discrepancies in the testimony of

23   a witness, or between the testimony of different witnesses,

24   may or may not cause you to discredit such testimony.  Two or

25   more persons witnessing an incident or a transaction may see

1    or hear it differently.  An innocent misrecollection, like a

2    failure of recollection, is not an uncommon experience.  In

3    weighing the effect of the inconsistency or discrepancy,

4    always consider whether it pertains to a matter of important

5    or unimportant detail, and whether the inconsistency or

6    discrepancy results from innocent error or intentional

7    falsehood.

8           You may consider the reasonableness or

9    unreasonableness, the probability or improbability of the

10   testimony of a witness in determining whether to accept it as

11   true and accurate.  You may consider whether the witness has

12   been contradicted or supported by other evidence that you

13   credit.

14          If you believe that any witness has shown him or

15   herself to be biased or prejudiced, for or against either

16   side in this trial, you may consider and determine whether

17   such bias or prejudice has colored the testimony of the

18   witness so as to affect the desire or capability of that

19   witness to tell the truth.

20          You should give the testimony of each witness such

21   weight as in your judgment it is fairly entitled to receive.

22          You have heard testimony from Lorenzo Moore.  The

23   government is permitted to use a witness who testified that

24   he participated in the offense charged against the defendant,

25   although the testimony of such a witness should be considered

with caution.  You should give his testimony as much weight
as in your judgment it deserves.

You have also heard evidence that Lorenzo Moore
entered into a plea agreement with the government in which he
agreed to testify truthfully in this case, and the government
agreed to bring his cooperation to the attention of his
sentencing judge and consider filing papers with his judge
which would permit that judge to impose a more lenient
sentence than that judge might otherwise be able to impose.

The government is permitted to enter into this kind
of plea agreement.  You, in turn, may accept the testimony of
such a witness and convict the defendant on the basis of this
testimony alone if it convinces you of the defendant's guilt
beyond a reasonable doubt.  A witness who has entered into a
plea agreement is under the same obligation to tell the truth
as any other witness.  The plea agreement does not protect
him against a prosecution for perjury or false statement
should he lie under oath.

However, you may consider whether a witness who has
entered into such an agreement has an interest different from
other types of witnesses.  You may consider whether the plea
agreement the witness entered into with the government has
motivated him to testify falsely against the defendant.

The testimony of a witness who has entered into a
plea agreement should be considered with caution.  You should

1    give the testimony as much weight as in your judgment it

2    deserves.

3          A police officer or law enforcement agent's testimony

4    should be evaluated by you just as any other evidence in the

5    case.  In evaluating the officer or agent's credibility, you

6    should use the same guidelines that you apply to the

7    testimony of any witness.  In no event should you give either

8    greater or lesser weight to the testimony of any witness

9    merely because he or she is a police officer or law

10    enforcement agent.

11          Every defendant in a criminal case has an absolute

12    right not to testify.  Orlando Bell has chosen to exercise

13    this right.  You must not hold this decision against him, and

14    it would be improper for you to speculate as to the reason or

15    reasons for his decision.  You must not assume the defendant

16    is guilty because he chose not to testify.

17          Ordinarily, a witness may not testify as to his or

18    her opinions or conclusions.  There is an exception for

19    expert witnesses, who are allowed to give opinions and the

20    reason for them because they have become expert in some art,

21    science, profession, or calling.

22          In this case, Sergeant Alvin Cardinal has testified

23    concerning drug trafficking.  You are not bound by an

24    expert's opinion.  If you found that the opinion is not based

25    on sufficient evidence or experience, that the reasons

supporting the opinion are not sound, or that the opinion is

outweighed by other evidence, you may completely or partially

disregard the opinion.  You should consider this evidence

with all the other evidence in the case and give it as much

weight as you think it fairly deserves.

The law treats prior inconsistent statements

differently depending on the circumstances in which they were

made.  I will now explain how you should evaluate those

statements.

You have heard evidence that Lorenzo Moore made a

statement on an earlier occasion and that this statement may

be inconsistent with his testimony here at trial.  It is for

you to decide whether the witness made such a statement and

whether in fact it was inconsistent with the witness's

testimony here.  If you find such an inconsistency, you may

consider the earlier statement in judging the credibility of

the witness, but you may not consider it as evidence that

what was said in the earlier statement was true.

You have also heard evidence that Lorenzo Moore made

a statement on an earlier occasion and that this statement

may be consistent with his testimony here at trial.  This

earlier statement was brought to your attention to help you

in evaluating the credibility of the witness.  If you find

that the earlier statement is consistent with the witness's

present testimony in court, you may consider this consistency

1    in judging the credibility of the witness here at trial, but

2    you may not use it as proof that what was said in the earlier

3    statement was true.  It is for you to decide whether a

4    witness made a statement on an earlier occasion and whether

5    it was in fact consistent with the witness's in-court

6    testimony here.

7          You have heard evidence that Lorenzo Moore has been

8    convicted of a crime.  You may consider this conviction only

9    in evaluating the credibility of his testimony in this case.

10         Someone's intent ordinarily cannot be proved

11   directly, because there is no way of knowing what a person is

12   actually thinking, but you may infer someone's intent from

13   the surrounding circumstances.  You may consider any

14   statement made or acts done by Orlando Bell and all other

15   facts or circumstances received in evidence that indicate his

16   intent.

17         You may infer, but are not required to infer, that a

18   person intends the natural and probable consequences of acts

19   he intentionally did or did not do.  It is entirely up to

20   you, however, to decide what facts to find from the evidence

21   received during this trial.  You should consider all the

22   circumstances in evidence that you think are relevant in

23   determining whether the government has proved beyond a

24   reasonable doubt that Orlando Bell acted with the necessary

25   state of mind.

 1          Recordings of conversations and intercepted phone

 2     calls identified by witnesses have been received in evidence.

 3     Transcripts of those recorded conversations are being

 4     furnished for your convenience and guidance as you listen to

 5     the tapes to clarify portions of the tape which are difficult

 6     to hear, and to help you identify speakers.  The recordings,

 7     however, are the evidence in the case; the transcripts are

 8     not.  If you notice any difference between the transcripts

 9     and the recordings, you must rely only on the recordings and

10     not the transcripts.  In addition, if you can not determine

11     from the recording that particular words were spoken, you

12     must disregard the transcripts as far as those words are

13     concerned.

14          Each count of the indictment charges a separate

15     offense.  You should, therefore, consider separately each

16     offense and the evidence which applies to it, and you should

17     return separate verdicts as to each count of the indictment

18     unless I specifically instruct you to do otherwise.  The fact

19     that you may find the defendant guilty or not guilty on any

20     one count of the indictment should not influence your verdict

21     with respect to any other count of the indictment for that

22     defendant.  Thus, you may find the defendant guilty or not

23     guilty on any one or more counts of the indictment, and you

24     may return different verdicts as to different counts.  At any

25     time during your deliberations, you may return your verdict

of guilty or not guilty with respect to any count.

The indictment charges that the offenses that occurred in the conspiracy count took place from on or about January 2015 and continued through December 7, 2017.  The indictment charges that the offense of possession with the intent to distribute cocaine base and possession of a firearm during and in relation to a drug trafficking crime, took place on or about March 8, 2017.  The proof need not establish with certainty the exact date of the alleged offenses.  It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

Defendant, Orlando Bell, is charged with conspiracy to distribute and possess with the intent to distribute cocaine base, also known as crack.  It is against the law to agree with someone to commit the crime of distribution and possession with the intent to distribute a controlled substance.

To find the defendant guilty of the crime of conspiracy, you must be convinced that the government has proved each of the following elements beyond a reasonable doubt:

First, that on or about January 2015 through on or about December 7, 2017, an agreement existed between two or more people to distribute and possess with the intent to

1    distribute a controlled substance.  This does not have to be

2    a formal agreement or plan in which everyone involved sat

3    down together and worked out the details.  On the other hand,

4    merely because people get together and talk about common

5    interests or do similar things does not necessarily show that

6    an agreement exists to distribute and to possess with intent

7    to distribute a controlled substance.  It is enough that the

8    government prove beyond a reasonable doubt that there was a

9    common understanding among those who were involved to commit

10   the crime of distribution and possession with intent to

11   distribute a controlled substance.  So the first thing that

12   must be shown is the existence of an agreement.

13        Second, the government must prove that the defendant

14   intentionally joined in that agreement.  It is not necessary

15   to find that they agreed to all of the details of the crime

16   or that they knew the identity of all the other people the

17   government has claimed were participating in the agreement.

18   A person may become a member of the conspiracy even if that

19   person agrees to play only a minor part as long as that

20   person understands the unlawful nature of the plan and

21   voluntarily, knowingly, and intentionally joins in it with

22   the intent to advance or further the unlawful object of the

23   conspiracy.  The government is not required to prove that the

24   objective of the conspiracy was achieved.  Even if the

25   defendant was not part of the agreement at the very start, he

1    can become a member of the conspiracy later if the government

2    proves that they intentionally joined the agreement.

3    Different people may become part of the conspiracy at

4    different times.

5        However, mere presence at the scene of the agreement

6    or of the crime, or merely being with the other participants,

7    does not show that the defendant knowingly joined in the

8    agreement.  Also, unknowingly acting in a way that helps the

9    participants, or merely knowing about the agreement itself,

10   without more, does not make the defendant part of the

11   conspiracy.  So the second thing that must be shown is that

12   the defendant was part of the conspiracy.

13       A conspiracy can be proved indirectly by facts and

14   circumstances which lead to a conclusion that a conspiracy

15   existed.  Nonetheless, the government must prove that such

16   facts and circumstances existed and that they led to that

17   conclusion that a conspiracy existed in this particular case.

18       In determining whether a conspiracy between two or

19   more people existed and whether the defendant was one of its

20   members, you may consider the acts and statements of any

21   other members of the conspiracy as evidence against the

22   defendant, whether done in or out of his presence while the

23   conspiracy existed.  When persons enter into an agreement to

24   commit a crime, they become agents for each other so that

25   everything which is said or done by one of them in

furtherance of that purpose is deemed to be the act or statement of all who have joined in that conspiracy and is evidence against all of the conspirators.  However, statements of any conspirator which are made before its existence or after its termination may be considered as evidence only against the person making the statements.

In summary, a conspiracy is kind of partnership in crime.  For any defendant to be convicted of the crime of conspiracy, the government must prove two things beyond a reasonable doubt:

First, that from in or about January 2015 through December 7, 2017, there was an agreement to distribute and possess with intent to distribute controlled substances; and second, that the defendant intentionally and knowingly joined in that agreement.

The law does not, however, require the government to prove an overt act in furtherance of the conspiracy to convict the defendant of this offense.  To distribute a controlled substance means to, one, distribute a detectable amount of a controlled substance; and two, do so voluntarily and on purpose, not by mistake or accident.

Distribute means to transfer or attempt to transfer to another person.  The government need not prove the defendant received or expected to receive anything of value in return.

1    To possess with the intent to distribute a controlled

2    substance means to possess a detectable amount of controlled

3    substance; two, to do so voluntarily and on purpose and not

4    by mistake or accident; and three, when he did so, he

5    intended to distribute, that is, transfer to another person

6    the controlled substance.  The government need not prove that

7    the defendant received or expected to receive anything of

8    value in return.

9    The law makes cocaine base -- that is, crack

10   cocaine -- a controlled substance.  In order to decide

11   whether the materials were cocaine base, you may consider all

12   evidence that may help you, including exhibits, expert and

13   non-expert testimony, and stipulations of fact.

14   The process in which you are to resolve the charges

15   is as follows:  If you find the defendant guilty of the

16   offense of conspiracy to distribute and possess with intent

17   to distribute a controlled substance as charged in the

18   indictment and you find that cocaine base, crack cocaine, was

19   involved in the conspiracy, you must then determine whether

20   the government proved that the quantity of cocaine base was

21   28 grams or more.

22   In determining quantity, you must determine the total

23   weight of any mixture and substance that contains a

24   detectable amount of cocaine base.  It is the entire weight

25   of the mixture and substance that controls your

1     determination.

2           In making the determination of drug quantities for

3     the defendant, you are instructed that a defendant is

4     responsible for those drugs that he agreed would be

5     distributed and/or possessed with intent to distribute and

6     those drug amounts distributed and/or possessed with intent

7     to distribute by other co-conspirators which the defendant

8     reasonably could have foreseen would be distributed or

9     possessed with the intent to distribute in furtherance of the

10    conspiracy.  In other words, the government is not required

11    to prove that the defendant personally distributed or

12    possessed with the intent to distribute 28 grams or more of

13    cocaine base.  A defendant is responsible for not only his

14    own actions but also for the actions of his co-conspirators

15    if those actions were known or reasonably foreseeable to the

16    defendant.  Thus, for example, you may count for purposes of

17    this element amounts of cocaine base sold by the defendant,

18    and amounts of cocaine base that the defendant could

19    reasonably foresee would be distributed and/or possessed with

20    the intent to distribute and sold by all of his

21    co-conspirators during the course of the conspiracy.  In

22    calculating drug quantities, you may rely on direct as well

23    as circumstantial evidence, and you may rely on the testimony

24    of any witness on this issue.  The government is not required

25    to have seized or physically produced the controlled

1          substances.

2                  You will be asked to complete a verdict form

3          specifying whether the government has proven beyond a

4          reasonable doubt that the defendant conspired to distribute

5          and/or possessed with intent to distribute a certain quantity

6          of cocaine base.  The verdict form also will ask you to

7          decide whether the amount of cocaine base was, one, 28 grams

8          or more of mixtures or substances containing a detectable

9          amount of cocaine base.  Your decision regarding the quantity

10         of cocaine for which the defendant is responsible must be

11         unanimous.  Two, if you're unable to find unanimously that

12         the amount of cocaine base for which the defendant is

13         responsible is 28 grams or more, you should consider whether

14         the drug quantity as to the defendant was less than 28 grams

15         or more of mixtures and substances containing a detectable

16         amount of cocaine base.

17                 Orlando Bell is charged with possession of a

18         controlled substance with intent to distribute.  I am going

19         to instruct you on the charge and also on the lesser included

20         offense of possession of a controlled substance.  After I

21         give you the elements of these crimes, I will tell you in

22         what order that you should consider them.

23                 Defendant Bell is charged with possession of cocaine

24         base with the intent to distribute.  For your deliberations,

25         each count should be considered separately.  However, the

1    elements are identical.  The elements of possession with

2    intent to distribute a controlled substance, each of which

3    the government must prove beyond a reasonable doubt, are

4    that, one, on or about March 8, 2017, the defendant possessed

5    a detectable amount of a controlled substance, in this case,

6    cocaine base or cocaine.  Two, he did so voluntarily and on

7    purpose, not by mistake or accident.  And three, when he did

8    so, he intended to distribute, that is transfer, to another

9    person the controlled substance.

10        The government need not prove that that the defendant

11   received or expected to receive anything of value in return.

12        The law makes cocaine base a controlled substance.

13   In order to decide whether the material was cocaine base, you

14   may consider all evidence that may help you, including

15   exhibits, expert and non-expert testimony, and the parties

16   stipulation of fact.  The government is not required to prove

17   that the defendant knew the precise type of controlled

18   substance that he possessed.  The government must prove

19   beyond a reasonable doubt, however, the defendant knew that

20   he possessed some type of controlled substance.

21        The elements of possession of cocaine base, each of

22   which the government must prove beyond a reasonable doubt,

23   are:  One, on or about March 8, 2017, Orlando Bell possessed

24   a detectable amount of cocaine base.  Two, he did so

25   voluntarily and on purpose, not by mistake or accident.  The

1   law makes cocaine base a controlled substance.  In order to

2   decide whether the material was cocaine base, you may

3   consider all evidence that may help you, including exhibits,

4   expert, and non-expert testimony.

5           Now I'm going to instruct you as to the order in

6   which you should consider these offenses.  You should

7   consider first whether Orlando Bell is guilty of possession

8   of a controlled substance with intent to distribute.  If you

9   find him guilty, do not go on to the other charge of

10  possession.  And if after making all reasonable efforts to

11  reach a verdict on possession of a controlled substance with

12  intent to distribute you are not able to do so, you are

13  allowed to consider the lesser included offense of simple

14  possession of a controlled substance.  This order will be

15  reflected in the verdict form that I will be giving you.

16          The indictment also charges Orlando Bell with

17  carrying a firearm during and in relation to a drug

18  trafficking crime, which is a violation of federal law.

19  Possession of a controlled substance with intent to

20  distribute cocaine base, which is alleged to have occurred on

21  March 8, 2017, is a drug trafficking crime.  In order to find

22  Orlando Bell guilty of this offense, you must find that the

23  government proved each of the following two elements beyond a

24  reasonable doubt:  First, that Orlando Bell committed the

25  crime of possession with the intent to distribute controlled

1    substances in connection with the offense alleged to have

2    occurred on March 8, 2017, as charged in the indictment; and

3    second, that during and in relation to the commission of that

4    crime, Orlando Bell knowingly used or carried a firearm.  The

5    phrase "uses or carries a firearm" means having a firearm or

6    firearms available to assist or aid in the commission of the

7    crime of possession with intent to distribute controlled

8    substances.  "Use" means more than the mere possession of a

9    firearm by a person who commits a crime.  To establish use,

10   the government must show active employment of the firearm.

11   If the defendant did not either disclose or mention the

12   firearm or actively employ it, the defendant did not use the

13   firearm.  "Carry" means the defendant had the firearm on his

14   person or possessed the firearm.  Third, that the defendant

15   Orlando Bell used or carried the firearm during and in

16   relation to the crime of possession with intent to distribute

17   controlled substances.

18         "During and in relation" means that the firearm must

19   have had some purpose or effect with respect to the crime of

20   possession with intent to distribute controlled substances.

21   The firearm must have at least facilitated or had the

22   potential for facilitating possession with the intent to

23   distribute controlled substances.

24         In determining whether Orlando Bell used or carried a

25   firearm in relation to the possession with the intent to

1    distribute controlled substances, you may consider all of the

2    factors received in evidence in the case, including the

3    nature of the underlying crime, possession with intent to

4    distribute controlled substances, how close Orlando Bell was

5    to the firearm in question, the usefulness of the firearm to

6    possession with intent to distribute controlled substances,

7    and the circumstances surrounding the presence of the

8    firearm.

9        The government is not required to show that Orlando

10   Bell actually displayed or fired the weapon.  However, the

11   government must prove beyond a reasonable doubt that the

12   firearm was in Orlando Bell's possession or under his control

13   at the time that the crime of possession with intent to

14   distribute controlled substances was committed and that the

15   firearm facilitated or had the potential of facilitating the

16   possession with the intent to distribute controlled

17   substances.

18       Possession means to have physical possession or to

19   otherwise exercise control over tangible property.  A person

20   may possess property in either of two ways:  First, the

21   person may have physical possession of it by holding it in

22   his or her hand or by carrying it in his or her body or

23   person.  This is called actual possession.  Second, a person

24   may exercise control over property not in his physical

25   possession if that person has both the power and intent at a

1    given time to control the property.  This is called

2    constructive possession.  In addition, the law recognizes the

3    possibility that two or more individuals can jointly have

4    property in their constructive possession.  Two or more

5    persons have property in their joint constructive possession

6    when they each have the power and intent at a given time to

7    control the property.

8         Mere presence near something or mere knowledge of

9    location, however, is not enough to show possession.  To

10   prove possession of cocaine or cocaine base against the

11   defendant in this case, the government must prove beyond a

12   reasonable doubt that he had either actual or constructive

13   possession of one or all of them.

14        The verdict must represent the considered judgment of

15   each juror, and in order to return a verdict, each juror must

16   agree on the verdict.  In other words, your verdict must be

17   unanimous.

18        You'll be provided with a verdict form for your use

19   when you have concluded your deliberations.  The form is not

20   evidence in this case, and nothing in it should be taken to

21   suggest or convey any opinion by me as to what the verdict

22   should be.  Nothing in the form replaces the instructions of

23   law I have already given you, and nothing in it replaces or

24   modifies the instructions about the elements that the

25   government must prove beyond a reasonable doubt.  That form

1      is meant only to assist you in recording your verdict.

2          During the course of this trial, a number of exhibits

3      were admitted in evidence.  Sometimes only those parts of an

4      exhibit that are relevant to your deliberations were

5      admitted.  Where this has occurred, I have required the

6      irrelevant parts of the statement to be blacked out or

7      deleted.  Thus, as you examine the exhibits and you see or

8      hear a statement where there appears to be omissions, you

9      should consider only the portions that were admitted.  You

10     should not guess as to what has been taken out.

11         I will be sending into the jury room with you

12     exhibits that have been admitted into evidence except for the

13     weapons, ammunition, drugs, or other contraband.  You may

14     examine any or all of them as you consider your verdicts.

15     Please keep in mind that exhibits that were only marked for

16     identification but were not admitted into evidence will not

17     be given to you to examine or consider in reaching your

18     verdicts.  You will have the transcript binders with you

19     during deliberations, but you're reminded that the

20     transcripts in the binders are not evidence, they're only an

21     aid to you in listening to the tapes.

22         If you wish to examine the weapons, the ammunition,

23     drugs, or other contraband, please notify the clerk by a

24     written note, and the marshal will bring them to you.  For

25     security purposes, the marshal will remain in the jury room

1    while each of you has the opportunity to examine this

2    evidence.  You should not discuss the evidence or otherwise

3    discuss the case amongst yourselves while the marshal is

4    present in the jury room.  You may ask to examine this

5    evidence as often as you find necessary.

6          When you return to the jury room, you should first

7    select a foreperson to preside over your deliberations and be

8    your spokesperson here in court.  There are no specific rules

9    regarding how you should select the foreperson.  That is up

10   to you.  However, as you go about the task, be mindful of

11   your mission to reach a fair and just verdict based on the

12   evidence.  Consider selecting a foreperson who will be able

13   to facilitate your discussions, who can help you organize the

14   evidence, who will encourage civility and mutual respect

15   among all of you, who will invite each juror to speak up

16   regarding his or her views about the evidence and who will

17   promote a full and fair consideration of that evidence.

18         The question of possible punishment of the defendant

19   in the event of a conviction is not a concern of yours and

20   should not enter into or influence your deliberations in any

21   way.  The duty of imposing sentence in the event of a

22   conviction rests exclusively with me.  Your verdict should be

23   based solely on the evidence in this case, and you should not

24   consider the matter of punishment at all.

25         I would like to remind you that in some cases,

1    although not necessarily this one, there may be reports in

2    the newspaper or on the radio, internet, or television

3    concerning this case.  If there should be such media coverage

4    in this case, you may be tempted to read it, listen to it, or

5    watch it.  You must not read, listen to, or watch such

6    reports because you must decide this case solely on the

7    evidence presented in this courtroom.  If any publicity about

8    this trial inadvertently comes to your attention, do not

9    discuss it with the other jurors or anyone else.  Just let me

10   and my clerk know as soon after it happens as you can, and I

11   will then briefly discuss it with you.

12          As you retire to the jury room to deliberate, I also

13   wish to remind you of an instruction that I gave you at the

14   beginning of the trial.  During deliberations, you may not

15   communicate with anyone not on the jury about this case.

16   This includes any electronic communications such as an e-mail

17   or text or blogging about the case.  In addition, you may not

18   conduct any independent investigation during deliberations.

19   This means you may not conduct any research in person or

20   electronically via the internet or in any other way.

21          If it becomes necessary during your deliberations to

22   communicate with me, you may send a note by way of the

23   marshal signed by your foreperson or by any one or more

24   members of the jury.  No member of the jury should try to

25   communicate with me except by such a signed note.  And I will

1    never communicate with any member of the jury on any matter

2    concerning the merits of this case except in writing or

3    orally here in open court.

4         Bear in mind, also, that you are never under any

5    circumstances to reveal to any person -- not the clerk, the

6    marshal or me -- how jurors are voting until after you have

7    reached a unanimous verdict.  This means that you should

8    never tell me in writing or in open court how the jury is

9    divided on any matter; for example 6/6 or 7/5 or 11/1 or in

10   any other fashion whether the vote is for conviction or

11   acquittal or on any other issue in this case.

12        With that, we will begin closing statements.

13        Mr. Mohanty.

14        MR. MOHANTY:  Thank you, Your Honor.

15        May it please the Court, counsel, Mr. Bell, ladies

16   and gentlemen of the jury, good morning.

17        Ladies and gentlemen, very simply, on March 8, 2017,

18   after Mr. Bell called Mr. Holroyd and said he wanted to --

19   after Agent Bullington saw what he thought was a meeting

20   between those two men, Park Police officers stopped Mr. Bell

21   in his car.  Mr. Bell was the only one in the car.  And in

22   his pocket, they found Government Exhibit 222, a loaded

23   .25 caliber handgun.  In his back pocket, along with an extra

24   magazine, extra ammunition, they found Government

25   Exhibit 223, over $400 in cash.  They found eight cellphones

1    in the car, one of which was the cellphone that Mr. Bell had

2    used to call Mr. Holroyd.

3          Back at the station, as you heard from the police

4    officers -- Officer Keness, Officer LaGrossa -- from his

5    body, they found Government Exhibit 221, two eight balls of

6    crack cocaine.

7          Ladies and gentlemen, we have proven to you beyond a

8    reasonable doubt that the defendant is guilty.  He is guilty

9    of each and every count in the indictment.  He is guilty of

10   conspiracy, conspiracy to distribute and possess with intent

11   to distribute cocaine, in particular, 28 grams or more of

12   crack cocaine.  He is guilty of possession with intent to

13   distribute that crack cocaine, and he is guilty of carrying a

14   firearm in furtherance of that crime.

15         Now, you will know he is guilty when you consider all

16   of the evidence in this case, you follow the instructions

17   that Judge McFadden gave to you, and you use your common

18   sense in evaluating that evidence.

19         I'm going to go through the instructions that Judge

20   McFadden just gave you in a shorthand fashion, but please

21   make sure you follow the Judge's instructions.

22         I'm going to start with the firearms count and work

23   backwards.  To prove he is guilty of a firearms charge, all

24   we need to show is that he possessed the firearm and that he

25   did so in furtherance of the drug trafficking crime, in

1    particular, possession with intent to distribute crack

2    cocaine on March 8, 2017.  That's it.  And there is no

3    question that he possessed it, right?  It's in his front

4    pocket.  You heard that from Officer Keness.  And in his back

5    pocket, he had extra ammunition, and he had money, and on him

6    he had the drugs.

7         Now, it's pretty commonsensical, but you heard it

8    directly from Sergeant Cardinal:  Why would a drug dealer

9    carry a gun?  To protect the drugs, to protect the money.  It

10   is that simple.

11        Now, Mr. Davis says, you know, it is a small gun, and

12   I suppose that's right.  I suppose that Government

13   Exhibit 22, this .25 caliber handgun is a small gun.  It is

14   smaller than the one he had on December 7, 2017, when he got

15   arrested.  Isn't that the point?  He wanted a small gun that

16   he could easily conceal in his pocket, right?  And he wanted

17   a gun -- certainly a .25 caliber gun would do the job -- of

18   protecting his drugs, protecting his money.

19        He had a permit for it, Mr. Davis says.  And that's

20   true.  He had a permit to carry a gun in Virginia.  He didn't

21   have a permit to carry a gun in D.C.  And no one has a permit

22   to carry a gun in furtherance of drug trafficking.  You know

23   that.

24        Now, the second charge, the possession with the

25   intent to distribute crack cocaine, again that relates to the

1    March 8th offense.  Again, there is no question that he

2    possessed it, right?  You know where these drugs were found,

3    right?  Back at the station, right off of his body.

4            There is no question that it is crack cocaine.  The

5    stipulation that you heard Mr. Rosenberg read makes that

6    clear.  This is crack cocaine.  He possessed it.

7            The only question is did he intend to distribute it.

8    That's the only question.  And there is no doubt that he did

9    that.  To show that, let's start with the defendant's own

10   words.

11           Government Exhibit 201 are the text messages from the

12   cellphone that he had when he was arrested on December 7,

13   2017.  Now, we haven't looked at these in close detail, but

14   we will in a moment.  But when you're looking at this exhibit

15   back in the jury room, I want you to remember something:  The

16   incoming messages from people sending text messages to him,

17   unless those were from Lorenzo Moore who took the witness

18   stand and told you what he meant in those text messages, the

19   other text messages, the incoming ones, are just there to

20   show you context for what the defendant himself said in

21   response to help you explain what he meant.

22           So let's take a look at that first one, line 70, a

23   message sent on October 27th, 2017 by the defendant.

24   Outgoing.  "I heard you wear the wire."  In response, "Stop

25   texting my phone."  Ladies and gentlemen, I prefer not to

1    curse in open court, but you can read.  "F'in' snitch.  Can't

2    wait till your B ass is gone.  Stop snitching."

3           Does anybody need me to explain that that means?

4    Does anybody need me to tell you what wearing a wire means?

5    If you have forgotten, remember what Detective Quigley told

6    you, what she wears when she does controlled purchases.

7           This is line 80.  A call, a text message exchange on

8    10/28/2017.  The incoming message reads, "Yo, I'm going to

9    need another one."  Mr. Bell responds with basically

10   gibberish.

11          The next message, again the incoming call, "One of

12   them bags was all F'in' powder with a few chunks.  I told you

13   I didn't want that" blank.  "Gotta get a new bag.  You can

14   keep those.  Weight is the same.  Gotta make this right."

15          What does Mr. Bell say in response?  "I'll straight

16   it out, but you got to straight me out too.  Straight me out.

17   I'll throw you one for free."

18          Next message, line 58.  "I'mma handle mine.  But that

19   joint was for the" blank.  "She ain't taking it plus it don't

20   weigh no 2 grams.  Gotta fix this bro."

21          Mr. Bell says, "That's the right weight, I checked

22   it.  That's for sure."

23          Again, it's pretty obvious what they're talking

24   about, right?  Pretty obvious what his intent is with the

25   drugs that he has.

1              Line 102, on October 29, 2017, Mr. Bell says,

2    "Everything I gave you was real but you fake out a whole jig

3    on me.  I think you taking me for a" blank.

4              There's an incoming message.  "Orlando, give me a

5    call.  I need you."

6              Any doubt that that's his phone?

7              Another incoming message.  "Yo, I'mma need another.

8    They got 250."  It goes on.  "The little ones aren't halfs."

9    Again, clearly, they're talking about drugs, right?

10             Mr. Bell, "I found 20 on the ground.  So check for

11   the other 20."

12             Mr. Bell, on November 1, 2017, a message to Lorenzo

13   Moore, who told you that was his phone number, 607-8289,

14   "They ain't like this one."  And Mr. Moore said, "I got that

15   one from Foots."  Again, that's the nickname for Wayne

16   Holroyd.  "I should be straight today."

17             Mr. Bell apparently wasn't happy with the quality.

18   "I only get two at most from Foots.  Usually one."

19             Mr. Moore:  "Didn't know.  I won't get any more from

20   him.  If I don't get it, I'll just tell you."

21             Government Exhibit 200, this is the screen shot that

22   was on that phone that Mr. Bell had in his possession, the

23   same phone number that he used to call Mr. Holroyd.  Again,

24   this is just a screen shoot of the text that you saw earlier.

25   But it is clear that they're talking about dealing,

1    trafficking crack cocaine.  You would know that using your

2    common sense if I showed this to you out on the street

3    without any court reporters around, without the judge around.

4    Everybody would know that.

5         So what else?  What else shows his intent?

6         Remember what Sergeant Cardinal told you.  Remember,

7    he has had 12 years, 12 years investigating narcotics cases.

8    What did he tell you?  An eight ball is about 3 and a half

9    grams crack cocaine.  You can buy one in D.C. for about $150.

10   You can break it down into dime bags, and the profit you

11   would get would be about $550.  So those two eight balls that

12   he had on March 8, that is $1,100 in profit sitting on his

13   back.  That shows you his intent.

14        Remember I asked Mr. Cardinal, I asked Sergeant

15   Cardinal, "Where would a drug dealer hide his drugs?"  He got

16   pretty graphic about it.  I'm going to keep it PG.  What he

17   said, the way I would say it to my children is:  They would

18   keep them in their private areas.

19        Where did they find the drugs?  Again, you heard

20   Officer LaGrossa testify.  Where did they find these drugs?

21   Just where a drug dealer would keep them.

22        What else?  You heard just today from Detective

23   O'Neal from Prince William County.  He told you how they had

24   an informant, in his words, a snitch, wear a wire and buy

25   drugs from him twice in Prince William County.  Excuse me.

1      In Manassas, Virginia.  That shows his intent.

2            There is more evidence, right?  And that evidence

3      starts to spill over into the conspiracy count.  As the Judge

4      instructed you, a conspiracy is simply an agreement, an

5      agreement to commit a crime.  It doesn't have to be a formal

6      written document.  It doesn't even have to be an oral

7      agreement where people sit down and discuss it fully.  All it

8      is is a common understanding to take action for a common

9      purpose.  Here the common purpose is simple, to sell drugs to

10     make money.

11           How does it work?  Mr. Holroyd makes money when he

12     sells it to Mr. Bell.  So does Mr. Moore.  Mr. Bell makes

13     money when he sells the drugs to people in Manassas,

14     Virginia.  It is that simple.

15           What else do they do?  They look out for each other.

16     You heard Mr. Moore tell you, after Mr. Bell got arrested,

17     after he got released on bond, he called Mr. Moore, and he

18     said, "I got picked up.  You should get rid of your phone."

19     And that's just what Mr. Moore did.  That shows a conspiracy.

20           Now, as you can guess, a conspiracy usually is a

21     secret agreement.  Right?  Not many conspiracies are done out

22     in the open, not many successful conspiracies.  Because of

23     that, we brought Lorenzo Moore into the courtroom.  Somebody

24     with inside information who is part of the conspiracy or

25     knows about it and can tell you what those calls meant, can

tell you that his name in that phone was listed as JoJo.  And

what did he tell you?  He told you that he sold crack cocaine

in what he called $100 blocks to the defendant.  He said a

hundred block is about 3 grams of crack cocaine.  And he

said, I sold him 5 or 10 $100 blocks about 20 times.  So you

can see it is real easy to get to an agreement that makes him

responsible for more than 28 grams of crack cocaine just on

Mr. Moore's testimony.

Now, the Judge instructed you that you should treat

Mr. Moore's testimony carefully, and you should.  You should.

Because he has an interest in this case.  No apology about

that.  But you saw him testify.  Did he seem evasive to you?

Did he admit I think on the very first question from

Mr. Rosenberg I'm a drug dealer?  Not only that, he told you

how to make crack.  Right?  You mix the baking soda, you mix

it with the powder cocaine, a little water, you microwave it

for 30 seconds.  And he told you what he did.  He didn't

minimize.

Remember, he pled guilty to a sentence which is

punishable by life imprisonment.  I'm not going to sentence

Mr. Moore.  Mr. Rosenberg isn't going to sentence Mr. Moore.

Judge McFadden will.  And when he was on that witness stand

in front of the Judge that will sentence him, did he minimize

what he did?  No.  In fact, he made it very clear.  He's the

one that sold those drugs to the defendant, so the defendant

1    could resell them.

2         Now, finally, the wiretap, ladies and gentlemen.  And

3    I'm going to be frank about this.  When we played the calls

4    for you, it was extremely difficult to hear, right?  It was

5    really hard to hear through the PA system.  There is a quick

6    fix to that.  When you go back to the jury room, you'll have

7    a clean computer, you will have a disk with the calls, and

8    you can play the calls for yourselves with those speakers.  I

9    hope that will be a lot easier for you to understand.

10        And when you do that, this is what you'll see:

11   Government Exhibit 2, a call on January 8th.  And I will be

12   clear with you about this.  There are a lot of calls, but

13   that doesn't necessarily mean there's a lot of deals because

14   a lot of the calls are just them trying to get together,

15   Mr. Holroyd and Mr. Bell.  Where are you?  What color car are

16   you in?  So focus on the deals, not the number of calls.

17   Government Exhibit 2, a call on January 8th, the defendant

18   tells Mr. Holroyd he wants to see him about one of those

19   things.

20        Government Exhibit 6, call on January 30, 2017.

21   Defendant asked for pretty much the same as last time, one.

22        Government Exhibit 10, a call on March 8th.

23   Defendant says, two, all right?  Again, that's the day that

24   he gets stopped and they get those two eight balls from him.

25        Government Exhibit 13, a call on March 19th.  The

1      defendant says, the same thing as last time.  He says he

2      doesn't want to talk too much on the phone.  Mr. Holroyd

3      confirms that he wants two.

4              Government Exhibit 15, a call on March 24th.  The

5      defendant says, same old thing.

6              Government Exhibit 17, call on April 1.  The

7      defendant says, same old, same old.

8              Remember that an eight ball is 3.5 grams.  By my

9      math, those calls alone show that the defendant was agreeing

10     to get 10 eight balls of crack cocaine from Mr. Holroyd.  He

11     got two on March 8th, two on March 19th, two on March 24th,

12     two on April 1.  And on the other calls in January, he got 1.

13     10 times 3.5, 35 grams.  Real easy to get above 28 just on

14     what he did alone.

15             Again, remember, they all made money.  That's their

16     partnership in crime, making money off of selling that crack

17     cocaine.

18             Now, ladies and gentlemen, Mr. Rosenberg and I are

19     not going to ask you to believe that Mr. Bell is the largest

20     drug dealer in the city.  We're not going to ask you to

21     believe that he is the most notorious drug dealer in the

22     city.  That's not what we're here to say.  We're here to ask

23     on behalf of the United States simply this:  You follow the

24     law as Judge McFadden has instructed you.  You use your

25     common sense to evaluate that evidence.  And we simply ask

1     that you hold him responsible for what he did.

2          Thank you.

3          THE COURT:  Thank you, Mr. Mohanty.

4          Why don't we take our lunch break now.

5          Ladies and gentlemen, the case is almost to you but

6     not quite.  So the same instructions we have discussed before

7     remain.  Please come back at 1:45, and we will conclude with

8     the arguments of counsel, and then you will get the case to

9     deliberate on.

10          So see you at 1:45.

11          Thank you.

12          (Jury not present)

13          THE COURT:  You all might have seen there were a

14     couple of places in there where heroin was still in the

15     instructions that I just read past.  So we'll take that out

16     for the copies that go back to the jury.

17          Anything before we break for lunch?

18          All right.  See you folks at 1:45.

19          (Luncheon recess taken)

20

21

22

23

24

25

1    AFTERNOON SESSION

2         (1:50 p.m.)

3         (Jury present)

4         THE COURT:  Welcome back, ladies and gentlemen.  You

5    may be seated.

6         We're ready to hear from the defense.

7         Mr. Davis.

8         MR. DAVIS:  Thank you, Your Honor.  Counsel.  Good

9    afternoon, ladies and gentlemen.

10        Thank you for being patient.  We tried to move the

11   case in an efficient manner.  You were spared a number of

12   chemists' testifying that they performed tests on substances.

13   We just like to kind of move things along.

14        Before I start, though, I would like to just touch on

15   a couple of things that Mr. Mohanty was referring to.

16        First of all, in Virginia, you are allowed to carry a

17   weapon if you have a permit.  It is called a concealed weapon

18   permit.  The gun on March 8th of 2017 that was on Mr. Bell,

19   Mr. Bell had a gun on him when he was arrested in December of

20   2017 in Virginia.  Now, we may not all agree with the laws in

21   different states, but those are the laws, and he carried a

22   gun, as many do in Virginia.  He may not be as sophisticated

23   or as clever as some others because apparently he didn't

24   realize that he couldn't carry it in the District of

25   Columbia, but that doesn't add anything to the proof of

1    whether he was using that weapon during and in relation to a

2    narcotics offense.

3         The text messages, the text messages were coming from

4    a number of people.  If you look at those closely, you're

5    going to realize that you don't even know who the other

6    people are on the other end.  The only person that you know

7    is on the other end for certain is JoJo.  And the only one

8    that told you he was JoJo was Mr. Moore, which we submit is

9    not a credible witness.  So you don't even know who is on the

10   other end.  More importantly, you don't know who is on the

11   outgoing end.  You didn't hear any testimony that Mr. Bell

12   was sending these text messages out.  You just didn't hear

13   it.

14        Now, Mr. Mohanty referred to a "Mr. Bell responds,"

15   but you didn't hear that.  You didn't hear that.

16        And if you actually listen -- you don't have to, but

17   it is in evidence -- if you actually listen to Mr. Moore's

18   interview when the FBI picked him up in January of 2018, he

19   points out that, well, you've got those text messages, but,

20   you know, you don't know who did them.  And that's true.  You

21   don't know who did them.  You have to take that extra leap,

22   and you have to assume it is someone, but you have no

23   evidence of it.  Much less on the other end.

24        There is a reference to "Orlando" in those text

25   messages.  There is one reference to "Orlando," and that one

1    reference to "Orlando" is non-drug-related.  It was from some

2    lady, and it was non-drug-related.

3          The government has a burden here, they have the

4    burden of proof.  The defense has no obligation to present

5    one shred of evidence.  They bring a case.  It is their

6    burden to establish each and every fact beyond a reasonable

7    doubt.  And that is a very heavy burden.  And for that

8    reason, after I sit down, the government is going to stand

9    back up -- probably Mr. Mohanty or perhaps Mr. Rosenberg --

10   and they're going to be able to address everything that I'm

11   talking to you about now, and the reason they get to do that

12   is because they have that burden, and it balances things a

13   little, but I can't get back up and respond, so I ask all of

14   you to please respond for me.

15         The charges in this case, Mr. Bell is charged with

16   being involved in a conspiracy to distribute and possess with

17   intent to distribute cocaine base greater than or equal to 28

18   grams.  Well, when we tell you that it is greater than or

19   equal to 28 grams, everybody knows that is a trip switch for

20   some purpose, because you have to find beyond a reasonable

21   doubt that he, one, was engaged in a conspiracy; and two,

22   that the quantity of drugs that he is to be held accountable

23   for -- and I'm not sidetracking the government's *Pinkerton*

24   theory about how he is responsible for others' actions that

25   are reasonably foreseeable to him -- but that trip switch has

1    to be met for him.  This is important when you look at the

2    evidence in this case.

3          So what do we have here for a conspiracy?  Does

4    conspiracy mean, if someone sells me drugs, I'm a member of a

5    conspiracy?  No.  That isn't what it is.  Otherwise,

6    everybody who bought drugs from somebody would be a member of

7    a conspiracy.  So you really have to keep this

8    partnership-in-crime business in perspective.

9          Lorenzo Moore, Steven Anderson, Crevonte Johnson.

10   Remember Crevonte Johnson when Mr. Holroyd was selling ounces

11   of crack cocaine to Detective Quigley?  These are guys from

12   the area.  These are guys from the area where this case

13   evolved.  And as the FBI agent, the case agent told you, the

14   reason this case came about is there were murders in the

15   area.  That is how all drug cases end up in federal court.

16   Look at this.  We don't have tractor trailers full of

17   cocaine.  We don't have crates on ships being shipped up from

18   South America.  We don't have submarines being pulled behind

19   boats here.  We have got nickel and dime crack.  It comes

20   here because there were homicides, unsolved homicides.  You

21   bring them into federal court, and you convict them on the

22   drugs or you convict them on the murder, but in the end it

23   doesn't matter.  That's why they bring them into federal

24   court, and that's why we're here.

25          MR. MOHANTY:  Objection.

1        THE COURT:  Sustained.

2        Move on, Mr. Davis.

3        MR. DAVIS:  Lorenzo Moore, Steven Anderson, Wayne

4   Holroyd, Crevonte Johnson.  They share customers.  They share

5   sources.  They sell together.  Crevonte Johnson is with

6   Holroyd.  Holroyd is with Steven Anderson on occasion.  They

7   have been selling drugs for decades.  The testimony was

8   Mr. Holroyd has been selling them for 25 years.  Mr. Moore

9   told you that he has been selling them for nine years.  And

10  if you look at -- if you reflect back on the testimony, nine

11  years takes him back to about when he got out of jail for his

12  parole violation.  So when the United States talks about how

13  he came in, how truthful and honest he was, when we get going

14  here, I would like you to realize that all the truthful and

15  honest stuff he told you, he didn't get charged with.  He

16  didn't get charged with any of it.  Mr. Moore is a pretty

17  clever man.

18        And if you watch this video at the conclusion, you

19  will see just how clever he is.  They cooked together, they

20  cooked cocaine into crack together.  Search warrants were

21  executed at their houses.  When they executed search warrants

22  at their houses, they find packaging material, they find

23  tally sheets, scales, they find implements of a narcotics

24  distribution for all of them.  Of course, they're in a

25  conspiracy.  It is very clear.  We haven't even finished the

563

1    list, and you already know that they're in a conspiracy

2    together.

3         And the wire affidavits, according to the case agent,

4    all of those individuals are mentioned by name.  What about

5    Mr. Bell?  He is not even in there.  As a matter of fact, the

6    investigation is going on for over a year, and Mr. Bell isn't

7    even a known presence until March 8th of 2017.  The

8    investigation had been going on for well over a year.

9         All those men that I was talking about a few moments

10   ago, that's their workplace, that's where they work.  They

11   don't have jobs.  That's where they work, in that area.

12        Mr. Bell doesn't work in that area.  He's not a part

13   of this group.  And there is no evidence to put him in as a

14   part of this group.  There is no evidence that he's involved

15   in a partnership of crime with anyone.

16        Customers.  Look at the quantities we're talking

17   about as far as Mr. Bell is concerned.  6 grams of crack

18   cocaine is alleged to have been recovered from him on

19   March 8th of 2017.  If you look at the calls and if you

20   assume -- which you have to, because there is no

21   surveillance, there is no anything to back up -- the next

22   time he talks to Mr. Holroyd on the phone, which I think was

23   March 19th, that's about 11 days.  6 grams is a half a gram a

24   day over that 11-day period before he goes back.  What

25   evidence do you have before you that that man was

1    distributing?  First of all, if you accept the fact that he

2    possessed it, what evidence do you have that he was selling

3    it?  And there is none.  There is absolutely none.

4         In Virginia, which is really interesting, Virginia,

5    you got less than 2 grams of crack cocaine.  Ladies and

6    gentlemen, this could go up in smoke in 5 minutes.  What's

7    going on here?  Did you even -- now, I want to put this into

8    perspective.  I could have subpoenaed that informant as

9    easily as the government could have brought him in, the one

10   that purchased this, the one that you didn't hear from from

11   the witness stand.  But I ask you:  Who has the burden of

12   proof here?

13        What about this man?  What do we know about him?  We

14   know nothing.  Absolutely nothing.  You don't even know why

15   he was doing this.

16        You heard he was searched.  Was he searched?  How

17   well was he searched?  Who searched him?  Was he in the sight

18   of this detective from the county?  No.  Was there any

19   evidence that this was obtained from the men who were

20   involved in a conspiracy here?  Is there any evidence of

21   that?  Is there any evidence that he handled this?

22        Now, you don't always have to have fingerprints and

23   DNA.  But you know, when you don't have the person that

24   bought it and they're saying that he got it from someone and

25   you don't have it happening in front of anyone, perhaps you

1    might want some forensic evidence to establish that.  And

2    it's plastic.  And there's several little packs, which means

3    each little pack would hold a print.  You can't get the rock

4    in there without touching it.

5         We submit to you that that is a half case in

6    Virginia.  Number one, he was never charged in Virginia.

7    Number two, he wasn't charged with substantive acts of that

8    here.  Well, he couldn't -- strike that.  He wasn't charged

9    in Virginia for that.  We don't even know why.  We know

10   nothing about the person that engaged in the transaction with

11   him.  The tapes are almost useless.  I guess you

12   could -- they could be interpreted in two or three different

13   ways, but they don't really add much to what's going on here.

14   But the big point is:  Where did it come from?

15        Without proof of packaging, without proof of

16   redistributing during the time period -- and keep in mind,

17   we're talking January, February, and March -- without

18   evidence that he was engaged in distributing, how does he get

19   found guilty of conspiracy to possess with intent to

20   distribute much less that he is not a part of that group,

21   much less that it doesn't add up to 28 grams.

22        And the United States told you that you can listen to

23   the calls and you can add it up.  You can.  But how do you

24   know that that is what happened?  That's a pretty big leap.

25   And that's where the proof beyond a reasonable doubt comes

1    in.  If there is any question in your mind how serious this

2    is, look it, I mean this is a scary place to be now, it is

3    serious.  The United States takes it seriously, and I can

4    guarantee you that we take it serious over here.

5         There's nothing to indicate that he had an agreement

6    with these men.  He's not a part of them.  He's not tied up

7    with them.  There is absolutely nothing to establish that

8    anything was foreseeable from his perspective as to what

9    these men were doing.  How would he know?  What evidence were

10   you presented that he had inside information on what these

11   men were doing?  He is not even a part of the neighborhood.

12   There is absolutely nothing to establish that he knew

13   anything of what they were doing.

14        There are no scales at Mr. Bell's house.  And the

15   bigger question is:  Why did no one even bother to search his

16   house?  Think about it.  On both occasions.  I mean he is

17   pulled over in March, and then he is arrested in December.

18   Why didn't anybody even bother to get a search warrant?

19        I think Mr. Moore -- one of the things we would agree

20   must be accurate is that he was a non-issue here when he got

21   arrested.  If you listen to the tape of his interview -- and

22   it is long -- but if you listen to it, he doesn't mention

23   Bell.  He pleads guilty 5 months later.  His plea agreement

24   doesn't mention Bell.  You know when he starts mentioning

25   Bell?  A month ago, maybe two.  After everybody is out of the

1    picture or close to when everyone is out of the picture,

2    that's when he starts mentioning Bell.  Recall?  "I seen him

3    once or twice.  That's what I told him."  Then when

4    Mr. Holroyd got out of the picture, then all the other stuff

5    comes up.  And does he have an interest?  We think so.

6    Anyone would.

7         Again, just because he bought a usable amount of

8    drugs from Mr. Holroyd on March 8th, it does not ipso facto

9    mean that he is conspiring with these men in a partnership in

10   crime.  He is not in a partnership of crime with anyone.  And

11   they haven't proved it, and they couldn't prove it because he

12   isn't.

13        The March 8th stop.  If you credit the testimony of

14   the Park Police, he had 6.2 grams of crack on him.  Again,

15   between March 8th and March 19th, 11 days, if he used a half

16   a gram a day, that would have exhausted that 6 grams.  And

17   that is the only amount of drugs that came up during those

18   three months when they were monitoring those calls.  And you

19   just don't know.  You have to assume that he did other

20   things.  You have to assume it.  That's the one time that

21   surveillance was utilized as far as Mr. Bell was concerned.

22        Are you beginning to get the picture about Mr. Bell

23   as he fits into this case?  He is a non-entity.  He is not a

24   target.  He shouldn't be here.  He is collateral damage.  He

25   shouldn't be here.

1          The evidence of that 6 grams, based on this evidence,

2     it is equally likely that he used it or sold it.  There is

3     nothing else to indicate what happened to that 6.2 grams

4     between March 8th and March 19th.  There is no evidence.  You

5     have to assume that he did it.  There is no evidence that he

6     sold it or that he intended to distribute it.

7          And there is a separate charge on this, too.  There

8     is a separate charge called possession with intent to

9     distribute independent of the narcotics conspiracy, which we

10    submit wasn't in existence.  But separate and distinct from

11    that, he is charged with possession with intent to distribute

12    that 6.2 grams.  Again, it is just as likely, based on this

13    evidence, that it could have been for personal use or intent

14    to distribute.  And the man is entitled to the benefit of the

15    doubt.  And the reason that he is entitled to the benefit of

16    the doubt is because they carry the burden.

17         The expert was fun.  I didn't even ask him any

18    questions.  They're very slick.  They're very articulate.  I

19    mean, they're just smooth.  That's what they do.  They rotate

20    from courtroom to courtroom, they come in.  They're

21    experienced narcotics detectives, but he really didn't have

22    anything to add here.  I mean, if you believe that street

23    dealers cram drugs up their body cavity, all of them, there

24    has to be something missing there.  So take his testimony and

25    take what he has to say and do what you want with it, but we

1    submit he added nothing to proof about this man being in

2    possession with intent to distribute those drugs.  He had no

3    scales.  He had no large amounts of money.  He had no

4    packaging materials.  He had no tally sheets.  He had no

5    customers.  You have to guess.  And we submit that that is

6    just not what you want to do here.  No baggies, tally sheets.

7    He had two rocks, two rocks on March 8th.

8         There's talk about the cellphones that were in the

9    car, several cellphones.  Well, they have the cellphones.  I

10   didn't hear testimony that every one of them was an iPhone.

11   I thought the FBI cracked the iPhones anyways.  I thought

12   they paid the Israelis $3 million and they figured it out.

13   Maybe they didn't.  That's not before you.  It just doesn't

14   matter.  But all of them, you heard no testimony that they

15   were all iPhones and they couldn't get into them.  So they

16   had these phones.  All right.  He is a drug dealer.  He has

17   got a lot of phones.  Well, you got them.  Did you look at

18   them?  What shows that he is a drug dealer?  It's a red

19   herring.

20        There is no intent to distribute for that March 8,

21   2017 offense.  The evidence isn't there.  You have to create

22   it in your mind in order to convict him of that, and we

23   submit that that is not what we're supposed to do here.

24        Assuming that he isn't in possession with intent to

25   distribute, the Court is going to instruct you that you have

1   to go to the lesser included offense, which is simple

2   possession of crack cocaine, and we're talking about the 6.2

3   grams.  And if he doesn't have an intent to distribute, if

4   they didn't present the evidence that he intended to

5   distribute it, then you move on to the next question of

6   whether he simply possessed it.

7          The 924(c) count.  I'm going to move off of the

8   simple possession.  You have to find that he was actually in

9   possession of it.  But if you find he is actually in

10  possession of it and you find that they didn't present any

11  evidence or have any evidence to show that on March 8th he

12  had a specific intent to distribute that 6.2 grams, you go to

13  possession.  You decide that count.  And now you move on to

14  the third count in the case, and that is what we call the

15  924(c) count.  That is using and carrying a gun during a drug

16  trafficking offense.  Well, if he is guilty of simple

17  possession, he is not guilty of a drug trafficking offense,

18  so you can check that count off.  That crack that they claim

19  he had on him on March 8th has to be possessed with intent to

20  distribute for you to be able to go to the count that charges

21  him with carrying a gun during a drug trafficking offense.

22  Because simple possession is not a drug trafficking offense,

23  and His Honor has already instructed you on that.

24         And the fact that he has the gun -- you'll have the

25  jury instructions back there -- the fact that he has it, use

1    means more than mere possession.  As the defendant did not

2    even disclose or mention the firearm, you have no evidence

3    that this firearm was used or disclosed.  Or actively employ

4    it?  The defendant did not use the firearm.  That firearm was

5    not used in relation to a drug trafficking offense.

6           And look at this firearm.  I mean he had to be an

7    idiot to have used this in a drug trafficking offense with

8    these guys because you heard from Mr. Moore, who worked the

9    area for nine years, the area with the homicides, what has he

10   got in his house?  He has a weapon that holds 35 rounds;

11   bang, bang, bang 35 times.  How long do you think he would

12   make out if that is what the purpose of this was?  How long

13   do you think he would last down in that neighborhood?

14          Mr. Bell was collateral damage here.  They have to

15   try him, because the allegations are that he had 6.2 grams of

16   crack cocaine on him, and he was picked up on a wire.  They

17   can't let him go.

18          So why is he here?  Why is he sitting before you here

19   today?

20          They're all kinds of reasons.  There is no evidence,

21   but there's all kinds of conclusions you can draw.  Maybe he

22   has nothing to trade.  Maybe he is not a hustler like these

23   guys.

24          And really, you'll find Mr. Moore's video

25   entertaining if you want to watch it.  He is playing the

1      agents.  I mean, he is really good.

2           Maybe he's slow.  Maybe he's just not very fast.

3      Maybe when he gets pulled over in D.C., he whips out his

4      Virginia carry permit.  Maybe he is just not that bright.  Or

5      maybe he feels so violated and humiliated that he can't let

6      it go.  Ever think about that?  Maybe combine the two; that

7      maybe he is not that fast and he feels so violated and

8      humiliated by what happened here.  And look at it from his

9      perspective.  What do you think he thinks is going on here?

10     He probably thinks I got arrested on March 8th by the Park

11     Police with a gun and crack.  All this other stuff, he is not

12     gathering this.  That's what he is thinking.

13          Let's take a look at Lorenzo Moore for a second.

14     Lorenzo Moore is "Let's make a deal."  Granted, he got up

15     there and said he was selling drugs for nine years, ounces,

16     had a gun with a magazine with 35 rounds in it, and this is

17     what he does for a living.  He's down in that area.  He's

18     working with Holroyd.  He knows them all.

19          So what does he have here?  Well, he's pleading

20     guilty to using and carrying a firearm during a drug

21     trafficking offense.  So what does that look like?  Well,

22     that means he has got a minimum of 5 years he has to do on

23     that but a maximum of life.  So that's where he is starting.

24     Then, there's something called the sentencing guidelines in

25     here.  And what did he sign off on?  He signed off his

1    expectation is he is starting at 60 months.  He is starting

2    at 60 months, that's his expectation.  Then he's cooperating,

3    he is trying to bring it down.

4            How do you feel about that based on what we know

5    here, what's going on?  How would you like to be sitting at

6    that table?

7            MR. MOHANTY:  Objection.

8            THE COURT:  Sustained.

9            MR. DAVIS:  I will withdraw that.

10           Think about it from his perspective, what you know

11   about him and the way he thinks.  You must have been able to

12   form some conclusions after taking all this in over the past

13   couple of days.

14           And there is no mention of Mr. Bell in here.  And he

15   didn't even plead guilty until May 23rd -- 22nd or 23rd,

16   about four months afterwards.  And Mr. Bell is not even

17   mentioned because there are bigger fish to fry, the real guys

18   in the conspiracy.  There's Mr. Holroyd and the other people.

19   So Mr. Moore is focused on them.  Remember he told you that?

20   The government may stand up and say, well, you know,

21   Mr. Davis wants you to pick and choose what he is telling the

22   truth on and what he is not telling the truth on.  But that's

23   just a fact.  Because Mr. Holroyd was in here until recently.

24   When he went out, that's when Mr. Bell went from, I've seen

25   him once or twice -- and you don't even know when he said

1   that -- but you do know he didn't tell it when he was

2   interviewed by the FBI when he got arrested.

3        Mr. Moore did not plead to a separate charge of

4   possession with intent to distribute the drugs that were

5   found in his home.  He did not plead guilty to possessing

6   with intent to distribute or conspiracy to possess with

7   intent to distribute or distribute crack cocaine in excess --

8   equal to or in excess of 28 grams, or for that matter, equal

9   to or in excess of 280 grams.  And he told you he has been

10  selling drugs for nine years.  He pled to nothing of that.

11  He pled to a gun.  And he is starting at five.

12       Do you think he has an incentive to do something?

13       And if you watch the videotape, he has got five kids.

14  And he explains his kids know what he does for a living

15  because he is sitting there trying to downplay.  He's playing

16  the agents.  He's going, I will just go to jail for 10 or 15

17  years.  It doesn't matter.  He is literally working them.

18  It's really kind of interesting.  You ought to watch it.  If

19  you wonder how the deal goes down when they get arrested, it

20  is very interesting.

21       Well, come September, he starts talking about

22  Mr. Bell and Mr. Holroyd's not around.  You should take all

23  this into consideration when you think about whether you're

24  willing to accept anything Mr. Moore says.  And again, when

25  Mr. Moore is testifying, he is testifying about a conspiracy,

1    something he did not plead to.  And he is trying to put this

2    man in it.

3             And when you watch the video, he tells him he has

4    been dealing drugs in that area for nine years.  And they're

5    talking about murders.  But he knows nothing about those.  He

6    knows nothing about those.  It's interesting how he comes up

7    with the guy with the peashooter that is not a part of the

8    group, and he sits here and he testifies against him so that

9    he can whittle away at his 60 months.

10            Mr. Anderson.  And Mr. Moore said that Mr. Bell

11   called him up on the phone and told him what was going on.

12   Remember?  Told him what was going on about the case.

13            Listen to this.

14            (Audiotape played)

15            MR. DAVIS:  You know what he just told you?  By the

16   way, if you want to listen to it again, it is at 1613.  What

17   he just told you is that Steven Anderson, one of the other

18   conspirators in the case, one of the big dogs, called him and

19   told him everything.  He already knows what is going on with

20   the case.  He sits there and he tells them, I already know.

21   It is interesting.  He comes in when everybody else is out of

22   the case, he comes in, and he tells them Mr. Bell called him.

23   It's on video.  You just saw it.  You just saw it.  Mr. Bell

24   didn't tell him anything.  You want to know why?  Because

25   Mr. Bell is not a part of that group.  You know who was?

1      Steven Anderson, that's who is a part of that group.

2           As a matter of fact, if you listen to the whole

3      interview, you know where he got that extended 35-round

4      magazine that he rammed into that gun?  He got it from Steven

5      Anderson.  These are the guys in the neighborhood, folks.

6      These are the people that are conspiring.  And what easier

7      target than some clown from out of town to dump things on to

8      cut your time back?

9           And what else did he tell us about that?  What else

10     did he tell us about the call, which apparently he didn't

11     receive from Mr. Bell?  But he sat up there and told you that

12     Mr. Bell called him and told him to get rid of his phone.

13     Well, guess what?  That is not true, either.

14          Bear with me for one second.  It is going to take a

15     second to get into this, but it will come up very quickly.

16          (Audiotape played)

17          MR. DAVIS:  I will turn it up in a few seconds here.

18          (Audiotape played)

19          MR. DAVIS:  He didn't get rid of his phone.  That's

20     the phone for the customers.  They had that phone.

21          Do you see any evidence that Mr. Bell was in

22     communication with that man?  Do you see any evidence?  Do

23     you see any toll records?  We all get cellphone bills.  You

24     know how you can tell what call he made and how much time

25     elapsed with it?  Everybody gets them.  It's not rocket

1    science.  Do you see any toll records indicating that Bell

2    communicated with Mr. Moore?

3          And Mr. Moore already lied to you.  He created the

4    impression that Mr. Bell told him to dump his phone.  He

5    didn't dump his phone.  He's got it right there.  And he knew

6    what was going on.  Not because Bell told him.  Because

7    Mr. Anderson did, one of the guys, one of the guys from the

8    hood, one of the guys that's hustling and has been hustling.

9          I could go in and show you other excerpts where

10   Mr. Moore says, "Well, what's in it for me?  What am I going

11   to get out of this?"  And if you have the time -- it takes

12   about an hour to watch the whole thing, a little over an

13   hour.  But I can summarize it for you.  Basically he works

14   the agents.  Tells them him he's giving them everything he's

15   got there.  He's telling them that everything you need is on

16   that phone.

17         Well, apparently Mr. Bell isn't on that phone.  And

18   apparently, anything that he gave you on Mr. Bell really

19   isn't that reliable.

20         This March 8th stop.  First of all, the stop was a

21   ruse.  You know it was a ruse.  He is getting stopped no

22   matter what.  You know that.  And he told you as much.  This

23   traffic ticket was just a ruse.  Bell was being stopped.  On

24   a wish and a prayer.  Because no one observed anything, no

25   one even knew who he was, no one saw anything.  They just saw

1    him go in, and they got him.

2          Now, what about the testimony you heard about what

3    happened on March 8th?  How comfortable are you with this?

4    Aside from the stop being a ruse, how comfortable are you

5    with this?

6          Keness.  "I didn't transport him."  Remember I was

7    asking him if he was sticking his hands in his pants front

8    and back and so forth?  He said, "I didn't transport him."

9    Remember his demeanor.  He got riled.  He didn't like being

10   questioned like that.  He got riled.  And you can take that

11   into consideration because that is one of the things that you

12   can weigh when evaluating a witness's credibility, their

13   demeanor, how they came off when they testified.

14         What's interesting, Keness didn't transport him.

15   Guess what?  LaGrossa, the young guy that came in, he was the

16   transport.  And lo and behold, he didn't transport Bell.  And

17   he told you.  He thought he was going to be transporting him.

18   But he didn't.

19         It doesn't seem right.  Something's wrong.  And

20   that's not a question; that's a fact.  We heard that.

21         Well, weigh that contradiction, weigh being

22   strip-searched twice at the police station, weigh what you

23   think happened --

24         MR. MOHANTY:  Objection.

25         THE COURT:  Counsel, approach.

1          (At the bench)

2          MR. MOHANTY:  There is no evidence anybody was

3     strip-searched twice.

4          MR. DAVIS:  I thought he said he was strip-searched

5     twice.

6          THE COURT:  No, you asked him that.

7          MR. DAVIS:  Oh, I'll withdraw that.  I'll correct it

8     before the jury.

9          THE COURT:  Mr. Davis, how much longer?

10         MR. DAVIS:  About a minute.

11         THE COURT:  Okay.

12         (In open court)

13         MR. DAVIS:  Actually, your recollection controls.  If

14    he was strip-searched once, your recollection controls.

15         But how comfortable are you with what happened?  Do

16    you believe Officer Keness when I asked him if they were

17    laughing at this man when they forcibly strip-searched him?

18         And then look at Mr. Bell and consider what type of

19    individual you're dealing with.

20         And when you do that, think about why he is here, why

21    somebody that is collateral damage ends up still being here.

22         This case is a big deal.  This is no small matter.

23    We spent two and a half days in the United States District

24    Court for the District of Columbia.  You have FBI agents, you

25    have police officers from all kinds of jurisdictions, and you

1      have the man who the one cooperator that hit the stand told

2      you was insignificant and he just wasn't of consequence.

3              The case is very important to the United States.

4      They don't like to lose a case when they bring it because

5      there's a lot of resources that go into a case.  But they

6      couldn't let him go.

7              Mr. Bell --

8              MR. MOHANTY:  Objection.

9              MR. DAVIS:  -- is feeling like that now.

10             MR. MOHANTY:  Objection.

11             THE COURT:  Mr. Davis.

12             MR. DAVIS:  I'm not saying -- all I'm asking you to

13     do is to -- we ask you for only what the law allows.  We ask

14     you to make them prove it beyond a reasonable doubt because

15     you are the last thing standing between this man and the law.

16             I hope that I have been able to point out where they

17     were lacking evidence in this case.  And I ask you to go back

18     and please review it, and if you agree with us, I ask you to

19     give him the benefit of the doubt and find him not guilty.

20             Thank you.

21             THE COURT:  Mr. Mohanty, rebuttal.

22             MR. MOHANTY:  Thank you, Your Honor.

23             (Counsel confer)

24             THE COURT:  Mr. Mohanty, take the exhibits, please.

25             MR. MOHANTY:  I'm sorry.

1          May I proceed, Your Honor?

2          THE COURT:  You may.

3          MR. MOHANTY:  Thank you.

4          Ladies and gentlemen, good afternoon.

5          The overriding theme that you heard from Mr. Davis

6    right now, the defendant's lawyer, is basically this:  My

7    client is collateral damage.  He's small time.

8          That's basically what he is saying to you.  Right?

9          Collateral damage, to me, as I always heard it, was

10   someone who was innocent, sort of an innocent bystander.  But

11   this case is really about the choices the defendant made.

12         You'll have the Judge's instructions, and you heard

13   me already.  All we're asking you to do is follow the

14   instructions, use your common sense, and apply the law.  What

15   he is asking you to do for his client is ignore the evidence,

16   ignore the Judge's instructions, and because his client is,

17   as he puts it, small time, you should just find him not

18   guilty.

19         Think about why he has to ask you that.  Because he

20   knows the evidence is overwhelmingly against his client.

21         And we bear the burden in this case.  We bear the

22   burden in every criminal case, and we welcome it.  We have

23   proven beyond a reasonable doubt that he is guilty.

24         And you will have the Judge's instructions in

25   writing.  It is not beyond all doubt.  It is not absolute

1      certainty.  It is beyond a reasonable doubt.  And if you are

2      firmly convinced that he is guilty, then you must find him

3      so.

4             Again, Government Exhibit 222.  Let me go through

5      some of what Mr. Davis said one by one.

6             He calls this a peashooter.  I can guarantee you that

7      if somebody was shot with a .25 caliber bullet, they wouldn't

8      think it was a peashooter.

9             The text messages.  Ms. Battle, can you pull them up?

10            Mr. Davis needs to run away from these text messages

11     on behalf of his client because they're pretty bad.  Right?

12     Let's remember where the text messages come from?  They don't

13     come from Lorenzo Moore.  They don't come from Agent

14     Bullington.  They don't come from Mr. Rosenberg.  They come

15     from the phone that he had on December 7th, the phone number

16     that just happens to match the number that he used when he

17     called Wayne Holroyd during the wiretap.

18            Again, let's go to the first one.  "I heard that you

19     wear the wire."

20            What do you think that means?

21            Mr. Innocent Bystander, collateral damage.

22            I didn't read the words the first time, but sometimes

23     I get a little bit aggravated, and I'm going to read them

24     into the record.  "Fuckin' snitch.  Can't wait till your

25     bitch ass gone."  That's innocent bystander.  "Stop

1    snitching."  That's collateral damage.  That's small time.

2    That's what he wants you to believe.

3         His phone, his name, his number.  His words.

4         You wonder why we didn't call that informant.  You

5    wonder why we didn't call Mr. Johnson and make him testify.

6    Consider that when you ask yourself that question.  He's not

7    in the conspiracy.  He's just buying.  He's buying, and he's

8    reselling.  That's the whole point.

9         When he was arrested on March 8, 2017, you'll have

10   all those calls.  Go through them yourself.  You'll see that

11   it was in January was the last set of calls.  If he's just

12   using, if he's just using, how come he didn't have a crack

13   pipe?  How come he didn't immediately use those drugs the way

14   Sergeant Cardinal told you he would if he was a user?  How

15   come he had the $400 in cash?  How come he had the gun?  How

16   come he drove all the way up from Virginia to get the drugs?

17   Not use them but what, take them back to his house where he

18   can open a fine bottle of wine, make himself a little light

19   supper before he uses it?  No.  You know that's not how it

20   works.  He is taking them back to Virginia so he can resell

21   them like he did in Prince William County, like you just

22   heard today from Detective O'Neal.

23        Who cares if he is not in the same neighborhood?

24   You'll have the instruction again.  Look for that.  Look for

25   the instruction that says conspirators must live in the same

1      neighborhood and they must be close friends.  You won't see

2      it.  You didn't hear it from Judge McFadden.  He has a

3      different role in the conspiracy.  Some people supply it,

4      right?  Some people send it from Colombia or wherever it

5      comes from.  Some people cut it.  Some people package it.

6      Some people resell it.

7              Again, Mr. Moore told you he told him to get rid of

8      that phone.  And you'll have that whole interview with him.

9      Watch it yourself if you want to.  It is kind of unclear what

10     he is talking about sometimes.  It will be unclear to you

11     which phone Mr. Moore is talking about.  My guess is it

12     doesn't take a lot for you to figure out that it's unlikely

13     that anybody gets arrested and immediately tells the police

14     everything they know.  No.  And it is natural that the

15     police, the FBI in this case, first focused on the homicide,

16     and they focused on the other drug dealers.  They didn't

17     initially ask him about Mr. Bell, so he didn't initially tell

18     them about Mr. Bell.

19              Mr. Davis asked you how come there weren't any search

20     warrants in Mr. Bell's residence.  Remember Agent Migliara

21     told you he asked and he was denied permission to search.

22              MR. DAVIS:  Objection.

23              THE COURT:  Counsel approach.

24              (At the bench)

25              MR. DAVIS:  I don't remember that.  It seems to be a

1    legal question.

2           MR. MOHANTY:  It came out through Mr. Rosenberg's

3    questioning.  Mr. Rosenberg asked him whether they consented

4    to a search of the apartment, and the answer was no.

5           MR. DAVIS:  I was talking about Mr. Bell's house.  He

6    didn't even live there.  He doesn't live there.

7           MR. ROSENBERG:  He was arrested coming home.

8           MR. DAVIS:  He was arrested going to his girlfriend's

9    house.  He lives in Alexandria.

10          THE COURT:  I understood the evidence to be it was

11   outside of his residence, so I'm going to overrule the

12   objection.

13          MR. DAVIS:  Your Honor, there's two times he was

14   arrested.  One, he was arrested in March, and they didn't

15   seek to do anything with that, and then there's the second.

16          MR. MOHANTY:  If you would like, I will clarify that.

17          MR. DAVIS:  I don't need it.  It doesn't even matter.

18          (In open court)

19          THE COURT:  The objection is overruled.

20          MR. MOHANTY:  Thank you, Your Honor.

21          On March 8th, he had -- Mr. Davis calls it a small

22   amount of drugs.  Again, look for any instruction that says

23   don't convict if it is a small amount of drugs.  That's what

24   he had that particular day.  I already went through with you

25   to add it up.

1           And again, Government Exhibit 221, you heard from

2     Sergeant Cardinal.  Mr. Davis can try and run away from

3     Sergeant Cardinal all he wants, but this is the bottom line

4     with him:  He's not involved in this case.  All he is

5     testifying about is his experience in other drug cases.

6           And what did he say?  Basically, this is $1,100 in

7     profit for him.

8           Number two, he sold about a gram -- remember, he is

9     buying 3 grams for $150 from Mr. Holroyd.  That is one eight

10    ball.  And he is selling one gram for that same price, $150

11    in Manassas.  That's how he was involved in the conspiracy.

12    He is tripling his money.  One shot.

13          Again, Mr. Moore, you heard him testify.  You judge

14    the testimony for yourself.  Whatever charges that could have

15    been brought that he didn't plead guilty to, who cares?

16    Really, who cares?  Judge McFadden can sentence him to life.

17    Who cares what other charges were dismissed?  Right?  He pled

18    to a life-eligible count.  And he told you what he did.  He

19    didn't minimize it.  Judge McFadden now knows about those

20    hundred blocks that he sold of crack cocaine.  He knows where

21    he got the gun.  He knows about everything else that he told

22    you that he did on that stand.

23          You know, your recollection controls.  But Officer

24    Keness, Officer LaGrossa, they did their job.  And in some

25    ways -- Mr. Davis says, oh, they didn't remember who

1    transported him.  Doesn't that makes sense to you?  That's

2    kind of a small thing, who transported him.  In a real way,

3    doesn't it make sense to you that, sadly, the low man on the

4    totem pole, Officer LaGrossa, was the one that got stuck with

5    having to retrieve the drugs from the defendant?  Doesn't

6    that make sense?  There is no evidence that he got searched

7    twice.  There is no evidence that anybody laughed at him.

8    That never happened.  This is just Thursday.  You all were

9    here, and you heard those officers testify.  So why does the

10   defendant's lawyer want to get up here and make you believe

11   that that's what happened?

12        Small time.  Collateral damage.  That's what he wants

13   you to believe.  So that's what he said.

14        What we ask, ladies and gentlemen, is simply this --

15   and again, I told you, this is not the case of the United

16   States against the largest drug dealer in the city.  There's

17   other people in this case.  And you really shouldn't -- and

18   Judge McFadden has probably instructed you on this -- don't

19   be concerned with what happened to them.  The only issue is:

20   Have we proven the elements of the offenses in this case as

21   to the defendant?  And we have.

22        Use your common sense.  Evaluate the evidence fairly,

23   without sympathy, without fear.  And when you do that, there

24   can only be one verdict.  We simply ask that you hold him

25   responsible for what he did.

588

1          Thank you.

2          THE COURT:  Counsel approach.

3          (At the bench)

4          THE COURT:  I'm going to read them attitude and

5     conduct of jurors and then excuse 13 and 14.

6          Anything further before we let them go?

7          All right.  Thanks.

8          (In open court)

9          THE COURT:  All right, ladies and gentlemen.  We're

10    almost there.  Final instruction for you.

11         The attitude and conduct of jurors at the beginning

12    of their deliberations are matters of considerable

13    importance.  It may not be useful for a juror upon entering

14    the jury room to voice a strong expression of an opinion on

15    the case or to announce a determination to stand for a

16    certain verdict.  When ones does that at the outset, a sense

17    of pride may cause that juror to hesitate to back away from

18    an announced position after a discussion of the case.

19    Furthermore, many juries find it useful to avoid an initial

20    vote upon retiring to the jury room.  Calmly reviewing and

21    discussing the case at the beginning of deliberations is

22    often a more useful way to proceed.

23         Remember that you are not partisans or advocates in

24    this matter, but you are judges of the facts.

25         The last thing I must do before you begin your

deliberations is to excuse the alternate jurors.  As I told

you before, the selection of alternates was an entirely

random process.  It is nothing personal.  We selected juror

seats 13 and 14 to be the alternate seats before any of you

entered the courtroom.  Since the rest of you have remained

healthy and attentive, I can now excuse those jurors in seats

13 and 14.

Before you two leave, I'm going to ask you to tear

out a page from your notebook and write down your name and

daytime phone number and hand this to Ms. Chaclan.  I do this

because it is possible, though unlikely, we may need to

summon you back to rejoin the jury in case something happens

to a regular juror.  Since that possibility exists, I'm also

going to instruct you not to discuss the case with anyone

until we call you.  My earlier instruction on the use of the

internet still applies.  Do not research this case or

communicate about it on the internet.  In all likelihood, we

will be calling you to tell you that there's been a verdict

and you're now free to discuss the case.  There is a small

chance we will need to bring you back on to the jury.

Thank you both very much for your service, and please

report back to the jury office to turn in your badge on your

way out.  Thanks to both of you.

The rest of you may retire to the jury room to begin

your deliberations.  Let me remind you that if you take a

1      break, if somebody needs to go to the bathroom or anything

2      like that, you should only be discussing the case when all 12

3      of you are there present.

4              We will be sending the evidence back with you

5      shortly, as well as a number of copies of the instructions.

6              Thank you very much.

7              (Jury retires to deliberate at 2:40 p.m.)

8              THE COURT:  Have you all gone over exhibits?  Are we

9      on the same page on those?

10              MR. ROSENBERG:  Yes, Your Honor.

11              THE COURT:  Do we have one binder that we can send --

12              MR. ROSENBERG:  Yes.

13              THE COURT:  Great.

14              MR. ROSENBERG:  I wasn't sure how you wanted to

15      handle this.  For the physical exhibits, there's just a place

16      holder.

17              MR. DAVIS:  That's fine.

18              MR. ROSENBERG:  We already went through this with

19      your clerk, Your Honor.

20              THE COURT:  Terrific.  We're ready to send those

21      back.  We'll send back the instructions in a minute.

22              Has defense had an opportunity to see the laptop?

23      Are you comfortable --

24              MR. DAVIS:  I haven't, but I'm certain -- well, I'll

25      take a peek now.

591

1          THE COURT:  Obviously, everyone make sure Ms. Chaclan

2     has your telephone numbers.

3          I would be inclined to just excuse them from the back

4     around 5 unless anybody particularly wants to come back then.

5     I will tell them to resume their deliberations at 9 in the

6     morning.  If we don't have a note before then, I would

7     probably call everyone back tomorrow afternoon to dismiss

8     them then.

9          MR. DAVIS:  I'm going to remain in the courthouse

10    today.  Actually, I will be here tomorrow because I have

11    something I have to do at 12:30.

12         THE COURT:  Mr. Bell, please stay close and make sure

13    your attorney is able to contact you.  We'll have everybody

14    back if there are any jury notes or anything like that.

15         Okay.  Anything else?

16         MR. DAVIS:  Nothing further.

17         THE COURT:  Thanks, folks.

18         (Proceedings adjourned)

19

20

21

22

23

24

25

592

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Patricia A. Kaneshiro-Miller, certify that the

4      foregoing is a correct transcript from the record of

5      proceedings in the above-entitled matter.

6

7

8      /s/ Patricia A. Kaneshiro-Miller          May 13, 2019
       ------------------------------------      ---------------------
9      PATRICIA A. KANESHIRO-MILLER                    DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

593

## $

**$1,100** [2] - 552:12, 586:6
**$100** [2] - 554:3, 554:5
**$150** [4] - 481:4, 552:9, 586:9, 586:10
**$400** [2] - 546:25, 583:15
**$550** [1] - 552:11

## '

**'Chemical** [1] - 502:12

## /

**/s** [1] - 592:8

## 1

**1** [6] - 471:22, 514:18, 551:12, 556:6, 556:12
**1.17** [1] - 502:7
**10** [5] - 554:5, 555:22, 556:10, 556:13, 574:16
**10/28/2017** [1] - 550:8
**102** [1] - 551:1
**104B** [1] - 501:19
**104C** [6] - 464:7, 502:11, 502:14, 503:6, 503:7, 503:8
**105B** [1] - 501:21
**105C** [6] - 464:8, 502:11, 502:14, 503:9, 503:10, 503:11
**106B** [1] - 501:23
**106C** [6] - 464:8, 502:11, 502:14, 503:12, 503:13, 503:14
**107B** [1] - 501:25
**107C** [6] - 464:9, 502:11, 502:14, 503:15, 503:16, 503:17
**11** [4] - 482:6, 483:3, 563:23, 567:15
**11-day** [1] - 563:24
**11/1** [1] - 546:9
**11th** [3] - 483:12, 490:6, 492:8
**12** [3] - 552:7, 590:2
**12.85** [1] - 501:24
**12:30** [1] - 591:11
**13** [5] - 555:25, 588:5, 589:4, 589:7, 592:8
**1350** [1] - 463:17
**14** [3] - 588:5, 589:4, 589:7
**15** [2] - 556:4, 574:16
**1613** [1] - 575:16
**17** [1] - 556:6
**17-234** [1] - 463:4
**17-234-7** [1] - 465:5
**19th** [5] - 555:25, 556:11, 563:23, 567:15, 568:4
**1:00** [1] - 473:14
**1:45** [3] - 557:7, 557:10, 557:18
**1:50** [1] - 558:2

## 2

**2** [7] - 471:24, 473:8, 479:7, 550:20, 555:11, 555:17, 564:5
**2.104** [1] - 506:22
**2.216** [1] - 507:20
**2.217** [4] - 508:6, 508:13, 508:20, 509:6
**2.218** [1] - 510:2
**2.220** [1] - 510:4
**20** [3] - 551:10, 551:11, 554:5
**200** [1] - 551:21
**20001** [1] - 463:22
**20036** [1] - 463:18
**201** [1] - 549:11
**2010** [1] - 468:12
**2015** [5] - 468:12, 468:14, 531:4, 531:23, 534:11
**2017** [33] - 468:15, 470:17, 473:13, 474:13, 482:6, 483:4, 492:25, 505:14, 513:18, 513:25, 514:19, 531:4, 531:8, 531:24, 534:12, 538:4, 538:23, 539:21, 540:2, 546:17, 548:2, 548:14, 549:13, 549:23, 551:1, 551:12, 555:20, 558:18, 558:20, 563:7, 563:19, 569:21, 583:9
**2018** [4] - 463:6, 495:19, 496:2, 559:18
**2019** [1] - 592:8
**202** [2] - 463:18, 497:22
**20530** [1] - 463:15
**21.28** [1] - 502:5
**22** [2] - 475:17, 548:13
**220.2** [1] - 507:7
**220.8** [1] - 507:5
**221** [3] - 502:2, 547:5, 586:1
**221A** [6] - 464:9, 502:11, 502:14, 503:18, 503:19, 503:20
**222** [2] - 546:22, 582:4
**223** [1] - 546:25
**22nd** [1] - 573:15
**23** [3] - 483:18, 495:19, 496:2
**236** [5] - 464:10, 497:16, 498:10, 498:12, 498:14
**23rd** [2] - 573:15
**24.41** [1] - 501:20
**24th** [4] - 466:1, 466:2, 556:4, 556:11
**25** [5] - 546:23, 548:13, 548:17, 562:8, 582:7
**25.8** [1] - 502:1
**250** [1] - 551:8
**26** [1] - 506:24
**26.02** [1] - 501:22
**27th** [1] - 549:23
**28** [12] - 535:21, 536:12, 537:7, 537:13, 537:14, 547:11, 554:7, 556:13, 560:17, 560:19, 565:21, 574:8
**280** [1] - 574:9
**29** [2] - 463:6, 551:1
**2:40** [1] - 590:7
**2nd** [8] - 470:17, 471:13, 473:13,

474:13, 484:7, 489:23, 492:8, 493:8

## 3

**3** [7] - 472:1, 472:22, 472:23, 552:8, 554:4, 569:12, 586:9
**3.5** [2] - 556:8, 556:13
**30** [2] - 554:17, 555:20
**303** [1] - 502:4
**303A** [6] - 464:10, 502:11, 502:14, 503:21, 503:22, 503:23
**333** [1] - 463:21
**35** [4] - 556:13, 571:10, 571:11, 572:16
**35-round** [1] - 576:3
**3539** [1] - 498:1
**37** [2] - 466:2, 514:17
**38** [2] - 466:1
**38RS** [1] - 466:4
**3A** [2] - 515:3, 515:4
**3B** [2] - 515:3, 515:6

## 4

**4** [2] - 472:3, 484:21
**40** [2] - 473:4, 507:9
**401** [5] - 464:11, 474:20, 475:1, 475:6, 475:18
**401A** [6] - 464:11, 480:19, 480:23, 481:17, 481:19, 481:21, 489:14, 489:19, 502:6
**401B** [8] - 464:12, 474:20, 502:11, 502:15, 503:24, 504:1, 504:2, 504:3
**401D** [3] - 474:22, 475:3, 475:4
**402** [5] - 464:12, 483:11, 483:14, 483:16, 503:24
**402A** [8] - 464:13, 487:8, 487:10, 487:24, 488:1, 488:2, 490:4, 502:8
**402B** [4] - 464:13, 504:4, 504:5, 504:6
**402C** [2] - 502:11, 502:15
**403** [8] - 464:14, 471:20, 471:22, 472:16, 472:18, 472:20, 479:6, 484:19
**403-2** [1] - 479:6
**410** [4] - 464:14, 496:1, 496:4, 496:5
**411** [5] - 464:15, 502:24, 502:25, 503:1
**467** [1] - 464:3
**4700A** [1] - 463:21
**472** [1] - 464:14
**475** [1] - 464:11
**481** [1] - 464:11
**483** [1] - 464:12
**488** [1] - 464:13
**489** [1] - 464:3
**493** [1] - 464:3
**495** [1] - 464:4
**496** [1] - 464:14
**498** [1] - 464:10
**499** [1] - 464:4

594

## 5

**5** [7] - 472:5, 485:25, 554:5, 564:6, 566:23, 572:22, 591:4
**503** [7] - 464:7, 464:8, 464:8, 464:9, 464:9, 464:10, 464:15
**504** [2] - 464:12, 464:13
**51** [1] - 511:7
**555** [1] - 463:15
**58** [1] - 550:18

## 6

**6** [7] - 472:7, 485:25, 555:20, 563:17, 563:23, 567:16, 568:1
**6.2** [6] - 567:14, 568:3, 568:12, 570:2, 570:12, 571:15
**6.200** [1] - 514:11
**6.201** [2] - 513:10, 514:13
**6.27** [1] - 502:3
**6/6** [1] - 546:9
**60** [3] - 573:1, 573:2, 575:9
**607-8289** [1] - 551:13
**62** [1] - 512:1
**63** [2] - 512:5, 512:24
**66** [1] - 514:5

## 7

**7** [5] - 531:4, 531:24, 534:12, 548:14, 549:12
**7/5** [1] - 546:9
**70** [2] - 512:8, 549:22
**71** [1] - 512:8
**7th** [1] - 582:15

## 8

**8** [14] - 505:14, 513:18, 513:25, 514:19, 531:8, 538:4, 538:23, 539:21, 540:2, 546:17, 548:2, 552:12, 569:20, 583:9
**80** [1] - 550:7
**801** [1] - 509:11
**8th** [24] - 497:11, 498:3, 499:4, 512:23, 514:14, 549:1, 555:11, 555:17, 555:22, 556:11, 558:18, 563:7, 563:19, 567:8, 567:13, 567:15, 568:4, 569:7, 570:11, 570:19, 572:10, 577:20, 578:3, 585:21

## 9

**9** [1] - 591:5
**924(c** [3] - 513:23, 570:7, 570:15
**9896** [1] - 502:9
**9:37** [1] - 465:2

## A

**a.m** [1] - 465:2
**ability** [2] - 522:23, 524:18

**able** [18] - 466:23, 467:2, 477:14, 478:6, 478:9, 486:5, 496:12, 496:13, 496:16, 497:4, 526:9, 539:12, 544:12, 560:10, 570:20, 573:11, 580:16, 591:13
**above-entitled** [1] - 592:5
**above-referenced** [1] - 502:13
**absent** [1] - 474:15
**absolute** [3] - 521:12, 527:11, 581:25
**absolutely** [4] - 564:3, 564:14, 566:7, 566:12
**accept** [5] - 517:15, 525:10, 526:11, 564:1, 574:24
**acceptable** [2] - 514:25, 522:12
**accident** [4] - 534:21, 535:4, 538:7, 538:25
**accompanying** [2] - 474:20, 474:21
**accomplice** [1] - 507:6
**accomplices** [1] - 504:21
**according** [1] - 563:3
**accountable** [1] - 560:22
**accuracy** [1] - 524:15
**accurate** [8] - 472:10, 474:16, 494:11, 509:24, 509:25, 524:8, 525:11, 566:20
**accurately** [2] - 505:22, 524:1
**accusing** [1] - 520:7
**achieved** [1] - 532:24
**acquittal** [3] - 504:14, 505:17, 546:11
**act** [2] - 534:1, 534:17
**acted** [1] - 529:24
**acting** [1] - 533:8
**action** [1] - 553:8
**actions** [4] - 536:14, 536:15, 560:24
**active** [1] - 540:10
**actively** [2] - 540:12, 571:3
**acts** [5] - 477:4, 529:14, 529:18, 533:20, 565:7
**actual** [3] - 521:23, 541:23, 542:12
**add** [9] - 487:1, 511:17, 514:12, 558:25, 565:13, 565:21, 565:23, 568:22, 585:25
**added** [2] - 507:6, 569:1
**addition** [3] - 530:10, 542:2, 545:17
**additional** [5] - 466:23, 471:10, 495:2, 503:3, 507:1
**address** [1] - 560:10
**adequate** [1] - 506:8
**adjourned** [1] - 591:18
**Administration** [3] - 500:23, 501:2, 519:10
**administrative** [1] - 496:17
**admissible** [2] - 502:15, 523:9
**admission** [1] - 500:10
**admit** [1] - 554:13
**admitted** [29] - 472:20, 475:1, 475:6, 481:21, 483:14, 483:16, 488:2, 496:5, 498:14, 503:1, 503:8, 503:11, 503:14, 503:17, 503:20, 503:23, 504:3, 504:6, 509:11, 509:15, 516:20, 517:21, 518:24, 519:1, 543:3, 543:5, 543:9,

543:12, 543:16
**advance** [1] - 532:22
**advocates** [1] - 588:23
**affect** [3] - 522:23, 522:25, 525:18
**affects** [1] - 524:4
**affidavits** [1] - 563:3
**afternoon** [4] - 473:15, 558:9, 581:4, 591:7
**AFTERNOON** [1] - 558:1
**afterwards** [2] - 467:2, 573:16
**agencies** [2] - 488:18, 489:2
**agency** [1] - 468:9
**agent** [8] - 495:17, 497:14, 498:16, 499:11, 527:10, 561:13, 563:3
**Agent** [7] - 495:4, 495:5, 495:11, 496:8, 499:8, 500:7, 546:19, 582:13, 584:20
**agent's** [2] - 527:3, 527:5
**agents** [5] - 533:24, 572:1, 574:16, 577:14, 579:24
**aggravated** [1] - 582:23
**ago** [2] - 563:10, 566:25
**agree** [10] - 500:16, 500:19, 501:14, 502:18, 507:15, 531:16, 542:16, 558:20, 566:19, 580:18
**agreed** [2] - 519:4, 519:8, 519:12, 526:5, 526:6, 532:15, 536:4
**agreeing** [1] - 556:9
**agreement** [29] - 507:8, 526:4, 526:11, 526:15, 526:16, 526:20, 526:22, 526:25, 531:24, 532:2, 532:6, 532:12, 532:14, 532:17, 532:25, 533:2, 533:5, 533:8, 533:9, 533:23, 534:12, 534:15, 553:4, 553:5, 553:7, 553:21, 554:6, 566:5, 566:23
**agrees** [1] - 532:19
**ahead** [2] - 500:14, 506:18
**aid** [6] - 510:18, 510:21, 511:13, 518:17, 540:6, 543:21
**aids** [1] - 510:25
**ain't** [2] - 550:19, 551:14
**Alabama** [1] - 492:2
**Alexandria** [1] - 585:9
**allegations** [1] - 571:15
**alleged** [5] - 531:9, 531:12, 539:20, 540:1, 563:18
**allow** [2] - 504:25, 522:25
**allowed** [3] - 527:19, 539:13, 558:16
**allows** [1] - 580:13
**almost** [3] - 557:5, 565:11, 588:10
**alone** [7] - 506:5, 517:21, 517:22, 523:22, 526:13, 556:9, 556:14
**alternate** [2] - 589:1, 589:4
**alternates** [1] - 589:2
**alternative** [3] - 507:20, 507:21, 508:11
**Alvin** [1] - 527:22
**amended** [1] - 466:5
**America** [3] - 465:5, 500:19, 561:18

**AMERICA** [1] - 463:3
**ammunition** [4] - 543:13, 543:22, 546:24, 548:5
**amount** [15] - 512:2, 514:20, 534:20, 535:2, 535:24, 537:7, 537:9, 537:12, 537:16, 538:5, 538:24, 567:7, 567:17, 585:22, 585:23
**amounts** [4] - 536:6, 536:17, 536:18, 569:3
**analysis** [2] - 500:25, 502:13
**Analysis** [1] - 502:12
**Anderson** [8] - 561:9, 562:3, 562:6, 575:10, 575:17, 576:1, 576:5, 577:7
**Android** [1] - 500:3
**announce** [1] - 588:15
**announced** [1] - 588:18
**answer** [4] - 523:12, 523:14, 523:15, 585:4
**answered** [1] - 523:13
**anyways** [1] - 569:11
**apartment** [1] - 585:4
**Apartments** [1] - 469:4
**apologize** [1] - 465:20
**apology** [1] - 554:11
**APPEARANCES** [1] - 463:12
**appeared** [2] - 478:7, 484:7
**Apple** [1] - 499:13
**applicable** [1] - 508:6
**applies** [3] - 517:14, 530:16, 589:16
**apply** [3] - 496:10, 527:6, 581:14
**appreciate** [1] - 494:24
**approach** [7] - 480:20, 480:21, 487:3, 487:5, 578:25, 584:23, 588:2
**appropriate** [2] - 512:16, 512:18
**April** [2] - 556:6, 556:12
**area** [14] - 473:1, 479:13, 479:14, 480:1, 485:10, 561:12, 561:15, 563:11, 563:12, 571:9, 572:17, 575:4
**areas** [2] - 484:17, 552:18
**argument** [2] - 516:21, 523:4
**arguments** [3] - 517:1, 519:23, 557:8
**arrange** [1] - 471:1
**arranged** [3] - 470:18, 473:7, 482:5
**arranging** [1] - 482:12
**arrest** [5] - 491:1, 496:9, 504:23, 512:23, 514:15
**arrested** [21] - 490:24, 491:24, 495:20, 499:17, 508:1, 548:15, 549:12, 553:16, 558:19, 566:17, 566:21, 572:10, 574:2, 574:19, 583:9, 584:13, 585:7, 585:8, 585:14
**arrow** [2] - 484:25, 485:6
**art** [1] - 527:20
**articulate** [1] - 568:18
**Ashton** [3] - 479:5, 479:8, 479:24
**aside** [2] - 469:18, 578:4
**asleep** [1] - 522:10
**ass** [2] - 550:2, 582:25
**assembling** [1] - 511:9

**asserts** [1] - 521:23
**assigned** [2] - 467:23, 467:25
**assignment** [1] - 468:8
**assist** [3] - 519:24, 540:6, 543:1
**associated** [1] - 483:12
**assume** [8] - 522:2, 522:6, 527:15, 559:22, 563:20, 567:19, 567:20, 568:5
**assuming** [1] - 569:24
**attempt** [1] - 534:22
**attending** [1] - 466:17
**attention** [3] - 526:6, 528:22, 545:8
**attentive** [1] - 589:6
**attitude** [2] - 588:4, 588:11
**Attorney** [1] - 492:21
**attorney** [1] - 591:13
**Attorney's** [1] - 463:14
**attorneys** [3] - 466:15, 518:9, 520:3
**attributed** [1] - 476:18
**audio** [5] - 471:5, 474:9, 474:13, 510:18, 510:24
**Audiotape** [5] - 475:19, 476:11, 483:19, 484:9, 575:14
**audiotape** [2] - 576:16, 576:18
**AUSA** [2] - 463:13, 463:14
**automobile** [1] - 485:16
**available** [1] - 540:6
**Avenue** [4] - 463:17, 463:21, 479:5, 479:8
**avoid** [1] - 588:19
**aware** [3] - 469:3, 490:22, 493:22

# B

**B-U-L-L-I-N-G-T-O-N** [1] - 495:16
**back-and-forth** [1] - 465:14
**backwards** [1] - 547:23
**bad** [1] - 582:11
**badge** [1] - 589:22
**bag** [2] - 481:1, 550:13
**baggies** [1] - 569:6
**bags** [5] - 493:16, 550:12, 552:10
**baking** [4] - 475:22, 476:3, 476:5, 554:15
**balances** [1] - 560:12
**ball** [3] - 552:8, 556:8, 586:10
**balls** [4] - 547:5, 552:11, 555:24, 556:10
**bang** [3] - 571:11
**base** [35] - 490:1, 501:20, 501:22, 501:24, 502:1, 502:3, 502:5, 502:7, 502:9, 531:6, 531:15, 535:9, 535:11, 535:18, 535:20, 535:24, 536:13, 536:17, 536:18, 537:6, 537:7, 537:9, 537:12, 537:16, 537:24, 538:6, 538:12, 538:13, 538:21, 538:24, 539:1, 539:2, 539:20, 542:10, 560:17
**based** [10] - 504:14, 504:17, 505:13, 521:13, 527:24, 544:11, 544:23, 568:1, 568:12, 573:4
**basis** [1] - 526:12

**bathroom** [1] - 590:1
**battle** [1] - 582:9
**bear** [4] - 546:4, 576:14, 581:21
**become** [5] - 527:20, 532:18, 533:1, 533:3, 533:24
**becomes** [1] - 545:21
**BEFORE** [1] - 463:10
**beforehand** [1] - 482:19
**began** [2] - 485:20, 491:9
**begin** [7] - 467:3, 470:10, 471:4, 483:21, 546:12, 588:25, 589:24
**beginning** [6] - 490:10, 518:16, 545:14, 567:22, 588:11, 588:21
**behalf** [4] - 465:9, 465:11, 556:23, 582:11
**behavior** [1] - 524:5
**behind** [2] - 491:5, 561:18
**behold** [1] - 578:16
**believability** [1] - 517:23
**BELL** [1] - 463:5
**bell** [68] - 469:23, 470:10, 476:1, 478:7, 478:18, 480:2, 484:1, 485:15, 485:18, 486:9, 488:6, 493:5, 496:13, 498:3, 504:15, 505:8, 505:23, 505:25, 508:9, 546:15, 546:18, 546:20, 546:21, 547:1, 550:9, 550:15, 550:21, 551:1, 551:10, 551:12, 551:17, 551:22, 553:12, 553:16, 555:15, 556:19, 558:18, 558:19, 559:11, 559:14, 560:15, 563:5, 563:6, 563:12, 563:17, 567:21, 567:22, 571:14, 573:14, 573:16, 574:22, 575:10, 575:22, 575:23, 575:25, 576:11, 576:12, 576:21, 577:4, 577:17, 577:18, 577:23, 579:18, 580:7, 584:17, 584:18, 591:12
**Bell** [30] - 465:5, 465:12, 468:17, 476:7, 482:10, 500:19, 527:12, 529:14, 529:24, 531:13, 537:17, 537:23, 538:23, 539:7, 539:16, 539:22, 539:24, 540:4, 540:15, 540:24, 541:4, 541:10, 566:23, 566:24, 566:25, 567:2, 573:24, 577:1, 577:6, 578:16
**Bell's** [1] - 541:12
**bell's** [5] - 494:18, 499:20, 566:14, 584:20, 585:5
**belongs** [1] - 476:22
**bench** [3] - 579:1, 584:24, 588:3
**benefit** [4] - 521:18, 568:14, 568:15, 580:19
**BENJAMIN** [3] - 464:4, 495:6, 495:15
**Benjamin** [1] - 495:15
**best** [3] - 465:22, 474:2, 493:11
**between** [17] - 465:22, 485:25, 493:4, 499:5, 505:8, 512:17, 513:15, 513:21, 524:19, 524:23, 530:8, 531:24, 533:18, 546:20, 567:15, 568:4, 580:15
**beyond** [51] - 500:21, 504:19, 520:15, 520:19, 520:23, 521:2, 521:8, 521:9, 523:18, 526:14, 529:23, 531:11, 531:21, 532:8, 534:9, 537:3, 538:3,

538:19, 538:22, 539:23, 541:11,
542:11, 542:25, 547:7, 560:6, 560:20,
565:25, 580:14, 581:23, 581:25, 582:1
**bias** [1] - 525:17
**biased** [1] - 525:15
**big** [4] - 565:14, 565:24, 575:18,
579:22
**bigger** [2] - 566:15, 573:17
**bills** [1] - 576:23
**binder** [1] - 590:11
**binders** [9] - 474:22, 475:8, 476:14,
510:6, 510:9, 511:11, 511:12, 543:18,
543:20
**Birney** [2] - 468:25, 469:4
**bit** [3] - 511:25, 513:17, 582:23
**bitch** [1] - 582:25
**blacked** [1] - 543:6
**blank** [4] - 472:7, 550:13, 550:19,
551:3
**block** [1] - 554:4
**blocks** [3] - 554:3, 554:5, 586:20
**blogging** [1] - 545:17
**blue** [1] - 478:19
**bluish** [1] - 477:19
**bluish-gray** [1] - 477:19
**boats** [1] - 561:19
**body** [4] - 541:22, 547:5, 549:3,
568:23
**bold** [1] - 513:3
**bond** [1] - 553:17
**Book** [2] - 513:11, 513:12
**bother** [2] - 566:15, 566:18
**bottle** [1] - 583:18
**bottom** [5] - 479:19, 479:20, 485:5,
515:3, 586:3
**bought** [3] - 561:6, 564:24, 567:7
**bound** [1] - 527:23
**break** [7] - 470:22, 504:8, 515:7,
552:10, 557:4, 557:17, 590:1
**brief** [1] - 489:4
**briefly** [3] - 479:6, 495:4, 545:11
**bright** [1] - 572:4
**bring** [13] - 466:9, 471:10, 510:9,
510:14, 516:3, 526:6, 543:24, 560:5,
561:21, 561:23, 573:3, 580:4, 589:20
**bringing** [1] - 511:8
**bro** [1] - 550:20
**brought** [4] - 528:22, 553:23, 564:9,
586:15
**Brown** [2] - 488:25, 492:23
**building** [1] - 479:20
**bullet** [1] - 582:7
**Bullington** [13] - 495:4, 495:5, 495:11,
495:15, 495:17, 496:8, 497:14, 498:16,
499:8, 499:11, 500:7, 546:19, 582:14
**BULLINGTON** [2] - 464:4, 495:6
**bunch** [1] - 472:25
**burden** [12] - 520:16, 521:1, 521:7,
560:3, 560:4, 560:6, 560:7, 560:12,

564:11, 568:16, 581:21, 581:22
**Bureau** [1] - 468:1
**business** [1] - 561:8
**busy** [1] - 477:22
**buy** [8] - 469:25, 475:9, 475:10, 481:2,
481:5, 491:7, 552:9, 552:24
**buying** [3] - 583:7, 586:9
**buys** [1] - 470:7
**BY** [22] - 467:13, 469:17, 470:24,
472:21, 475:15, 475:20, 476:12,
478:24, 480:22, 481:22, 483:20,
484:10, 487:6, 488:3, 488:12, 489:10,
489:17, 493:21, 495:10, 496:6, 498:15,
499:10
**Byers** [2] - 501:7, 519:13
**bypass** [1] - 499:23
**bystander** [2] - 581:10, 582:25
**Bystander** [1] - 582:21

## C

**calculating** [1] - 536:22
**caliber** [4] - 546:23, 548:13, 548:17,
582:7
**calmly** [1] - 588:20
**cannot** [1] - 529:10
**capability** [1] - 525:18
**car** [9] - 478:10, 478:25, 486:12,
494:18, 546:21, 547:1, 555:15, 569:9
**cardinal** [1] - 552:14
**Cardinal** [7] - 527:22, 548:8, 552:6,
552:15, 583:14, 586:2, 586:3
**carefully** [1] - 554:10
**cares** [4] - 583:23, 586:15, 586:16,
586:17
**carried** [4] - 540:4, 540:15, 540:24,
558:21
**carries** [1] - 540:5
**carry** [9] - 540:13, 548:9, 548:20,
548:21, 548:22, 558:16, 558:24,
568:16, 572:4
**carrying** [6] - 539:17, 541:22, 547:13,
570:15, 570:21, 572:20
**case** [94] - 466:19, 475:12, 492:16,
492:20, 493:24, 500:13, 500:18,
500:22, 501:5, 501:11, 502:16, 509:1,
509:16, 515:13, 515:14, 516:24,
517:14, 517:19, 518:2, 518:5, 518:7,
518:18, 518:25, 519:11, 519:15,
520:12, 521:21, 522:18, 523:2, 523:3,
524:13, 524:14, 526:5, 527:5, 527:11,
527:22, 528:4, 529:9, 530:7, 531:10,
533:17, 538:5, 541:2, 542:11, 542:20,
544:3, 544:23, 545:3, 545:4, 545:6,
545:15, 545:17, 546:2, 546:11, 547:16,
554:11, 557:5, 557:8, 558:11, 560:5,
560:15, 561:2, 561:12, 561:13, 561:14,
563:3, 565:5, 567:23, 570:14, 575:12,
575:18, 575:20, 575:22, 579:22, 580:3,
580:4, 580:5, 580:17, 581:11, 581:21,

581:22, 584:15, 586:4, 587:15, 587:17,
587:20, 588:15, 588:18, 588:21,
589:12, 589:14, 589:16, 589:19, 590:2
**Case** [1] - 465:4
**cases** [7] - 521:4, 521:6, 521:12,
544:25, 552:7, 561:15, 586:5
**cash** [2] - 546:25, 583:15
**caution** [2] - 526:1, 526:25
**cavity** [1] - 568:23
**cellphone** [4] - 499:20, 547:1, 549:12,
576:23
**cellphones** [8] - 496:7, 496:10,
499:11, 499:18, 546:25, 569:8, 569:9
**certain** [8] - 502:18, 503:2, 516:19,
519:4, 537:5, 559:7, 588:16, 590:24
**certainly** [2] - 476:10, 548:17
**certainty** [4] - 521:12, 522:17, 531:9,
582:1
**CERTIFICATE** [1] - 592:1
**certify** [1] - 592:3
**Chaclan** [3] - 465:24, 589:10, 591:1
**chance** [1] - 589:20
**changes** [1] - 506:21
**charge** [10] - 512:10, 521:3, 522:25,
537:19, 539:9, 547:23, 548:24, 568:7,
568:8, 574:3
**charged** [17] - 504:15, 512:9, 520:20,
521:15, 525:24, 531:13, 535:17,
537:17, 537:23, 540:2, 560:15, 562:15,
562:16, 565:6, 565:7, 565:8, 568:11
**charges** [14] - 470:5, 491:20, 504:14,
522:22, 523:18, 530:14, 531:2, 531:5,
535:14, 539:16, 560:15, 570:20,
586:14, 586:17
**chat** [1] - 467:2
**check** [5] - 509:2, 551:10, 570:18
**checked** [1] - 550:21
**chemical** [2] - 500:25, 502:13
**chemist** [1] - 501:7
**chemists** [2] - 501:2, 501:15
**chemists'** [1] - 558:12
**children** [1] - 552:17
**choices** [1] - 581:11
**choose** [3] - 512:17, 513:15, 573:21
**chose** [1] - 527:16
**chosen** [1] - 527:12
**CHRISTOPHER** [1] - 463:16
**Christopher** [1] - 465:11
**chunks** [1] - 550:12
**CI** [7] - 474:3, 476:24, 489:21, 490:18,
493:4, 493:11
**circumstances** [14] - 491:5, 491:10,
521:25, 524:16, 524:17, 524:20, 528:7,
529:13, 529:15, 529:22, 533:14,
533:16, 541:7, 546:5
**circumstantial** [8] - 521:22, 522:1,
522:9, 522:11, 522:15, 522:16, 522:20,
536:23
**city** [3] - 556:20, 556:22, 587:16
**civil** [1] - 521:4

**civility** [1] - 544:14
**claim** [1] - 570:18
**claimed** [1] - 532:17
**clarify** [3] - 475:8, 530:5, 585:16
**clean** [3] - 511:18, 515:1, 555:7
**clear** [6] - 513:7, 549:6, 551:25, 554:24, 555:12, 562:25
**clearer** [1] - 476:21
**clearly** [1] - 551:9
**CLERK** [2] - 465:4, 513:11
**clerk** [5] - 513:6, 543:23, 545:10, 546:5, 590:19
**Clerk's** [1] - 465:22
**clever** [3] - 558:23, 562:17, 562:19
**client** [5] - 505:19, 581:7, 581:15, 581:16, 581:20, 582:11
**clips** [1] - 515:13
**close** [7] - 465:15, 485:5, 541:4, 549:13, 567:1, 584:1, 591:12
**closely** [1] - 559:4
**closer** [1] - 484:16
**closing** [5] - 515:13, 516:4, 516:21, 517:1, 546:12
**closings** [2] - 515:9, 515:18
**clown** [1] - 576:7
**co** [3] - 536:7, 536:14, 536:21
**co-conspirators** [3] - 536:7, 536:14, 536:21
**cocaine** [82] - 480:17, 481:1, 481:2, 481:12, 481:23, 481:24, 482:7, 486:19, 487:14, 489:19, 489:25, 490:7, 491:7, 494:16, 494:21, 501:20, 501:22, 501:24, 502:1, 502:3, 502:5, 502:7, 502:9, 504:21, 504:24, 505:2, 531:6, 531:15, 535:9, 535:10, 535:11, 535:18, 535:20, 535:24, 536:13, 536:17, 536:18, 537:6, 537:7, 537:9, 537:10, 537:12, 537:16, 537:23, 538:6, 538:12, 538:13, 538:21, 538:24, 539:1, 539:2, 539:20, 542:10, 547:6, 547:11, 547:12, 547:13, 548:2, 548:25, 549:4, 549:6, 552:1, 552:9, 554:2, 554:4, 554:7, 554:16, 556:10, 556:17, 560:17, 561:11, 561:17, 562:20, 563:18, 564:5, 570:2, 571:16, 574:7, 586:20
**code** [2] - 499:21, 499:23
**collateral** [8] - 567:24, 571:14, 579:21, 581:7, 581:9, 582:21, 583:1, 587:12
**collected** [2] - 471:12, 480:24
**Colombia** [1] - 584:4
**color** [2] - 477:17, 555:15
**colored** [1] - 525:17
**Columbia** [3] - 493:2, 558:25, 579:24
**COLUMBIA** [1] - 463:1
**combine** [1] - 572:6
**comfortable** [8] - 507:17, 511:15, 511:16, 515:15, 578:3, 578:4, 579:15, 590:23
**coming** [4] - 468:6, 508:18, 559:3, 585:7

**command** [2] - 477:3, 477:5
**commence** [1] - 477:11
**commission** [2] - 540:3, 540:6
**commit** [4] - 531:16, 532:9, 533:24, 553:5
**commits** [1] - 540:9
**committed** [3] - 531:12, 539:24, 541:14
**common** [10] - 532:4, 532:9, 547:17, 552:2, 553:8, 553:9, 556:25, 581:14, 587:22
**commonsensical** [1] - 548:7
**Commonwealth** [4] - 492:21, 500:24, 501:8, 519:14
**communicate** [5] - 545:15, 545:22, 545:25, 546:1, 589:17
**communicated** [1] - 577:2
**communication** [1] - 576:22
**communications** [1] - 545:16
**complete** [1] - 537:2
**completed** [7] - 480:7, 481:1, 481:6, 482:2, 482:4, 488:15
**completely** [1] - 528:2
**compound** [1] - 470:21
**computer** [1] - 555:7
**conceal** [1] - 548:16
**concealed** [1] - 558:17
**concern** [1] - 544:19
**concerned** [5] - 524:14, 530:13, 563:17, 567:21, 587:19
**concerning** [5] - 501:4, 501:10, 527:23, 545:3, 546:2
**conclude** [3] - 505:1, 505:8, 557:7
**concluded** [1] - 542:19
**concludes** [2] - 502:16, 504:7
**conclusion** [3] - 533:14, 533:17, 562:18
**conclusions** [3] - 527:18, 571:21, 573:12
**condition** [2] - 481:13, 487:19
**conditions** [1] - 486:1
**conduct** [5] - 517:12, 545:18, 545:19, 588:5, 588:11
**conducted** [3] - 469:8, 469:22, 470:9
**confer** [1] - 580:23
**confidential** [7] - 470:1, 470:2, 471:2, 471:3, 490:5, 490:18, 504:22
**confirm** [1] - 481:24
**confirms** [1] - 556:3
**confuse** [1] - 513:20
**confusion** [1] - 465:21
**Connecticut** [1] - 463:17
**connection** [2] - 496:9, 540:1
**consented** [1] - 585:3
**consequence** [1] - 580:2
**consequences** [1] - 529:18
**consider** [51] - 502:19, 509:20, 515:4, 517:7, 517:16, 518:23, 519:5, 519:16, 519:18, 520:8, 520:9, 522:19, 523:1,

523:19, 524:3, 524:5, 524:16, 525:4, 525:8, 525:11, 525:16, 526:7, 526:19, 526:21, 528:3, 528:16, 528:17, 528:25, 529:8, 529:13, 529:21, 530:15, 533:20, 535:11, 537:13, 537:22, 538:14, 539:3, 539:6, 539:7, 539:13, 541:1, 543:9, 543:14, 543:17, 544:12, 544:24, 547:15, 579:18, 583:6
**considerable** [1] - 588:12
**consideration** [5] - 518:2, 521:14, 544:17, 574:23, 578:11
**considered** [5] - 525:25, 526:25, 534:5, 537:25, 542:14
**consistency** [3] - 508:15, 509:21, 528:25
**consistent** [6] - 508:7, 509:12, 509:19, 528:21, 528:24, 529:5
**consists** [1] - 518:25
**conspiracies** [2] - 553:21, 553:22
**conspiracy** [55] - 505:5, 505:8, 511:23, 512:3, 512:19, 513:22, 513:24, 531:3, 531:13, 531:20, 532:18, 532:23, 532:24, 533:1, 533:3, 533:11, 533:12, 533:13, 533:14, 533:17, 533:18, 533:21, 533:23, 534:2, 534:7, 534:9, 534:17, 535:16, 535:19, 536:10, 536:21, 547:10, 553:3, 553:4, 553:19, 553:20, 553:24, 560:16, 560:21, 561:3, 561:4, 561:5, 561:7, 562:25, 563:1, 564:20, 565:19, 568:9, 573:18, 574:6, 574:25, 583:7, 584:3, 586:11
**conspirator** [1] - 534:4
**conspirators** [6] - 534:3, 536:7, 536:14, 536:21, 575:18, 583:25
**conspired** [1] - 537:4
**conspiring** [2] - 567:9, 576:6
**Constitution** [1] - 463:21
**constructive** [4] - 542:2, 542:4, 542:5, 542:12
**contact** [8] - 488:6, 488:7, 488:16, 488:24, 489:1, 498:20, 498:22, 591:13
**contacted** [1] - 470:10
**contain** [1] - 501:17
**contained** [1] - 502:12
**containing** [2] - 537:8, 537:15
**contains** [5] - 501:20, 501:22, 501:24, 502:1, 502:3, 502:5, 502:7, 502:9, 535:23
**contaminants** [1] - 481:11
**contaminate** [1] - 487:1
**contaminated** [1] - 471:12
**contents** [1] - 502:13
**context** [1] - 549:20
**continue** [2] - 475:13, 504:9
**continued** [1] - 531:4
**contraband** [4] - 471:4, 471:11, 543:13, 543:23
**contradicted** [1] - 525:12
**contradiction** [1] - 578:21
**control** [8] - 473:19, 506:5, 518:11,

541:12, 541:19, 541:24, 542:1, 542:7

**controlled** [54] - 469:8, 469:22, 470:7, 470:9, 470:16, 473:23, 473:24, 482:7, 482:21, 501:18, 505:10, 511:24, 512:2, 513:7, 513:10, 514:10, 514:13, 531:17, 532:1, 532:7, 532:11, 534:13, 534:19, 534:20, 535:1, 535:2, 535:6, 535:10, 535:17, 536:25, 537:18, 537:20, 538:2, 538:5, 538:9, 538:12, 538:17, 538:20, 539:1, 539:8, 539:11, 539:14, 539:19, 539:25, 540:7, 540:17, 540:20, 540:23, 541:1, 541:4, 541:6, 541:14, 541:16, 550:6

**controls** [4] - 535:25, 579:13, 579:14, 586:23

**convenience** [1] - 530:4

**conversation** [2] - 476:9, 505:20

**conversations** [2] - 530:1, 530:3

**convey** [1] - 542:21

**convict** [6] - 526:12, 534:18, 561:21, 561:22, 569:22, 585:23

**convicted** [2] - 529:8, 534:8

**conviction** [6] - 510:3, 510:5, 529:8, 544:19, 544:22, 546:10

**convinced** [4] - 521:10, 521:15, 531:20, 582:2

**convinces** [1] - 526:13

**cooked** [2] - 562:19, 562:20

**cooperating** [1] - 573:2

**cooperation** [1] - 526:6

**cooperator** [1] - 580:1

**copies** [4] - 515:8, 517:4, 557:16, 590:5

**copy** [3] - 513:3, 515:24, 517:2

**corner** [2] - 479:19, 479:20

**correct** [26] - 482:20, 489:21, 489:22, 489:23, 490:1, 490:2, 490:7, 490:11, 490:19, 491:14, 491:15, 492:5, 492:6, 493:9, 493:12, 494:12, 496:3, 499:6, 499:18, 499:24, 500:4, 508:11, 508:12, 516:22, 579:7, 592:4

**correctly** [2] - 470:6, 485:9

**corrects** [1] - 465:25

**Costco** [17] - 471:17, 472:11, 473:7, 473:10, 473:16, 473:18, 473:20, 474:4, 479:5, 479:15, 480:10, 484:11, 484:25, 492:8, 492:14, 492:15, 494:9

**Counsel** [3] - 465:6, 558:8, 580:23

**counsel** [9] - 465:12, 506:9, 506:25, 517:1, 546:15, 557:8, 578:25, 584:23, 588:2

**count** [26] - 505:5, 505:15, 512:19, 512:20, 512:21, 512:22, 514:16, 521:2, 530:14, 530:17, 530:20, 530:21, 531:1, 531:3, 536:16, 537:25, 547:9, 547:22, 553:3, 570:7, 570:13, 570:14, 570:15, 570:18, 570:20, 586:18

**Count** [3] - 466:1, 466:2

**counts** [3] - 513:19, 530:23, 530:24

**County** [13] - 467:22, 467:24, 468:11,

468:13, 470:6, 471:18, 472:12, 482:25, 491:14, 492:17, 552:23, 552:25, 583:21

**county** [1] - 564:18

**County's** [1] - 473:2

**couple** [6] - 506:1, 506:21, 508:5, 557:14, 558:15, 573:13

**course** [8] - 496:14, 497:10, 507:2, 513:24, 523:10, 536:21, 543:2, 562:24

**court** [15] - 478:14, 522:4, 528:25, 529:5, 544:8, 546:3, 546:8, 550:1, 552:3, 561:15, 561:21, 561:24, 579:12, 585:18, 588:8

**COURT** [114] - 463:1, 465:10, 465:13, 466:7, 466:9, 466:11, 469:11, 469:16, 470:22, 472:18, 475:1, 475:4, 475:7, 478:23, 480:21, 481:19, 483:14, 483:17, 487:5, 488:1, 488:10, 489:7, 489:15, 493:19, 494:24, 495:2, 495:5, 496:4, 498:12, 500:7, 500:14, 502:17, 502:25, 503:2, 503:5, 503:7, 503:10, 503:13, 503:16, 503:19, 503:22, 503:25, 504:2, 504:5, 504:7, 504:11, 504:17, 505:25, 506:5, 506:8, 506:11, 506:14, 506:18, 507:12, 507:15, 507:20, 508:2, 508:6, 508:12, 508:20, 508:23, 509:6, 509:18, 510:1, 511:4, 511:17, 511:20, 512:13, 512:24, 513:2, 513:16, 514:2, 514:6, 514:9, 514:18, 514:22, 514:24, 515:1, 515:15, 515:17, 515:23, 516:3, 516:7, 516:12, 516:14, 516:19, 516:23, 557:3, 557:13, 558:4, 562:1, 573:8, 578:25, 579:6, 579:9, 579:11, 580:11, 580:21, 580:24, 581:2, 584:23, 585:10, 585:19, 588:2, 588:4, 588:9, 590:8, 590:11, 590:13, 590:20, 591:1, 591:12, 591:17, 592:1

**Court** [6] - 463:20, 505:22, 509:20, 546:15, 569:25, 579:24

**Court's** [2] - 465:25, 466:2

**Courthouse** [1] - 463:21

**courthouse** [1] - 591:9

**courtroom** [6] - 490:14, 545:7, 553:23, 568:20, 589:5

**coverage** [1] - 545:3

**crack** [47] - 480:17, 481:1, 481:2, 481:12, 481:23, 481:24, 482:7, 486:19, 487:14, 489:19, 491:7, 494:16, 494:21, 504:21, 504:24, 505:2, 531:15, 535:9, 535:18, 547:6, 547:12, 547:13, 548:1, 548:25, 549:4, 549:6, 552:1, 552:9, 554:2, 554:4, 554:7, 554:15, 556:10, 556:16, 561:11, 561:19, 562:20, 563:17, 564:5, 567:14, 570:2, 570:18, 571:16, 572:11, 574:7, 583:12, 586:20

**cracked** [1] - 569:11

**cram** [1] - 568:23

**crates** [1] - 561:17

**create** [1] - 569:21

**created** [1] - 577:3

**credibility** [15] - 508:25, 509:7, 509:13,

509:17, 509:21, 517:23, 523:21, 523:24, 524:4, 527:5, 528:16, 528:23, 529:1, 529:9, 578:12

**credible** [1] - 559:9

**credit** [2] - 525:13, 567:13

**Crevonte** [4] - 561:9, 561:10, 562:4, 562:5

**crime** [35] - 505:3, 505:13, 510:3, 510:5, 514:4, 520:8, 521:15, 529:8, 531:7, 531:16, 531:19, 532:10, 532:15, 533:6, 533:24, 534:8, 539:18, 539:21, 539:25, 540:4, 540:7, 540:9, 540:16, 540:19, 541:3, 541:13, 547:14, 547:25, 553:5, 556:16, 561:8, 563:15, 567:10

**crimes** [2] - 468:4, 537:21

**Criminal** [2] - 463:4, 465:4

**criminal** [6] - 492:1, 520:12, 521:6, 521:12, 527:11, 581:22

**CROSS** [3] - 464:2, 489:9, 499:9

**CROSS-EXAMINATION** [2] - 489:9, 499:9

**CRR** [1] - 463:20

**current** [1] - 514:3

**curse** [1] - 550:1

**customers** [4] - 562:4, 563:16, 569:5, 576:20

**cut** [2] - 576:8, 584:5

---

# D

**D.C** [12] - 463:6, 463:15, 463:22, 469:1, 472:11, 472:25, 473:5, 492:23, 504:22, 548:21, 552:9, 572:3

**damage** [8] - 567:24, 571:14, 579:21, 581:7, 581:9, 582:21, 583:1, 587:12

**dark** [2] - 477:24, 486:3

**DATE** [1] - 592:9

**date** [4] - 470:15, 531:9, 531:12

**dates** [1] - 469:15

**DAVIS** [72] - 463:16, 465:11, 469:10, 470:21, 472:17, 474:23, 478:22, 481:18, 483:13, 487:25, 488:9, 489:8, 489:10, 489:16, 489:17, 493:18, 495:4, 496:3, 498:11, 499:10, 504:12, 505:20, 507:10, 507:13, 507:25, 508:3, 508:8, 508:13, 508:16, 508:22, 509:2, 509:5, 509:25, 510:8, 510:19, 511:1, 511:16, 512:7, 513:18, 514:5, 514:8, 514:16, 514:21, 514:23, 514:25, 515:12, 516:2, 516:11, 516:18, 516:22, 558:8, 562:2, 573:9, 575:15, 576:17, 576:19, 579:4, 579:7, 579:10, 579:13, 580:9, 580:12, 584:22, 584:25, 585:5, 585:8, 585:13, 585:17, 590:17, 590:24, 591:9, 591:16

**Davis** [24] - 463:17, 465:11, 489:7, 504:11, 505:18, 511:15, 511:20, 512:6, 516:16, 548:11, 548:19, 558:7, 562:2, 573:21, 579:9, 580:11, 581:5, 582:5, 582:10, 584:19, 585:21, 586:2, 586:25

**Davis'** [1] - 507:23

**daylight** [1] - 478:1
**days** [4] - 563:23, 567:15, 573:13, 579:23
**daytime** [1] - 589:10
**DC** [1] - 463:18
**DEA** [1] - 501:5
**deal** [19] - 471:9, 471:13, 473:6, 474:2, 474:5, 477:10, 480:6, 480:25, 482:5, 482:16, 482:17, 482:18, 485:3, 485:15, 487:16, 493:8, 572:14, 574:19, 579:22
**dealer** [9] - 548:8, 552:15, 552:21, 554:14, 556:20, 556:21, 569:16, 569:18, 587:16
**dealers** [2] - 568:23, 584:16
**dealing** [3] - 551:25, 575:4, 579:19
**deals** [4] - 484:23, 494:3, 555:13, 555:16
**decades** [1] - 562:7
**December** [9] - 492:25, 531:4, 531:24, 534:12, 548:14, 549:12, 558:19, 566:17, 582:15
**decide** [15] - 517:20, 517:21, 517:22, 518:2, 518:5, 522:14, 528:13, 529:3, 529:20, 535:10, 537:7, 538:13, 539:2, 545:6, 570:13
**decided** [3] - 505:23, 506:11, 506:16
**decision** [7] - 505:23, 506:1, 506:6, 506:9, 527:13, 527:15, 537:9
**deemed** [1] - 534:1
**defendant** [84] - 478:18, 478:21, 487:20, 499:16, 500:19, 502:18, 504:21, 505:1, 507:4, 510:5, 514:19, 520:12, 520:14, 520:17, 520:20, 520:24, 521:2, 521:15, 521:17, 523:18, 525:24, 526:12, 526:23, 527:11, 527:15, 530:19, 530:22, 531:13, 531:19, 532:13, 532:25, 533:7, 533:10, 533:12, 533:19, 533:22, 534:8, 534:14, 534:18, 534:24, 535:7, 535:15, 536:3, 536:7, 536:11, 536:13, 536:16, 536:17, 536:18, 537:4, 537:10, 537:12, 537:14, 537:23, 538:4, 538:10, 538:17, 538:19, 540:11, 540:12, 540:13, 540:14, 542:11, 544:18, 547:8, 549:20, 549:23, 554:3, 554:25, 555:17, 555:21, 555:23, 556:1, 556:5, 556:7, 556:9, 571:1, 571:4, 581:11, 587:5, 587:21
**DEFENDANT** [4] - 506:4, 506:7, 506:10, 506:17
**Defendant** [1] - 463:16
**defendant's** [6] - 520:10, 521:10, 526:13, 549:9, 581:6, 587:10
**Defendants** [1] - 463:6
**defense** [10] - 493:23, 505:16, 507:6, 509:8, 515:12, 516:9, 516:16, 558:6, 560:4, 590:22
**degree** [1] - 522:17
**delay** [1] - 465:21
**deleted** [1] - 543:7
**deliberate** [3] - 545:12, 557:9, 590:7

**deliberating** [1] - 467:3
**deliberations** [21] - 517:3, 517:5, 518:12, 518:16, 518:23, 523:16, 530:25, 537:24, 542:19, 543:4, 543:19, 544:7, 544:20, 545:14, 545:18, 545:21, 588:12, 588:21, 589:1, 589:25, 591:5
**Dembowski** [1] - 501:1
**demeanor** [3] - 524:5, 578:9, 578:13
**denied** [1] - 584:21
**deny** [1] - 505:16
**Department** [7] - 467:22, 467:24, 468:13, 488:22, 500:24, 501:8, 501:12, 519:14
**department** [1] - 491:1
**depicting** [1] - 472:24
**depictions** [1] - 472:10
**DEPUTY** [1] - 465:4
**describe** [2] - 470:25, 478:16
**described** [1] - 524:1
**deserves** [3] - 526:2, 527:2, 528:5
**desire** [1] - 552:18
**detail** [2] - 525:5, 549:13
**details** [3] - 524:21, 532:3, 532:15
**detectable** [8] - 514:19, 534:19, 535:2, 535:24, 537:8, 537:15, 538:5, 538:24
**Detective** [14] - 467:8, 467:20, 468:22, 480:23, 488:4, 491:9, 491:11, 491:22, 491:24, 494:24, 550:5, 552:22, 561:11, 583:22
**detective** [14] - 467:21, 469:8, 469:18, 474:4, 475:8, 475:11, 475:21, 476:13, 484:11, 489:11, 489:14, 491:12, 493:22, 564:18
**detectives** [1] - 568:21
**determination** [3] - 536:1, 536:2, 588:15
**determine** [8] - 517:18, 517:24, 521:21, 523:22, 525:16, 530:10, 535:19, 535:22
**determining** [6] - 523:17, 525:10, 529:23, 533:18, 535:22, 540:24
**device** [4] - 471:5, 474:7, 474:10, 482:16
**difference** [1] - 530:8
**different** [12] - 484:15, 508:18, 518:10, 524:23, 526:20, 530:24, 533:3, 533:4, 558:21, 565:12, 584:3
**differently** [2] - 525:1, 528:7
**difficult** [4] - 467:1, 497:22, 530:5, 555:4
**difficulty** [1] - 466:21
**digits** [2] - 497:23, 497:25
**dime** [2] - 552:10, 561:19
**direct** [10] - 483:11, 496:21, 521:21, 521:24, 522:5, 522:11, 522:15, 522:18, 522:19, 536:22
**DIRECT** [3] - 464:2, 467:12, 495:9
**directed** [2] - 480:12, 486:17
**directly** [3] - 485:22, 529:11, 548:8
**disagree** [1] - 514:4

**disclose** [2] - 540:11, 571:2
**disclosed** [1] - 571:3
**discredit** [1] - 524:24
**discrepancies** [1] - 524:22
**discrepancy** [2] - 525:3, 525:6
**discuss** [10] - 505:18, 505:22, 506:8, 544:2, 544:3, 545:9, 545:11, 553:7, 589:14, 589:19
**discussed** [2] - 512:4, 557:6
**discussing** [2] - 588:21, 590:2
**discussion** [1] - 588:18
**discussions** [1] - 544:13
**disk** [1] - 555:7
**dismiss** [1] - 591:7
**dismissed** [1] - 586:17
**displayed** [1] - 541:10
**disregard** [2] - 528:3, 530:12
**distinct** [1] - 568:10
**distinguish** [1] - 513:21
**distribute** [74] - 505:2, 505:9, 505:10, 511:23, 511:24, 513:10, 514:1, 514:14, 531:6, 531:14, 531:17, 531:25, 532:1, 532:6, 532:7, 532:11, 534:12, 534:13, 534:18, 534:19, 534:22, 535:1, 535:5, 535:16, 535:17, 536:5, 536:7, 536:9, 536:12, 536:20, 537:4, 537:5, 537:18, 537:24, 538:2, 538:8, 539:8, 539:12, 539:20, 539:25, 540:7, 540:16, 540:20, 540:23, 541:1, 541:4, 541:6, 541:14, 541:16, 547:10, 547:11, 547:13, 548:1, 548:25, 549:7, 560:16, 560:17, 565:20, 568:6, 568:9, 568:11, 568:14, 569:2, 569:20, 569:25, 570:3, 570:5, 570:12, 570:20, 574:4, 574:6, 574:7
**distributed** [5] - 536:5, 536:6, 536:8, 536:11, 536:19
**distributing** [2] - 564:1, 565:18
**distribution** [3] - 531:16, 532:10, 562:24
**District** [4] - 493:2, 558:24, 579:23, 579:24
**DISTRICT** [3] - 463:1, 463:1, 463:10
**divided** [1] - 546:9
**Division** [1] - 468:1
**division** [1] - 491:12
**DNA** [1] - 564:23
**docket** [1] - 466:4
**document** [1] - 553:6
**Document** [1] - 466:4
**dogs** [1] - 575:18
**done** [8] - 465:21, 469:19, 490:10, 518:4, 529:14, 533:22, 533:25, 553:21
**doubt** [38] - 500:21, 504:19, 520:15, 520:19, 520:23, 521:2, 521:8, 521:9, 521:13, 521:18, 523:18, 526:14, 529:24, 531:11, 531:22, 532:8, 534:10, 537:4, 538:3, 538:19, 538:22, 539:24, 541:11, 542:12, 542:25, 547:8, 549:8, 551:6, 560:7, 560:21, 565:25, 568:15, 568:16, 580:14, 580:19, 581:23,

581:25, 582:1
**down** [12] - 470:22, 485:22, 500:7, 532:3, 552:10, 553:7, 560:8, 571:13, 572:17, 573:3, 574:19, 589:9
**downplay** [1] - 574:15
**drafting** [1] - 513:6
**draw** [3] - 519:19, 520:10, 571:21
**drawn** [1] - 522:1
**Dreads** [2] - 483:22, 483:24
**drew** [1] - 479:11
**drive** [5] - 477:20, 480:3, 485:20, 492:10, 494:9
**driven** [3] - 474:3, 482:17, 485:15
**driver** [1] - 486:9
**driver's** [3] - 478:8, 484:3, 484:6
**driving** [2] - 478:10, 478:13
**drop** [3] - 474:6, 484:23, 492:7
**dropped** [7] - 474:4, 480:9, 484:22, 492:12, 492:14, 494:2, 494:13
**drove** [9] - 477:16, 477:24, 478:4, 479:16, 480:4, 485:18, 486:6, 486:17, 583:16
**Drug** [3] - 500:23, 501:2, 519:10
**drug** [38] - 468:25, 481:23, 482:3, 505:7, 505:13, 514:4, 515:5, 527:23, 531:7, 536:2, 536:6, 536:22, 537:14, 539:17, 539:21, 547:25, 548:8, 548:22, 552:15, 552:21, 554:14, 556:20, 556:21, 560:1, 560:2, 561:15, 569:16, 569:18, 570:15, 570:17, 570:21, 570:22, 571:5, 571:7, 572:20, 584:16, 586:5, 587:16
**drugs** [40] - 469:25, 470:16, 490:16, 493:16, 500:22, 508:16, 536:4, 543:13, 543:23, 548:6, 548:9, 548:18, 549:2, 550:25, 551:9, 552:15, 552:19, 552:20, 552:25, 553:9, 553:13, 554:25, 560:22, 561:4, 561:6, 561:22, 562:7, 567:8, 567:17, 568:23, 569:2, 572:15, 574:4, 574:10, 575:4, 583:13, 583:16, 585:22, 585:23, 587:16
**duly** [2] - 467:10, 495:7
**dump** [5] - 499:11, 499:17, 576:7, 577:4, 577:5
**duplicating** [2] - 512:14, 512:15
**during** [38] - 466:16, 496:14, 497:2, 497:10, 504:16, 513:24, 515:12, 515:13, 517:3, 517:4, 517:21, 518:11, 518:13, 518:15, 518:23, 519:3, 519:7, 523:10, 529:21, 530:25, 531:7, 536:21, 539:17, 540:3, 540:15, 540:18, 543:2, 543:19, 545:14, 545:18, 545:21, 559:1, 565:16, 567:17, 570:15, 570:21, 572:20, 582:17
**duty** [4] - 517:15, 520:21, 520:24, 544:21

# E

**e-mail** [1] - 545:16

**easier** [3] - 473:18, 555:9, 576:6
**easily** [2] - 548:16, 564:9
**easy** [2] - 554:6, 556:13
**education** [2] - 501:3, 501:9
**effect** [3] - 511:2, 525:3, 540:19
**efficient** [2] - 517:13, 558:11
**efforts** [1] - 539:10
**eight** [8] - 546:25, 547:5, 552:8, 552:11, 555:24, 556:8, 556:10, 586:9
**either** [9] - 466:23, 488:16, 515:25, 525:15, 527:7, 540:11, 541:20, 542:12, 576:13
**elapsed** [2] - 524:19, 576:25
**electronic** [2] - 497:11, 545:16
**electronically** [1] - 545:20
**element** [4] - 512:3, 520:19, 520:23, 536:17
**elements** [8] - 531:21, 537:21, 538:1, 538:21, 539:23, 542:24, 587:20
**eligible** [1] - 586:18
**elsewhere** [1] - 512:4
**employ** [2] - 540:12, 571:3
**employed** [3] - 468:14, 501:2, 501:7
**employment** [1] - 540:10
**encourage** [1] - 544:14
**end** [9] - 510:19, 511:10, 559:6, 559:7, 559:10, 559:11, 559:23, 561:15, 561:22
**ended** [1] - 488:21
**ends** [1] - 579:21
**Enforcement** [3] - 500:23, 501:2, 519:10
**enforcement** [4] - 488:17, 489:2, 527:3, 527:10
**engaged** [3] - 560:21, 565:10, 565:18
**ensure** [2] - 471:10, 481:9
**enter** [3] - 526:10, 533:23, 544:20
**entered** [6] - 526:4, 526:14, 526:20, 526:22, 526:24, 589:5
**entering** [1] - 588:13
**entertaining** [1] - 571:25
**entire** [1] - 535:24
**entirely** [2] - 529:19, 589:2
**entitled** [6] - 502:12, 519:22, 525:21, 568:14, 568:15, 592:5
**entity** [1] - 567:23
**entrance** [6] - 479:22, 479:23, 480:9, 484:24, 485:8, 486:14
**equal** [5] - 522:16, 560:17, 560:19, 574:8
**equally** [1] - 568:2
**equipment** [2] - 482:22, 482:24
**error** [1] - 525:6
**ESQ** [1] - 463:16
**essentially** [3] - 471:7, 491:17, 512:8
**establish** [6] - 531:9, 540:9, 560:6, 565:1, 566:7, 566:12
**establishes** [1] - 531:11
**ethnic** [1] - 518:1
**evaluate** [3] - 528:8, 556:25, 587:22

**evaluated** [1] - 527:4
**evaluating** [10] - 508:25, 509:7, 509:17, 523:24, 524:15, 527:5, 528:23, 529:9, 547:18, 578:12
**evaluation** [1] - 508:7
**evasive** [1] - 554:12
**event** [9] - 514:15, 524:16, 524:18, 524:19, 524:20, 524:21, 527:7, 544:19, 544:21
**evidence** [172] - 465:16, 471:11, 472:15, 472:20, 474:19, 474:24, 475:5, 475:6, 480:24, 481:11, 481:17, 481:21, 483:10, 483:16, 487:1, 487:23, 488:2, 489:18, 490:4, 495:25, 496:5, 498:10, 498:14, 500:11, 502:20, 503:1, 503:8, 503:11, 503:14, 503:17, 503:20, 503:23, 504:3, 504:6, 504:8, 504:17, 504:20, 504:25, 505:4, 505:5, 505:6, 505:14, 508:23, 508:25, 509:15, 509:16, 510:18, 510:24, 511:13, 516:10, 516:17, 516:24, 517:21, 517:22, 518:3, 518:10, 518:18, 518:19, 518:21, 518:24, 519:1, 519:6, 519:18, 519:21, 519:24, 519:25, 520:1, 520:9, 520:10, 520:18, 521:6, 521:14, 521:20, 521:21, 521:22, 521:24, 521:25, 522:1, 522:5, 522:9, 522:12, 522:13, 522:15, 522:17, 522:18, 522:19, 523:1, 523:5, 523:8, 525:12, 526:3, 527:4, 527:25, 528:2, 528:3, 528:4, 528:10, 528:17, 528:19, 529:7, 529:15, 529:20, 529:22, 530:2, 530:7, 530:16, 531:10, 533:21, 534:3, 534:6, 535:12, 536:23, 538:14, 539:3, 541:2, 542:20, 543:3, 543:12, 543:16, 543:20, 544:2, 544:5, 544:12, 544:14, 544:16, 544:17, 544:23, 545:7, 547:16, 547:18, 553:2, 556:25, 559:17, 559:23, 560:5, 561:2, 563:13, 563:14, 563:25, 564:2, 564:19, 564:20, 564:21, 565:1, 565:18, 566:9, 568:1, 568:4, 568:5, 568:13, 569:21, 570:4, 570:11, 571:2, 571:20, 576:21, 576:22, 579:2, 580:17, 581:15, 581:20, 585:10, 587:6, 587:7, 587:22, 590:4
**evolved** [1] - 561:13
**exact** [2] - 499:22, 531:9
**exactly** [3] - 474:25, 485:21, 519:16
**EXAMINATION** [5] - 467:12, 489:9, 493:20, 495:9, 499:9
**examine** [6] - 543:7, 543:14, 543:17, 543:22, 544:1, 544:4
**examined** [2] - 467:10, 495:7
**example** [4] - 522:2, 524:4, 536:16, 546:9
**except** [3] - 543:12, 545:25, 546:2
**exception** [2] - 509:11, 527:18
**excerpts** [1] - 577:9
**excess** [3] - 574:7, 574:8, 574:9
**exchange** [2] - 493:4, 550:7
**exchanges** [1] - 494:10

601

**exclusive** [1] - 518:8
**exclusively** [1] - 544:22
**excuse** [5] - 552:25, 588:5, 589:1, 589:6, 591:3
**excused** [2] - 495:1, 500:9
**executed** [2] - 562:21
**exercise** [4] - 505:24, 527:12, 541:19, 541:24
**exhausted** [1] - 567:16
**Exhibit** [40] - 471:20, 472:16, 480:19, 481:17, 483:11, 484:19, 487:8, 487:9, 487:24, 489:19, 490:4, 496:1, 497:16, 498:10, 501:19, 501:21, 501:23, 501:25, 502:2, 502:4, 502:6, 502:8, 502:11, 502:24, 546:22, 546:25, 547:5, 548:13, 549:11, 551:21, 555:11, 555:17, 555:20, 555:22, 555:25, 556:4, 556:6, 582:4, 586:1
**exhibit** [3] - 502:21, 543:4, 549:14
**EXHIBIT** [1] - 464:6
**exhibits** [15] - 489:13, 501:17, 502:14, 503:3, 519:1, 535:12, 538:15, 539:3, 543:2, 543:7, 543:12, 543:15, 580:24, 590:8, 590:15
**Exhibits** [1] - 502:14
**existed** [6] - 531:24, 533:15, 533:16, 533:17, 533:19, 533:23
**existence** [3] - 532:12, 534:5, 568:10
**exists** [2] - 532:6, 589:13
**exited** [2] - 477:16, 486:16
**expectation** [2] - 573:1, 573:2
**expected** [3] - 534:24, 535:7, 538:11
**experience** [6] - 501:3, 501:9, 519:21, 525:2, 527:25, 586:5
**experienced** [1] - 568:21
**expert** [12] - 501:4, 501:10, 505:7, 527:19, 527:20, 535:12, 535:13, 538:15, 539:4, 568:17
**expert's** [1] - 527:24
**explain** [4] - 499:1, 528:8, 549:21, 550:3
**explaining** [1] - 475:12
**explains** [1] - 574:14
**expressed** [1] - 518:6
**expression** [1] - 588:14
**extended** [1] - 576:3
**extensive** [1] - 505:21
**extent** [1] - 523:23
**extra** [4] - 546:23, 546:24, 548:5, 559:21
**extremely** [1] - 555:4
**eye** [1] - 477:12
**eyes** [1] - 474:2
**eyewitness** [1] - 521:23

# F

**F'in'** [2] - 550:1, 550:12
**fabrication** [1] - 509:13
**facilitate** [1] - 544:13

**facilitated** [2] - 540:21, 541:15
**facilitating** [2] - 540:22, 541:15
**fact** [20] - 502:19, 517:3, 519:5, 521:5, 521:23, 522:12, 528:14, 529:5, 530:18, 535:13, 538:16, 554:24, 560:6, 563:5, 564:1, 570:24, 570:25, 573:23, 576:2, 578:20
**facto** [1] - 567:8
**factors** [1] - 541:2
**facts** [17] - 482:14, 500:20, 502:19, 505:11, 517:19, 517:20, 517:24, 519:1, 519:4, 519:19, 521:21, 521:25, 529:15, 529:20, 533:13, 533:16, 588:24
**failed** [1] - 520:22
**failure** [1] - 525:2
**fair** [8] - 472:10, 490:23, 517:13, 518:2, 522:23, 523:2, 544:11, 544:17
**Fairfax** [2] - 470:5, 491:20
**fairly** [4] - 519:22, 525:21, 528:5, 587:22
**fake** [1] - 551:2
**falling** [2] - 522:3, 522:5
**false** [1] - 526:17
**falsehood** [1] - 525:7
**falsely** [1] - 526:23
**far** [5] - 469:20, 482:1, 530:12, 563:17, 567:21
**fashion** [2] - 546:10, 547:20
**fast** [2] - 572:2, 572:7
**favor** [1] - 522:13
**favorable** [1] - 504:18
**favoritism** [1] - 517:25
**FBI** [7] - 468:24, 559:18, 561:13, 569:11, 574:2, 579:24, 584:15
**fear** [2] - 517:25, 587:23
**February** [1] - 565:17
**federal** [4] - 539:18, 561:15, 561:21, 561:23
**fellow** [2] - 467:2, 469:18
**few** [7] - 469:9, 474:15, 500:11, 521:11, 550:12, 563:9, 576:17
**figure** [2] - 508:24, 584:12
**figured** [1] - 569:12
**file** [1] - 466:3
**filing** [1] - 526:7
**final** [3] - 465:16, 515:9, 588:10
**finally** [1] - 555:2
**fine** [4] - 511:1, 515:16, 583:18, 590:17
**fingerprints** [1] - 564:22
**finish** [1] - 515:7
**finished** [1] - 562:25
**firearm** [34] - 504:24, 505:3, 505:12, 513:24, 513:25, 514:3, 531:6, 539:17, 540:4, 540:5, 540:9, 540:10, 540:12, 540:13, 540:14, 540:15, 540:18, 540:21, 540:25, 541:5, 541:8, 541:12, 541:15, 547:14, 547:24, 571:2, 571:3, 571:4, 571:6, 572:20
**firearms** [2] - 540:6, 547:22, 547:23

**fired** [1] - 541:10
**firmly** [3] - 521:10, 521:14, 582:2
**first** [31] - 468:20, 470:15, 472:9, 485:14, 492:16, 500:22, 504:23, 506:2, 506:21, 507:10, 507:13, 507:15, 511:11, 512:1, 513:13, 516:9, 531:23, 532:11, 534:11, 539:7, 539:24, 541:20, 544:6, 549:22, 554:13, 558:16, 564:1, 577:20, 582:18, 582:22, 584:15
**fish** [1] - 573:17
**fits** [1] - 567:23
**five** [3] - 478:12, 574:11, 574:13
**fix** [2] - 550:20, 555:6
**focus** [2] - 469:14, 555:16
**focused** [3] - 573:19, 584:15, 584:16
**focusing** [1] - 468:25
**folks** [5] - 466:11, 473:20, 557:18, 576:5, 591:17
**follow** [6] - 481:8, 496:7, 517:8, 517:17, 547:16, 547:21, 556:23, 581:13
**follow-up** [2] - 481:8, 496:7
**followed** [1] - 480:13
**following** [5] - 476:16, 500:20, 501:17, 504:17, 531:21, 539:23
**follows** [3] - 467:11, 495:8, 535:15
**Foot** [1] - 498:23
**Foots** [4] - 498:20, 498:23, 551:15, 551:18
**FOR** [1] - 463:1
**force** [2] - 468:23, 492:18
**forcibly** [1] - 579:17
**foregoing** [1] - 592:4
**foreman's** [1] - 515:2
**Forensic** [4] - 500:24, 501:8, 501:12, 519:14
**forensic** [6] - 501:1, 501:7, 501:15, 519:13, 565:1
**foreperson** [4] - 544:7, 544:9, 544:12, 545:23
**foresee** [1] - 536:19
**foreseeable** [3] - 536:15, 560:25, 566:8
**foreseen** [1] - 536:8
**forgotten** [1] - 550:5
**form** [9] - 522:13, 537:2, 537:6, 539:15, 542:18, 542:19, 542:22, 542:25, 573:12
**formal** [3] - 520:7, 532:2, 553:5
**forth** [4] - 465:14, 473:21, 482:5, 578:8
**forward** [1] - 465:6
**foundation** [1] - 469:12
**four** [3] - 497:23, 497:25, 573:16
**Fourth** [1] - 463:15
**frame** [1] - 499:4
**frank** [1] - 555:3
**free** [4] - 466:25, 517:10, 550:17, 589:19
**Friday** [2] - 466:14, 466:17
**friends** [1] - 584:1

602

**friendship** [1] - 524:13
**front** [9] - 476:14, 480:9, 484:24, 486:14, 516:12, 548:3, 554:23, 564:25, 578:7
**fry** [1] - 573:17
**fuckin'** [1] - 582:24
**full** [3] - 524:10, 544:17, 561:16
**fully** [1] - 553:7
**fun** [1] - 568:17
**function** [2] - 517:12, 517:18
**furnished** [1] - 530:4
**furtherance** [9] - 505:3, 505:12, 514:3, 534:1, 534:17, 536:9, 547:14, 547:25, 548:22
**furthermore** [1] - 588:19

## G

**gathering** [1] - 572:12
**gender** [1] - 518:1
**general** [2] - 479:13, 479:14
**generally** [1] - 515:1
**gentlemen** [20] - 465:10, 465:13, 475:7, 502:17, 504:7, 516:14, 516:23, 546:16, 546:17, 547:7, 549:25, 555:2, 556:18, 557:5, 558:4, 558:9, 564:6, 581:4, 587:14, 588:9
**gibberish** [1] - 550:10
**girlfriend's** [1] - 585:8
**given** [8] - 474:6, 494:15, 519:10, 519:15, 542:1, 542:6, 542:23, 543:17
**golf** [1] - 466:15
**gotta** [3] - 550:13, 550:14, 550:20
**Government** [26] - 463:13, 472:20, 475:6, 481:21, 483:16, 488:2, 489:19, 496:5, 498:14, 503:8, 503:11, 503:14, 503:17, 503:20, 503:23, 504:3, 504:6, 546:22, 546:24, 547:5, 548:12, 549:11, 551:21, 555:11, 582:4, 586:1
**GOVERNMENT** [1] - 464:6
**government** [60] - 467:5, 467:7, 472:15, 474:19, 487:23, 495:2, 500:12, 501:17, 502:17, 504:18, 504:25, 507:2, 516:5, 520:15, 520:18, 520:22, 521:1, 523:17, 525:23, 526:4, 526:5, 526:10, 526:22, 529:23, 531:20, 532:8, 532:13, 532:17, 532:23, 533:1, 533:15, 534:9, 534:16, 534:23, 535:6, 535:20, 536:10, 536:24, 537:3, 538:3, 538:10, 538:16, 538:18, 538:22, 539:23, 540:10, 541:9, 541:11, 542:11, 542:25, 555:17, 555:20, 555:22, 555:25, 556:4, 556:6, 560:3, 560:8, 564:9, 573:20
**Government's** [22] - 471:20, 471:22, 472:16, 480:18, 481:17, 483:11, 484:19, 487:8, 487:9, 487:23, 490:4, 495:25, 497:15, 498:10, 501:23, 501:25, 502:2, 502:4, 502:6, 502:8, 502:10, 502:23
**government's** [9] - 466:19, 500:11,

501:19, 501:21, 502:16, 504:8, 511:22, 521:7, 560:23
**gram** [6] - 489:25, 490:6, 563:23, 567:16, 586:8, 586:10
**grams** [37] - 501:20, 501:22, 501:24, 502:1, 502:3, 502:5, 502:7, 502:9, 535:21, 536:12, 537:7, 537:13, 537:14, 547:11, 550:20, 552:9, 554:4, 554:7, 556:8, 556:13, 560:18, 560:19, 563:17, 563:23, 564:5, 565:21, 567:14, 567:16, 568:1, 568:3, 568:12, 570:3, 570:12, 571:15, 574:8, 574:9, 586:9
**grand** [1] - 493:1
**granted** [1] - 572:14
**graphic** [1] - 552:16
**gray** [1] - 477:19
**great** [1] - 590:13
**greater** [4] - 522:17, 527:8, 560:17, 560:18
**green** [1] - 478:19
**ground** [3] - 522:7, 522:8, 551:10
**group** [6] - 563:13, 563:14, 565:20, 575:8, 575:25, 576:1
**guarantee** [2] - 566:4, 582:6
**guess** [9] - 510:10, 513:9, 543:10, 553:20, 565:11, 569:5, 576:13, 578:15, 584:11
**guidance** [1] - 530:4
**guidelines** [2] - 527:6, 572:24
**guilt** [5] - 504:19, 520:10, 520:11, 521:10, 526:13
**guilty** [42] - 515:5, 515:6, 520:15, 520:21, 520:24, 521:2, 521:15, 521:16, 521:17, 521:19, 527:16, 530:19, 530:22, 530:23, 531:1, 531:19, 535:15, 539:7, 539:9, 539:22, 547:8, 547:9, 547:12, 547:13, 547:15, 547:23, 554:19, 565:19, 566:23, 570:16, 570:17, 572:20, 573:15, 574:5, 580:19, 581:18, 581:23, 582:2, 586:15
**gun** [21] - 548:9, 548:11, 548:13, 548:15, 548:17, 548:20, 548:21, 548:22, 558:18, 558:19, 558:22, 570:15, 570:21, 570:24, 572:11, 572:16, 574:11, 576:4, 583:15, 586:21
**guy** [2] - 575:7, 578:15
**guys** [10] - 473:3, 561:11, 561:12, 571:8, 571:23, 573:17, 576:5, 577:7, 577:8

## H

**half** [5] - 552:8, 563:23, 565:5, 567:15, 579:23
**halfs** [1] - 551:8
**hammering** [1] - 512:11
**hand** [8] - 466:25, 479:20, 520:22, 521:16, 521:24, 532:3, 541:22, 589:10
**handed** [4] - 468:21, 469:6, 480:25, 487:16

**handgun** [2] - 546:23, 548:13
**handle** [2] - 550:18, 590:15
**handled** [2] - 475:9, 564:21
**hands** [2] - 469:20, 578:7
**happy** [2] - 510:13, 551:17
**hard** [1] - 555:5
**hat** [1] - 473:9
**heads** [1] - 512:12
**healthy** [1] - 589:6
**hear** [20] - 466:24, 467:4, 475:21, 476:9, 476:10, 476:21, 517:1, 525:1, 530:6, 543:8, 555:4, 555:5, 558:6, 559:11, 559:12, 559:15, 564:10, 569:10, 584:2
**heard** [29] - 504:20, 516:23, 520:2, 525:22, 526:3, 528:10, 528:19, 529:7, 547:3, 548:4, 548:7, 549:5, 549:24, 552:19, 552:22, 553:16, 564:16, 569:14, 571:8, 578:2, 578:20, 581:5, 581:9, 581:12, 582:18, 583:22, 586:1, 586:13, 587:9
**hearing** [1] - 466:21
**heavy** [1] - 560:7
**held** [1] - 560:22
**help** [9] - 508:24, 509:7, 528:22, 530:6, 535:12, 538:14, 539:3, 544:13, 549:21
**helps** [1] - 533:8
**hereby** [1] - 500:19
**heroin** [1] - 557:14
**herring** [1] - 569:19
**herself** [1] - 525:15
**hesitate** [1] - 588:17
**hide** [2] - 473:19, 552:15
**highlight** [1] - 507:3
**highlighted** [3] - 512:1, 512:5, 512:18
**highlighting** [1] - 513:3
**himself** [3] - 492:10, 549:20, 583:18
**history** [1] - 492:1
**hit** [1] - 580:1
**hold** [6] - 481:10, 523:6, 527:13, 557:1, 565:3, 587:24
**holder** [1] - 590:16
**holding** [1] - 541:21
**holds** [1] - 571:10
**Holroyd** [27] - 496:15, 496:19, 497:2, 498:20, 505:9, 546:18, 547:2, 551:16, 551:23, 553:11, 555:15, 555:18, 556:2, 556:10, 561:10, 562:4, 562:6, 562:8, 563:22, 567:4, 567:8, 572:18, 573:18, 573:23, 582:17, 586:9
**Holroyd's** [1] - 574:22
**home** [2] - 574:5, 585:7
**homicide** [1] - 584:15
**homicides** [3] - 561:20, 571:9
**honest** [2] - 562:13, 562:15
**Honor** [47] - 465:4, 465:8, 465:20, 466:3, 467:7, 472:9, 472:14, 474:18, 475:14, 478:20, 480:20, 481:16, 483:9, 483:18, 487:4, 487:22, 489:4, 489:8, 494:23, 495:24, 496:3, 498:9, 499:7,

500:10, 502:16, 503:4, 504:12, 507:11,
507:19, 509:10, 510:10, 511:19,
515:20, 516:1, 516:2, 516:6, 516:11,
516:18, 546:14, 558:8, 570:23, 580:22,
581:1, 585:13, 585:20, 590:10, 590:19
**HONORABLE** [1] - 463:10
**hood** [1] - 577:8
**hope** [3] - 466:12, 555:9, 580:16
**hostility** [1] - 524:13
**hour** [2] - 577:12, 577:13
**house** [6] - 566:14, 566:16, 571:10,
583:17, 585:5, 585:9
**houses** [2] - 562:21, 562:22
**humiliated** [2] - 572:5, 572:8
**hundred** [2] - 554:4, 586:20
**hustler** [1] - 571:22
**hustling** [2] - 577:8

**I**

**I'mma** [2] - 550:18, 551:7
**idea** [1] - 510:23
**identical** [1] - 538:1
**identification** [4] - 475:4, 487:8,
497:15, 543:16
**identified** [6] - 478:21, 484:2, 501:6,
501:12, 530:2
**identifiers** [1] - 497:4
**identify** [4] - 465:6, 484:6, 496:13,
530:6
**identifying** [1] - 483:24
**identity** [3] - 501:4, 501:10, 532:16
**idiot** [1] - 571:7
**ignore** [7] - 517:8, 517:17, 518:7,
523:11, 523:14, 581:15, 581:16
**II** [3] - 464:3, 467:9, 467:21
**III** [1] - 463:9
**immediately** [2] - 583:13, 584:13
**impair** [1] - 524:17
**impartial** [2] - 522:23, 523:2
**impeach** [1] - 509:3
**impeached** [1] - 509:12
**impeachment** [3] - 509:7, 510:2, 510:4
**implements** [1] - 562:23
**importance** [1] - 588:13
**important** [4] - 513:22, 525:4, 561:1,
580:3
**importantly** [1] - 559:10
**impose** [2] - 526:8, 526:9
**imposing** [1] - 544:21
**impresses** [2] - 524:7, 524:8
**impression** [1] - 577:4
**imprisonment** [1] - 554:20
**improbability** [1] - 525:9
**improper** [1] - 527:14
**improperly** [1] - 517:25
**improve** [1] - 524:17
**in-court** [1] - 529:5
**inadvertently** [1] - 545:8

**incentive** [1] - 574:12
**incident** [1] - 524:25
**incidents** [1] - 492:19
**inclined** [1] - 591:3
**include** [2] - 507:21, 508:20
**included** [6] - 512:19, 513:8, 513:12,
537:19, 539:13, 570:1
**includes** [1] - 545:16
**including** [5] - 524:17, 535:12, 538:14,
539:3, 541:2
**incoming** [2] - 549:16, 549:19, 550:8,
550:11, 551:4, 551:7
**inconsistencies** [1] - 524:22
**inconsistency** [3] - 525:3, 525:5,
528:15
**inconsistent** [5] - 508:10, 509:5,
528:6, 528:12, 528:14
**incorrectly** [1] - 476:18
**independent** [2] - 545:18, 568:9
**indicate** [3] - 529:15, 566:5, 568:3
**indicated** [2] - 506:25, 518:6
**indicating** [3] - 506:15, 518:5, 577:1
**indicted** [2] - 492:21, 513:23, 513:24
**indictment** [17] - 465:19, 465:25,
466:5, 513:19, 520:7, 520:8, 530:14,
530:17, 530:20, 530:21, 530:23, 531:2,
531:5, 535:18, 539:16, 540:2, 547:9
**indirectly** [1] - 533:13
**individual** [4] - 468:16, 478:13,
487:13, 579:19
**individuals** [3] - 478:10, 542:3, 563:4
**infamous** [1] - 514:16
**infer** [3] - 529:12, 529:17
**inference** [1] - 520:10
**inferences** [2] - 519:20, 522:1
**influence** [2] - 530:20, 544:20
**influenced** [1] - 518:1
**informant** [36] - 470:1, 470:2, 471:3,
471:6, 471:8, 474:2, 475:25, 477:13,
477:15, 478:6, 480:3, 480:6, 480:9,
480:14, 480:25, 481:2, 481:5, 481:14,
482:15, 484:2, 486:10, 486:16, 486:18,
486:19, 486:21, 487:17, 488:7, 490:5,
490:18, 491:8, 492:19, 504:22, 552:24,
564:8, 583:4
**information** [2] - 553:24, 566:10
**initial** [1] - 588:19
**initiate** [2] - 470:7, 482:6
**initiated** [1] - 470:16
**innocence** [2] - 520:13, 520:17
**innocent** [7] - 520:13, 525:1, 525:6,
581:10, 582:21, 582:25
**insert** [2] - 511:10, 513:9
**inside** [7] - 478:4, 478:11, 486:5,
486:8, 487:9, 553:24, 566:10
**insignificant** [1] - 580:2
**instinct** [1] - 511:25
**instruct** [10] - 513:15, 516:4, 516:25,
517:14, 517:15, 530:18, 537:19, 539:5,
569:25, 589:14

**instructed** [7] - 520:4, 536:3, 553:4,
554:9, 556:24, 570:23, 587:18
**instruction** [14] - 507:5, 507:18,
510:11, 511:1, 511:23, 512:25, 513:13,
514:11, 545:13, 583:24, 583:25,
585:22, 588:10, 589:15
**instructions** [27] - 465:15, 506:20,
515:8, 515:17, 515:24, 517:2, 517:4,
517:6, 517:7, 517:9, 517:10, 517:16,
542:22, 542:24, 547:16, 547:19,
547:21, 557:6, 557:15, 570:25, 581:12,
581:14, 581:16, 581:24, 590:5, 590:21
**intend** [1] - 549:7
**intended** [6] - 518:21, 519:24, 535:5,
538:8, 568:6, 570:4
**intends** [1] - 529:18
**intent** [65] - 505:2, 505:10, 511:24,
513:10, 513:25, 514:14, 529:10,
529:12, 529:16, 531:6, 531:14, 531:17,
531:25, 532:6, 532:10, 532:22, 534:13,
535:1, 535:16, 536:5, 536:6, 536:9,
536:12, 536:20, 537:5, 537:18, 537:24,
538:2, 539:8, 539:12, 539:19, 539:25,
540:7, 540:16, 540:20, 540:22, 540:25,
541:3, 541:6, 541:13, 541:16, 541:25,
542:6, 547:10, 547:12, 548:1, 548:25,
550:24, 552:5, 552:13, 553:1, 560:17,
565:19, 568:8, 568:11, 568:13, 569:2,
569:20, 569:24, 570:3, 570:12, 570:19,
574:4, 574:6, 574:7
**intentional** [1] - 525:6
**intentionally** [5] - 529:19, 532:14,
532:21, 533:2, 534:14
**intercepted** [1] - 530:1
**intercepts** [1] - 498:7
**interest** [4] - 524:12, 526:20, 554:11,
567:5
**interesting** [6] - 564:4, 574:18, 574:20,
575:6, 575:21, 578:14
**interests** [1] - 532:5
**internet** [4] - 545:2, 545:20, 589:16,
589:17
**interpreted** [1] - 565:12
**interview** [8] - 495:22, 496:1, 507:25,
520:5, 519:18, 566:21, 576:3, 584:8
**interviewed** [2] - 495:19, 574:2
**introduce** [1] - 481:10
**investigating** [2] - 468:3, 552:7
**investigation** [15] - 468:16, 468:19,
468:20, 468:25, 469:4, 469:6, 469:20,
482:1, 482:3, 488:4, 494:8, 497:2,
545:18, 563:6, 563:8
**Investigations** [1] - 467:25
**investigations** [1] - 468:21
**investigative** [1] - 488:13
**investigator** [2] - 493:23, 520:5
**investigators** [1] - 520:3
**invite** [1] - 544:15
**involved** [15] - 468:15, 468:19, 468:24,
469:9, 475:10, 475:12, 512:3, 532:2,

532:9, 535:19, 560:16, 563:14, 564:20, 586:4, 586:11
**involving** [1] - 468:16
**iPhone** [2] - 499:24, 569:10
**iPhones** [3] - 499:14, 569:11, 569:15
**ipso** [1] - 567:8
**irrelevant** [1] - 543:6
**Israelis** [1] - 569:12
**issue** [4] - 536:24, 546:11, 566:20, 587:19
**issues** [1] - 466:23
**italics** [1] - 513:3
**itself** [1] - 533:9

## J

**jacket** [1] - 478:19
**jail** [2] - 562:11, 574:16
**January** [12] - 495:19, 496:2, 531:4, 531:23, 534:11, 555:11, 555:17, 555:20, 556:12, 559:18, 565:17, 583:11
**Jeep** [7] - 477:14, 477:17, 478:4, 479:16, 486:5, 486:8, 486:12
**jig** [1] - 551:2
**job** [2] - 548:17, 586:24
**jobs** [1] - 563:11
**Johnson** [19] - 470:3, 470:5, 470:9, 475:25, 476:4, 476:10, 476:23, 490:19, 490:23, 491:8, 493:23, 494:2, 494:9, 494:13, 561:9, 561:10, 562:4, 562:5, 583:5
**joined** [6] - 468:13, 532:14, 533:2, 533:7, 534:2, 534:14
**joins** [1] - 532:21
**joint** [3] - 495:24, 542:5, 550:19
**Joint** [2] - 502:24, 503:1
**jointly** [2] - 509:9, 542:3
**JoJo** [3] - 554:1, 559:7, 559:8
**Joseph** [1] - 501:1
**judge** [7] - 526:7, 526:8, 526:9, 552:3, 586:13, 586:19
**Judge** [10] - 547:17, 547:19, 553:3, 554:9, 554:22, 554:23, 556:24, 584:2, 586:16, 587:18
**JUDGE** [1] - 463:10
**Judge's** [4] - 547:21, 581:12, 581:16, 581:24
**judges** [3] - 517:19, 523:21, 588:24
**judging** [4] - 509:21, 523:24, 528:16, 529:1
**judgment** [8] - 504:13, 505:17, 519:22, 524:3, 525:21, 526:2, 527:1, 542:14
**judicial** [2] - 506:22, 506:23
**juries** [1] - 588:19
**jurisdiction** [1] - 473:3
**jurisdictions** [1] - 579:25
**juror** [7] - 542:15, 544:15, 588:13, 588:17, 589:3, 589:13
**JUROR** [1] - 506:13
**jurors** [10] - 467:3, 518:13, 518:19,

521:3, 545:9, 546:6, 588:5, 588:11, 589:1, 589:6
**Jury** [8] - 465:3, 466:10, 504:10, 515:22, 516:13, 557:12, 558:3, 590:7
**jury** [51] - 465:14, 466:9, 470:25, 472:16, 474:20, 474:22, 475:18, 482:11, 483:10, 483:15, 493:1, 498:10, 499:1, 504:19, 504:20, 505:1, 505:7, 506:20, 508:2, 510:6, 513:4, 513:20, 515:17, 516:3, 516:12, 517:18, 518:15, 522:22, 543:11, 543:25, 544:4, 544:6, 545:12, 545:15, 545:24, 546:1, 546:8, 546:16, 549:15, 555:6, 557:16, 570:25, 579:8, 588:14, 588:20, 589:12, 589:20, 589:22, 589:24, 591:14
**JURY** [1] - 463:9
**justified** [1] - 519:20

## K

**Kaneshiro** [2] - 592:3, 592:8
**KANESHIRO** [2] - 463:20, 592:9
**Kaneshiro-Miller** [2] - 592:3, 592:8
**KANESHIRO-MILLER** [2] - 463:20, 592:9
**keep** [10] - 507:4, 508:18, 512:4, 543:15, 550:14, 552:16, 552:18, 552:21, 561:7, 565:16
**Keness** [6] - 547:4, 548:4, 578:6, 578:14, 579:16, 586:24
**KEVIN** [1] - 463:14
**Kevin** [1] - 465:8
**kids** [2] - 574:13, 574:14
**kind** [17] - 465:14, 465:16, 466:16, 473:18, 477:6, 485:5, 486:13, 510:23, 512:11, 512:15, 520:9, 526:10, 534:7, 558:13, 574:18, 584:9, 587:2
**kinds** [3] - 571:20, 571:21, 579:25
**knowing** [2] - 529:11, 533:9
**knowingly** [4] - 532:21, 533:7, 534:14, 540:4
**knowledge** [3] - 479:14, 521:23, 542:8
**known** [3] - 531:15, 536:15, 563:7
**knows** [10] - 553:25, 560:19, 572:18, 575:5, 575:6, 575:19, 581:20, 586:19, 586:20, 586:21

## L

**lab** [2] - 481:24, 519:9
**lacking** [1] - 580:17
**ladies** [18] - 475:7, 502:17, 504:7, 516:14, 516:23, 546:15, 546:17, 547:7, 549:25, 555:2, 556:18, 557:5, 558:4, 558:9, 564:5, 581:4, 587:14, 588:9
**lady** [1] - 560:2
**LaGrossa** [5] - 547:4, 552:20, 578:15, 586:24, 587:4
**language** [2] - 507:1, 513:3, 513:6
**lap** [1] - 486:13

**laptop** [2] - 511:18, 590:22
**large** [1] - 569:3
**largest** [2] - 556:19, 587:16
**laser** [1] - 479:18
**last** [12] - 482:15, 497:23, 497:25, 503:25, 507:13, 511:6, 555:21, 556:1, 571:13, 580:15, 583:11, 588:25
**laughed** [1] - 587:7
**laughing** [1] - 579:17
**LAW** [1] - 513:11
**law** [24] - 488:17, 489:2, 517:13, 517:14, 517:15, 520:16, 521:12, 522:11, 522:13, 527:3, 527:9, 528:6, 531:15, 534:16, 535:9, 538:12, 539:1, 539:18, 542:2, 542:23, 556:24, 580:13, 580:15, 581:14
**laws** [2] - 558:20, 558:21
**lawyer** [5] - 520:4, 523:5, 523:6, 581:6, 587:10
**lawyer's** [2] - 523:7, 523:11
**lawyers** [3] - 519:23, 520:1, 523:3
**laying** [1] - 469:12
**lead** [2] - 505:7, 533:14
**leading** [2] - 488:10, 499:3
**leap** [2] - 559:21, 565:24
**learn** [1] - 488:8
**least** [1] - 540:21
**leave** [6] - 478:25, 479:13, 479:14, 509:16, 512:24, 589:8
**leaves** [1] - 521:9
**leaving** [1] - 508:10
**led** [1] - 533:16
**left** [2] - 479:20, 516:25
**left-hand** [1] - 479:20
**legal** [2] - 483:25, 585:1
**lengthy** [1] - 492:1
**lenient** [1] - 526:8
**less** [5] - 537:14, 559:23, 564:5, 565:20, 565:21
**lesser** [6] - 513:8, 513:12, 527:8, 537:19, 539:13, 570:1
**liability** [2] - 512:22, 512:25
**Liberty** [4] - 477:14, 477:17, 478:4, 479:16
**license** [2] - 484:4, 484:6
**lie** [1] - 526:18
**lied** [1] - 577:3
**life** [4] - 554:20, 572:23, 586:16, 586:18
**life-eligible** [1] - 586:18
**light** [4] - 477:24, 504:18, 519:20, 583:18
**lighting** [1] - 486:1
**likelihood** [1] - 589:17
**likely** [3] - 521:5, 568:2, 568:12
**likewise** [1] - 490:5
**line** [7] - 479:11, 485:4, 549:22, 550:7, 550:18, 551:1, 586:3
**list** [1] - 563:1

**listed** [1] - 554:1
**listen** [15] - 508:14, 510:8, 510:15, 511:9, 530:4, 545:4, 545:5, 559:16, 559:17, 565:22, 566:21, 566:22, 575:13, 575:16, 576:2
**listened** [1] - 498:6
**listening** [5] - 471:5, 482:16, 510:12, 511:14, 543:21
**literally** [1] - 574:17
**live** [3] - 583:25, 585:6
**lives** [1] - 585:9
**living** [2] - 572:17, 574:14
**lo** [1] - 578:16
**loaded** [1] - 546:22
**location** [3] - 471:14, 482:17, 542:9
**locked** [1] - 499:13
**logs** [2] - 498:17, 498:19
**look** [27] - 474:12, 481:12, 487:18, 496:10, 496:24, 498:17, 511:20, 513:4, 515:9, 549:22, 553:15, 559:4, 561:1, 561:16, 562:10, 563:16, 563:19, 566:2, 569:17, 571:6, 572:8, 572:13, 572:21, 579:18, 583:24, 585:22
**looked** [3] - 522:2, 522:6, 549:13
**looking** [4] - 472:23, 485:8, 497:19, 549:14
**Looking** [1] - 480:23
**looks** [4] - 472:24, 476:2, 507:8, 514:2
**Lorenzo** [17] - 495:17, 507:21, 508:21, 510:2, 525:22, 526:3, 528:10, 528:19, 529:7, 549:17, 551:12, 553:23, 561:9, 562:3, 572:13, 572:14, 582:13
**lose** [1] - 580:4
**lost** [1] - 488:6
**low** [1] - 587:3
**lunch** [2] - 557:4, 557:17
**luncheon** [1] - 557:19

# M

**magazine** [3] - 546:24, 572:16, 576:4
**mail** [1] - 545:16
**main** [2] - 484:17, 485:8
**male** [1] - 486:10
**Malvin** [9] - 470:3, 475:25, 476:4, 476:10, 476:23, 490:19, 490:21, 490:23, 494:2
**man** [12] - 492:4, 562:17, 563:25, 564:13, 568:14, 569:1, 575:2, 576:22, 579:17, 580:1, 580:15, 587:3
**Manassas** [7] - 471:17, 473:1, 473:7, 473:11, 553:1, 553:13, 586:11
**manner** [3] - 517:13, 524:6, 558:11
**Manor** [3] - 484:16, 485:4, 485:10
**map** [3] - 472:24, 473:2, 479:9
**maps** [1] - 472:10
**March** [46] - 497:11, 498:3, 499:4, 505:14, 512:23, 513:18, 513:25, 514:14, 514:19, 531:8, 538:4, 538:23, 539:21, 540:2, 546:17, 548:2, 549:1,

552:12, 555:22, 555:25, 556:4, 556:11, 558:18, 563:7, 563:19, 563:23, 565:17, 566:17, 567:8, 567:13, 567:15, 568:4, 569:7, 569:20, 570:11, 570:19, 572:10, 577:20, 578:3, 583:9, 585:14, 585:21
**mark** [1] - 480:5
**marked** [6] - 471:20, 475:4, 480:18, 487:7, 497:15, 543:15
**marshal** [5] - 543:24, 543:25, 544:3, 545:23, 546:6
**match** [1] - 582:16
**matched** [3] - 497:5, 497:8, 497:12
**material** [3] - 538:13, 539:2, 562:22
**materials** [2] - 535:11, 569:4
**math** [1] - 556:9
**matter** [16] - 510:22, 525:4, 544:24, 546:1, 546:9, 561:23, 563:5, 569:14, 574:8, 574:17, 576:2, 577:22, 579:22, 585:17, 588:24, 592:5
**matters** [4] - 466:16, 524:1, 524:11, 588:12
**maximum** [1] - 572:23
**McFadden** [9] - 463:10, 547:17, 547:20, 554:22, 556:24, 584:2, 586:16, 586:19, 587:18
**mean** [10] - 477:5, 555:13, 561:4, 566:2, 566:16, 567:9, 568:19, 568:22, 571:6, 572:1
**means** [18] - 522:12, 523:24, 534:19, 534:22, 535:2, 540:5, 540:8, 540:13, 540:18, 541:18, 545:19, 546:7, 550:3, 550:4, 565:2, 571:1, 572:22, 582:20
**meant** [4] - 543:1, 549:18, 549:21, 553:25
**media** [1] - 545:3
**meet** [2] - 471:2, 490:23
**meeting** [3] - 471:2, 520:2, 546:19
**Melanie** [2] - 501:7, 519:13
**member** [7] - 468:22, 532:18, 533:1, 545:24, 546:1, 561:4, 561:6
**members** [3] - 533:20, 533:21, 545:24
**memory** [7] - 518:10, 518:11, 518:17, 518:19, 518:20, 524:8, 524:15
**men** [7] - 546:20, 563:9, 564:19, 566:6, 566:9, 566:11, 567:9
**mention** [6] - 466:20, 540:11, 566:22, 566:24, 571:2, 573:14
**mentioned** [4] - 466:13, 490:9, 563:4, 573:17
**mentioning** [2] - 566:24, 567:2
**mere** [5] - 533:5, 540:8, 542:8, 571:1
**merely** [6] - 469:12, 520:7, 527:9, 532:4, 533:6, 533:9
**merits** [1] - 546:2
**message** [8] - 549:23, 550:7, 550:8, 550:11, 550:18, 551:4, 551:7, 551:12
**messages** [13] - 549:11, 549:16, 549:18, 549:19, 559:3, 559:12, 559:19, 559:25, 582:9, 582:10, 582:12
**met** [4] - 482:15, 491:10, 493:23, 561:1

**Metropolitan** [1] - 488:22
**MICHAEL** [1] - 463:16
**microwave** [1] - 554:16
**might** [6] - 467:2, 507:9, 513:16, 526:9, 557:13, 565:1
**Migliara** [1] - 584:20
**miles** [1] - 473:4
**Miller** [2] - 592:3, 592:8
**MILLER** [2] - 463:20, 592:9
**million** [1] - 569:12
**mind** [6] - 529:25, 543:15, 546:4, 565:16, 566:1, 569:22
**mindful** [1] - 544:10
**mine** [1] - 550:18
**minimize** [3] - 554:18, 554:23, 586:19
**minimum** [1] - 572:22
**minor** [1] - 532:19
**minute** [3] - 508:4, 579:10, 590:21
**minutes** [2] - 493:10, 564:6
**misrecollection** [1] - 525:1
**missing** [1] - 568:24
**mission** [1] - 544:11
**misspelled** [1] - 514:10
**mistake** [4] - 534:21, 535:4, 538:7, 538:25
**mix** [2] - 554:15
**mixture** [10] - 501:19, 501:21, 501:23, 501:25, 502:2, 502:4, 502:6, 502:8, 535:23, 535:25
**mixtures** [2] - 537:8, 537:15
**modifies** [1] - 542:24
**Mohanty** [8] - 465:9, 546:13, 557:3, 558:15, 559:14, 560:9, 580:21, 580:24
**mohanty** [1] - 516:8
**MOHANTY** [18] - 463:13, 465:20, 466:8, 511:19, 516:6, 546:14, 561:25, 573:7, 578:24, 579:2, 580:8, 580:10, 580:22, 580:25, 581:3, 585:2, 585:16, 585:20
**moment** [3] - 489:4, 509:2, 549:14
**moments** [1] - 563:9
**money** [14] - 481:10, 494:14, 494:15, 494:19, 548:5, 548:9, 548:18, 553:10, 553:11, 553:13, 556:15, 556:16, 569:3, 586:12
**monitoring** [1] - 567:18
**month** [3] - 468:7, 492:24, 566:25
**months** [7] - 505:21, 566:23, 567:18, 573:1, 573:2, 573:16, 575:9
**Moore** [44] - 495:17, 496:1, 505:6, 505:9, 507:25, 508:21, 510:2, 525:22, 526:3, 528:10, 528:19, 529:7, 549:17, 551:13, 551:14, 551:19, 553:12, 553:16, 553:17, 553:19, 553:23, 554:21, 559:8, 561:9, 562:3, 562:8, 562:16, 566:19, 571:8, 572:13, 572:14, 573:19, 574:3, 574:24, 574:25, 575:10, 577:2, 577:3, 577:10, 582:13, 584:7, 584:11, 586:13
**Moore's** [5] - 507:21, 554:8, 554:10,

559:17, 571:24
**morning** [11] - 465:8, 465:10, 465:13, 466:11, 466:18, 467:14, 467:15, 495:11, 495:12, 546:16, 591:6
**most** [3] - 504:18, 551:18, 556:21
**motion** [4] - 470:10, 504:11, 504:13, 505:16
**motions** [1] - 504:15
**motivated** [1] - 526:23
**motivation** [1] - 470:4
**motive** [1] - 524:9
**move** [15] - 469:10, 472:15, 474:19, 481:16, 483:10, 487:23, 495:25, 498:9, 503:3, 558:10, 558:13, 562:2, 570:5, 570:7, 570:13
**moved** [5] - 489:18, 490:3, 507:22, 509:8, 509:9
**MR** [163] - 465:8, 465:11, 465:20, 466:8, 467:7, 467:13, 469:10, 469:14, 469:17, 470:21, 470:23, 470:24, 472:14, 472:17, 472:21, 474:18, 474:23, 474:25, 475:3, 475:14, 475:15, 475:20, 476:12, 478:20, 478:22, 478:24, 480:22, 481:16, 481:18, 481:20, 481:22, 483:9, 483:13, 483:18, 483:20, 484:10, 487:3, 487:6, 487:22, 487:25, 488:3, 488:9, 488:11, 488:12, 489:4, 489:6, 489:8, 489:10, 489:16, 489:17, 493:18, 493:21, 494:23, 495:4, 495:10, 495:24, 496:3, 496:6, 498:9, 498:11, 498:15, 499:7, 499:10, 500:10, 500:15, 502:23, 503:4, 503:6, 503:9, 503:12, 503:15, 503:18, 503:21, 503:24, 504:1, 504:4, 504:12, 505:20, 507:10, 507:13, 507:19, 507:23, 507:25, 508:3, 508:8, 508:13, 508:15, 508:16, 508:22, 509:2, 509:3, 509:5, 509:10, 509:24, 509:25, 510:7, 510:8, 510:17, 510:19, 510:23, 511:1, 511:16, 511:19, 512:7, 512:15, 513:1, 513:18, 514:5, 514:7, 514:8, 514:16, 514:21, 514:23, 514:25, 515:12, 515:16, 515:20, 516:1, 516:2, 516:6, 516:11, 516:18, 516:22, 546:14, 558:8, 561:25, 562:3, 573:7, 573:9, 575:15, 576:17, 576:19, 578:24, 579:2, 579:4, 579:7, 579:10, 579:13, 580:8, 580:9, 580:10, 580:12, 580:22, 580:25, 581:3, 584:22, 584:25, 585:2, 585:5, 585:7, 585:8, 585:13, 585:16, 585:17, 585:20, 590:10, 590:12, 590:14, 590:17, 590:18, 590:24, 591:9, 591:16
**murder** [1] - 561:22
**murders** [2] - 561:14, 575:5
**must** [44] - 520:8, 521:7, 521:8, 521:16, 521:18, 522:24, 523:1, 523:6, 523:12, 523:19, 527:13, 527:15, 530:9, 530:12, 531:20, 532:12, 532:13, 533:11, 533:15, 534:9, 535:19, 535:22, 537:10, 538:3, 538:18, 538:22, 539:22,

540:10, 540:18, 540:21, 541:11, 542:11, 542:14, 542:15, 542:16, 542:25, 545:5, 545:6, 566:20, 573:11, 582:2, 583:25, 584:1, 588:25
**mutual** [1] - 544:14

## N

**name** [13] - 467:18, 467:20, 468:16, 470:3, 483:22, 483:25, 495:13, 498:22, 507:21, 554:1, 563:4, 583:3, 589:9
**Narcotics** [1] - 468:1
**narcotics** [12] - 468:4, 468:8, 468:21, 468:22, 470:8, 487:1, 492:16, 552:7, 559:2, 562:23, 568:9, 568:21
**natural** [2] - 529:18, 584:14
**nature** [4] - 522:22, 522:25, 532:20, 541:3
**near** [2] - 531:12, 542:8
**necessarily** [3] - 532:5, 545:1, 555:13
**necessary** [7] - 482:4, 508:14, 521:4, 529:24, 532:14, 544:5, 545:21
**neck** [1] - 491:3
**need** [16] - 503:3, 505:25, 531:8, 534:23, 535:6, 538:10, 547:24, 550:3, 550:4, 550:9, 551:5, 551:7, 577:15, 585:17, 589:11, 589:20
**needs** [2] - 582:10, 590:1
**negotiated** [1] - 470:19
**neighborhood** [5] - 566:11, 571:13, 576:5, 583:23, 584:1
**never** [7] - 494:10, 520:16, 546:1, 546:4, 546:8, 565:6, 587:8
**new** [2] - 514:9, 550:13
**newspaper** [1] - 545:2
**next** [10] - 467:6, 479:5, 479:23, 480:5, 482:3, 488:13, 550:11, 550:18, 563:21, 570:5
**nickel** [1] - 561:19
**nickname** [3] - 484:1, 490:21, 551:15
**NIHAR** [1] - 463:13
**Nihar** [1] - 465:9
**nine** [6] - 562:9, 562:10, 571:9, 572:15, 574:10, 575:4
**non** [8] - 488:10, 535:13, 538:15, 539:4, 560:1, 560:2, 566:20, 567:23
**non-drug-related** [2] - 560:1, 560:2
**non-entity** [1] - 567:23
**non-expert** [3] - 535:13, 538:15, 539:4
**non-issue** [1] - 566:20
**non-leading** [1] - 488:10
**none** [2] - 564:3
**nonetheless** [1] - 533:15
**note** [6] - 517:10, 518:21, 543:24, 545:22, 545:25, 591:6
**note-taker's** [1] - 518:21
**notebook** [1] - 589:9
**notebooks** [1] - 518:14
**notes** [5] - 518:14, 518:17, 518:20, 518:21, 591:14

**nothing** [19] - 488:15, 491:16, 542:20, 542:22, 542:23, 564:14, 565:10, 566:5, 566:7, 566:12, 568:3, 569:1, 571:22, 574:10, 575:5, 575:6, 589:3, 591:16
**notice** [3] - 506:22, 506:23, 530:8
**notify** [1] - 543:23
**notorious** [1] - 556:21
**November** [16] - 468:12, 468:14, 470:17, 471:13, 473:13, 474:13, 482:6, 483:3, 483:12, 484:7, 489:23, 490:6, 492:8, 493:8, 551:12
**number** [27] - 466:18, 497:1, 497:5, 497:8, 497:9, 497:12, 497:13, 497:20, 497:21, 498:5, 502:22, 517:4, 543:2, 551:13, 551:23, 555:16, 558:11, 559:4, 565:6, 565:7, 582:15, 582:16, 583:3, 586:8, 589:10, 590:5
**Number** [3] - 466:4, 489:19, 490:4
**numbers** [1] - 591:2
**NW** [3] - 463:15, 463:17, 463:21

## O

**O'Neal** [6] - 467:8, 467:20, 469:15, 475:21, 552:23, 583:22
**O'NEAL** [2] - 464:3, 467:9
**O-'-N-E-A-L** [1] - 467:21
**oath** [3] - 501:16, 509:4, 526:18
**object** [2] - 523:8, 532:22
**objected** [1] - 523:3
**objecting** [1] - 523:5
**objection** [24] - 469:10, 470:21, 472:17, 472:18, 474:23, 475:1, 478:22, 481:18, 481:19, 483:13, 487:25, 488:1, 488:9, 498:11, 498:12, 523:11, 561:25, 573:7, 578:24, 580:8, 580:10, 584:22, 585:12, 585:19
**objections** [2] - 504:16, 523:6
**objective** [1] - 532:24
**obligation** [2] - 526:15, 560:4
**observe** [6] - 474:1, 477:14, 478:6, 478:10, 494:5, 524:11
**observed** [2] - 524:1, 577:24
**obtained** [1] - 564:19
**obvious** [2] - 550:23, 550:24
**obviously** [2] - 511:20, 591:1
**occasion** [4] - 528:11, 528:20, 529:4, 562:6
**occasions** [2] - 492:7, 566:16
**occurred** [5] - 505:14, 531:3, 539:20, 540:2, 543:5
**October** [6] - 463:6, 466:1, 466:2, 468:6, 549:23, 551:1
**OF** [4] - 463:1, 463:3, 463:9, 592:1
**offense** [30] - 512:3, 513:8, 513:13, 513:21, 520:20, 520:21, 520:23, 520:25, 525:24, 530:15, 530:16, 531:5, 531:11, 534:18, 535:16, 537:20, 539:13, 539:22, 540:1, 549:1, 559:2, 569:21, 570:1, 570:16, 570:17, 570:21,

570:22, 571:5, 571:7, 572:21
**offenses** [4] - 531:2, 531:10, 539:6, 587:20
**offer** [1] - 516:16
**offered** [1] - 523:4
**Office** [3] - 463:14, 465:22, 468:12
**office** [2] - 465:22, 589:22
**officer** [5] - 490:11, 494:7, 527:3, 527:5, 527:9
**Officer** [8] - 547:4, 548:4, 552:20, 579:16, 586:23, 586:24, 587:4
**officers** [4] - 546:20, 547:4, 579:25, 587:9
**OFFICIAL** [1] - 592:1
**often** [2] - 544:5, 588:22
**old** [3] - 556:5, 556:7
**omissions** [1] - 543:8
**once** [7] - 465:16, 467:3, 474:3, 512:11, 567:3, 573:25, 579:14
**one** [78] - 466:20, 466:21, 466:22, 468:20, 475:16, 476:13, 479:8, 484:17, 484:19, 485:4, 485:25, 489:4, 490:6, 490:9, 495:13, 503:25, 511:10, 512:22, 522:13, 522:21, 530:20, 530:23, 533:19, 533:25, 534:19, 537:7, 538:4, 538:23, 542:13, 545:1, 545:23, 546:21, 547:1, 548:14, 548:21, 549:22, 550:9, 550:17, 551:14, 551:15, 551:18, 552:9, 554:25, 555:18, 555:21, 559:7, 559:25, 560:5, 560:21, 564:9, 564:10, 565:6, 566:15, 566:19, 567:20, 569:10, 575:17, 575:18, 576:14, 577:7, 577:8, 577:24, 577:25, 578:11, 580:1, 582:5, 582:18, 585:14, 586:9, 586:10, 586:12, 587:4, 587:24, 590:11
**One** [1] - 550:11
**ones** [2] - 549:19, 551:8, 588:16
**ongoing** [1] - 505:20
**open** [8] - 546:3, 546:8, 550:1, 553:22, 579:12, 583:18, 585:18, 588:8
**operating** [1] - 499:15
**operation** [3] - 477:7, 482:2, 482:13
**opinion** [10] - 501:4, 501:10, 518:6, 527:24, 528:1, 528:3, 542:21, 588:14
**opinions** [2] - 527:18, 527:19
**opportunity** [5] - 505:18, 505:21, 524:10, 544:1, 590:22
**oral** [1] - 553:6
**orally** [1] - 546:3
**order** [10] - 513:16, 535:10, 537:22, 538:13, 539:1, 539:5, 539:14, 539:21, 542:15, 569:22
**Order** [2] - 465:25, 466:2
**orderly** [1] - 517:12
**ordinarily** [2] - 527:17, 529:10
**organize** [1] - 544:13
**origin** [1] - 518:1
**Orlando** [26] - 465:5, 465:12, 468:16, 476:7, 482:10, 500:19, 527:12, 529:14, 529:24, 531:13, 537:17, 538:23, 539:7,

539:16, 539:22, 539:24, 540:4, 540:15, 540:24, 541:4, 541:9, 541:12, 551:4, 559:24, 559:25, 560:1
**ORLANDO** [1] - 463:5
**others'** [1] - 560:24
**otherwise** [7] - 507:17, 512:11, 526:9, 530:18, 541:19, 544:2, 561:5
**ought** [1] - 574:18
**ounces** [2] - 561:10, 572:15
**ourselves** [3] - 512:14, 512:15, 512:21
**outcome** [1] - 524:12
**outfitted** [2] - 471:5, 482:16
**outgoing** [2] - 549:24, 559:11
**outset** [1] - 588:16
**outside** [2] - 477:24, 585:11
**outweighed** [1] - 528:2
**overall** [1] - 472:24
**overcomes** [1] - 521:13
**overhead** [3] - 472:9, 473:9, 473:10
**overriding** [1] - 581:5
**overrule** [1] - 541:24
**overruled** [2] - 469:11, 585:19
**overt** [1] - 534:17
**overwhelmingly** [1] - 581:20
**own** [6] - 518:10, 518:19, 518:20, 518:22, 536:14, 549:9

# P

**p.m** [4] - 485:25, 558:2, 590:7
**PA** [1] - 555:5
**pack** [1] - 565:3
**package** [1] - 584:5
**packages** [1] - 487:13
**packaging** [3] - 562:22, 565:15, 569:4
**packs** [1] - 565:2
**page** [24] - 465:17, 471:22, 471:24, 472:1, 472:3, 472:5, 472:7, 472:22, 472:23, 473:8, 479:7, 484:21, 506:24, 507:9, 511:7, 512:1, 512:5, 512:8, 512:24, 514:5, 515:3, 589:9, 590:9
**PAGE** [1] - 464:6
**paid** [1] - 569:12
**pants** [1] - 578:7
**papers** [1] - 526:7
**paperwork** [2] - 482:4, 488:14
**paragraph** [8] - 506:22, 506:24, 507:10, 507:14, 511:11, 512:5, 512:18, 514:7
**parentheses** [1] - 507:2
**Park** [5] - 496:9, 498:4, 546:20, 567:14, 572:10
**park** [1] - 477:16
**Parkchester** [1] - 469:4
**parked** [3] - 479:16, 485:1, 485:3
**parking** [24] - 473:25, 477:1, 477:8, 477:14, 477:20, 477:22, 479:1, 479:19, 479:21, 479:23, 480:8, 480:13, 484:15, 484:17, 485:4, 485:5, 485:10, 485:18, 485:21, 486:14, 492:8, 493:7, 494:1,

494:2
**parole** [1] - 562:12
**part** [17] - 492:18, 493:23, 523:16, 532:19, 532:25, 533:3, 533:10, 533:12, 553:24, 563:12, 563:14, 565:20, 566:6, 566:11, 575:7, 575:25, 576:1
**partially** [1] - 528:2
**participants** [2] - 533:6, 533:9
**participated** [1] - 525:24
**participating** [1] - 532:17
**particular** [15] - 477:7, 477:12, 485:3, 485:20, 486:16, 488:14, 517:6, 520:20, 520:23, 522:14, 530:11, 533:17, 547:11, 548:1, 585:24
**particularly** [3] - 497:9, 513:22, 591:4
**parties** [12] - 500:16, 500:18, 500:25, 501:6, 501:14, 502:10, 507:17, 519:2, 519:3, 519:7, 519:12, 538:15
**partisans** [1] - 588:23
**partnership** [6] - 534:7, 556:16, 561:8, 563:15, 567:9, 567:10
**partnership-in-crime** [1] - 561:8
**parts** [2] - 543:3, 543:6
**party** [2] - 488:16, 523:7
**pass** [1] - 474:22
**passenger** [2] - 478:7, 486:10
**past** [5] - 477:16, 479:17, 480:3, 557:15, 573:12
**patience** [1] - 516:15
**patient** [1] - 558:10
**PATRICIA** [2] - 463:20, 592:9
**Patricia** [2] - 592:3, 592:8
**Pause** [1] - 489:5
**peashooter** [3] - 575:7, 582:6, 582:8
**peek** [1] - 590:25
**pending** [2] - 470:5, 491:20
**people** [19] - 524:13, 531:25, 532:4, 532:16, 533:3, 533:19, 549:16, 553:7, 553:13, 559:4, 559:6, 573:18, 576:6, 584:3, 584:4, 584:5, 584:6, 587:17
**per** [1] - 466:2
**perfectly** [1] - 520:4
**performed** [1] - 558:12
**perhaps** [2] - 560:9, 564:25
**period** [2] - 563:24, 565:16
**perjury** [1] - 526:17
**permission** [5] - 480:20, 481:16, 487:3, 498:9, 584:21
**permit** [8] - 526:8, 548:19, 548:20, 548:21, 558:17, 558:18, 572:4
**permitted** [5] - 518:13, 519:18, 522:16, 525:23, 526:10
**person** [26] - 484:7, 504:24, 520:8, 522:2, 524:7, 529:11, 529:18, 532:18, 532:19, 532:20, 534:6, 534:23, 535:5, 538:9, 540:9, 540:14, 541:19, 541:21, 541:23, 541:25, 545:19, 546:5, 559:6, 564:23, 565:10
**personal** [3] - 518:22, 568:13, 589:3
**personally** [2] - 469:24, 536:11

**persons** [3] - 524:25, 533:23, 542:5
**perspective** [6] - 508:13, 561:8, 564:8, 566:8, 572:9, 573:10
**pertains** [1] - 525:4
**PG** [1] - 552:16
**phone** [55] - 470:10, 470:12, 470:25, 471:6, 473:23, 473:24, 496:13, 496:18, 497:1, 497:5, 497:8, 497:9, 497:12, 497:20, 497:21, 498:2, 498:3, 498:5, 498:16, 498:21, 498:24, 499:1, 499:3, 499:5, 499:25, 500:2, 530:1, 549:25, 551:6, 551:13, 551:22, 551:23, 553:18, 554:1, 556:2, 563:22, 575:11, 576:12, 576:19, 576:20, 577:4, 577:5, 577:16, 577:17, 582:15, 583:3, 584:8, 584:11, 589:10
**phones** [4] - 496:24, 499:16, 569:16, 569:17
**photo** [3] - 484:4, 484:6, 497:22
**photographs** [2] - 471:20, 471:21
**photos** [1] - 472:10
**phrase** [1] - 540:5
**physical** [5] - 497:21, 541:18, 541:21, 541:24, 590:15
**physically** [1] - 536:25
**pick** [5] - 480:12, 485:11, 485:13, 486:18, 573:21
**picked** [5] - 473:16, 491:22, 553:18, 559:18, 571:16
**picture** [4] - 567:1, 567:4, 567:22
**pin** [1] - 499:23
**pinch** [1] - 481:9
**Pinkerton** [7] - 512:8, 512:10, 512:20, 512:21, 512:22, 512:25, 560:23
**pipe** [1] - 583:13
**Place** [2] - 468:25, 469:4
**place** [2] - 473:25, 474:5, 482:17, 531:3, 531:8, 566:2, 590:15
**places** [2] - 473:16, 557:14
**plan** [2] - 532:2, 532:20
**plastic** [1] - 565:2
**play** [11] - 508:2, 508:3, 508:4, 513:16, 515:10, 515:11, 515:13, 516:19, 523:15, 532:19, 555:8
**played** [8] - 475:19, 476:11, 483:19, 484:9, 555:3, 575:14, 576:16, 576:18
**playing** [3] - 466:15, 571:25, 574:15
**plea** [8] - 507:8, 526:4, 526:11, 526:15, 526:16, 526:21, 526:25, 566:23
**plead** [5] - 573:15, 574:3, 574:5, 575:1, 586:15
**pleading** [1] - 572:19
**pleads** [1] - 566:23
**pled** [4] - 554:19, 574:10, 574:11, 586:17
**plus** [1] - 550:19
**pocket** [5] - 546:22, 546:23, 548:4, 548:5, 548:16
**point** [22] - 468:6, 470:9, 471:5, 471:8, 471:19, 475:11, 477:12, 478:16, 479:4,

480:12, 484:3, 485:20, 486:16, 488:6, 488:8, 488:14, 488:16, 490:9, 548:15, 565:14, 580:16, 583:8
**pointer** [1] - 479:18
**pointing** [1] - 484:25
**points** [1] - 559:19
**pole** [1] - 587:4
**Police** [9] - 467:22, 467:24, 468:13, 488:22, 496:9, 498:4, 546:20, 567:14, 572:11
**police** [11] - 468:9, 490:10, 491:6, 494:7, 527:3, 527:9, 547:3, 578:22, 579:25, 584:13, 584:15
**portion** [3] - 485:6, 515:10, 517:6
**portions** [3] - 516:20, 530:5, 543:9
**position** [1] - 588:18
**positioned** [1] - 484:14
**possess** [14] - 505:9, 511:23, 531:14, 531:25, 532:6, 534:13, 535:1, 535:2, 535:16, 541:20, 547:10, 560:16, 565:19, 574:6
**possessed** [20] - 505:1, 514:19, 536:5, 536:6, 536:9, 536:12, 536:19, 537:5, 538:4, 538:18, 538:20, 538:23, 540:14, 547:24, 548:3, 549:2, 549:6, 564:2, 570:6, 570:19
**possessing** [1] - 574:5
**possession** [63] - 505:12, 513:7, 513:9, 513:23, 513:25, 514:3, 514:10, 514:13, 531:5, 531:6, 531:17, 532:10, 537:17, 537:20, 537:23, 538:1, 538:21, 539:7, 539:10, 539:11, 539:14, 539:19, 539:25, 540:7, 540:8, 540:16, 540:20, 540:22, 540:25, 541:3, 541:6, 541:12, 541:13, 541:16, 541:18, 541:21, 541:23, 541:25, 542:2, 542:4, 542:5, 542:9, 542:10, 542:13, 547:12, 548:1, 548:24, 551:22, 568:8, 568:11, 569:2, 569:24, 570:2, 570:8, 570:9, 570:10, 570:13, 570:17, 570:22, 571:1, 574:4
**possibility** [3] - 521:17, 542:3, 589:13
**possible** [4] - 474:3, 521:13, 544:18, 589:11
**potential** [2] - 540:22, 541:15
**powder** [2] - 550:12, 554:16
**power** [2] - 541:25, 542:6
**powerful** [1] - 521:7
**powwow** [1] - 465:16
**prayer** [1] - 577:24
**precise** [1] - 538:17
**predecessor** [1] - 475:9
**prefer** [1] - 549:25
**prejudice** [2] - 517:24, 525:17
**prejudiced** [1] - 525:15
**preparation** [1] - 520:5
**preponderance** [1] - 521:6
**presence** [7] - 470:18, 470:19, 533:5, 533:22, 541:7, 542:8, 563:7
**present** [15] - 465:3, 466:10, 470:12, 504:10, 509:20, 515:22, 516:13,

528:25, 544:4, 557:12, 558:3, 560:4, 570:4, 570:10, 590:3
**presented** [5] - 516:24, 522:19, 523:1, 545:7, 566:10
**preside** [1] - 544:7
**presumed** [1] - 520:12
**presumption** [1] - 520:13
**pretty** [13] - 465:15, 477:22, 486:3, 499:15, 548:7, 550:23, 550:24, 552:16, 555:21, 562:16, 565:24, 582:11
**previously** [1] - 516:20
**price** [1] - 586:10
**pride** [1] - 588:17
**primarily** [1] - 468:3
**Prince** [12] - 467:21, 467:23, 468:13, 471:18, 472:11, 473:2, 482:25, 491:14, 492:16, 552:23, 552:25, 583:21
**print** [3] - 493:16, 515:8, 565:3
**private** [1] - 552:18
**probability** [1] - 525:9
**probable** [1] - 529:18
**problem** [2] - 508:19, 512:7
**procedure** [1] - 499:15
**proceed** [2] - 581:1, 588:22
**Proceedings** [1] - 591:18
**proceedings** [1] - 592:5
**process** [2] - 535:14, 589:3
**produce** [1] - 520:18
**produced** [1] - 536:25
**profession** [1] - 527:21
**profit** [3] - 552:10, 552:12, 586:7
**promote** [1] - 544:17
**proof** [15] - 509:22, 510:3, 510:4, 521:9, 521:13, 529:2, 531:8, 558:25, 560:4, 564:12, 565:15, 565:25, 569:1
**proper** [2] - 520:4, 523:5
**properly** [1] - 518:24
**property** [7] - 541:19, 541:20, 541:24, 542:1, 542:4, 542:5, 542:7
**proposed** [1] - 511:22
**prosecution** [1] - 526:17
**protect** [3] - 526:16, 548:9
**protecting** [2] - 548:18
**prove** [24] - 520:17, 520:22, 521:5, 532:8, 532:13, 532:23, 533:15, 534:9, 534:17, 534:23, 535:6, 536:11, 538:3, 538:10, 538:16, 538:18, 538:22, 541:11, 542:10, 542:11, 542:25, 547:23, 567:11, 580:14
**proved** [8] - 523:17, 529:10, 529:23, 531:21, 533:13, 535:20, 539:23, 567:11
**proven** [8] - 500:20, 519:19, 520:15, 520:19, 537:3, 547:7, 581:23, 587:20
**proves** [1] - 533:2
**provide** [2] - 517:2, 517:3
**provided** [2] - 496:20, 542:18
**provider** [2] - 496:18, 496:20
**proving** [2] - 521:1, 522:12
**publicity** [1] - 545:7

**publish** [5] - 472:15, 474:19, 475:18, 483:10, 498:10
**published** [4] - 472:19, 483:14, 489:15, 498:13
**pull** [4] - 477:14, 479:6, 484:19, 582:9
**pulled** [3] - 561:18, 566:17, 572:3
**punishable** [1] - 554:20
**punishment** [2] - 544:18, 544:24
**purchase** [8] - 469:8, 470:11, 470:16, 470:18, 471:1, 473:12, 482:7, 482:9
**purchased** [1] - 564:10
**purchases** [2] - 469:22, 550:6
**purchasing** [1] - 504:21
**purpose** [12] - 481:8, 486:23, 534:1, 534:21, 535:3, 538:7, 538:25, 540:19, 553:9, 560:20, 571:12
**purposes** [4] - 487:8, 497:15, 536:16, 543:25
**pursuant** [2] - 465:25, 495:24
**pursuing** [1] - 466:6
**put** [9] - 475:5, 488:24, 508:20, 513:18, 515:3, 515:14, 563:13, 564:7, 575:1
**puts** [1] - 581:17
**PWID** [2] - 515:4, 515:5

## Q

**qualified** [2] - 501:3, 501:9
**quality** [1] - 551:17
**quantities** [3] - 536:2, 536:22, 563:16
**quantity** [6] - 535:20, 535:22, 537:5, 537:9, 537:14, 560:22
**questioned** [1] - 578:10
**questioning** [1] - 585:3
**questions** [10] - 489:6, 493:18, 494:23, 499:7, 506:1, 517:9, 517:13, 519:25, 522:21, 568:18
**quick** [1] - 555:5
**quickly** [1] - 576:15
**Quigley** [2] - 550:5, 561:11
**quite** [1] - 557:6

## R

**race** [1] - 518:1
**radio** [1] - 545:2
**raise** [1] - 466:25
**rammed** [1] - 576:4
**ramp** [1] - 480:4
**random** [1] - 589:3
**rational** [1] - 504:19
**reach** [5] - 488:17, 488:20, 522:23, 539:11, 544:11
**reached** [1] - 546:7
**reaching** [4] - 488:21, 522:18, 523:2, 543:17
**read** [13] - 500:14, 510:11, 511:3, 513:12, 513:14, 545:4, 545:5, 549:5, 550:1, 557:15, 582:22, 582:23, 588:4

**reading** [2] - 500:11, 510:13
**reads** [1] - 550:8
**ready** [6] - 466:9, 466:18, 504:9, 515:9, 558:6, 590:20
**real** [6] - 521:17, 551:2, 554:6, 556:13, 573:17, 587:2
**realize** [3] - 558:24, 559:5, 562:14
**really** [16] - 492:4, 508:8, 509:11, 512:21, 555:5, 561:7, 564:4, 565:13, 568:21, 571:24, 572:1, 574:18, 577:18, 581:11, 586:16, 587:17
**reason** [7] - 473:16, 527:14, 527:20, 560:8, 560:11, 561:14, 568:15
**reasonable** [35] - 500:21, 504:19, 505:1, 505:7, 519:20, 520:15, 520:19, 520:23, 521:2, 521:8, 521:9, 521:25, 523:18, 526:14, 529:24, 531:11, 531:21, 532:8, 534:10, 537:4, 538:3, 538:19, 538:22, 539:10, 539:24, 541:11, 542:12, 542:25, 547:8, 560:6, 560:20, 565:25, 580:14, 581:23, 582:1
**reasonableness** [1] - 525:8
**reasonably** [5] - 531:12, 536:8, 536:15, 536:19, 560:25
**reasons** [3] - 527:15, 527:25, 571:20
**rebuttal** [1] - 580:21
**recalled** [1] - 524:1
**receive** [6] - 519:22, 525:21, 534:24, 535:7, 538:11, 576:11
**received** [7] - 529:15, 529:21, 530:2, 534:24, 535:7, 538:11, 541:2
**recent** [1] - 509:13
**recently** [1] - 573:23
**Recess** [1] - 515:21
**recess** [1] - 557:19
**recognize** [5] - 471:21, 471:22, 480:19, 487:9, 497:23
**recognizes** [1] - 542:2
**recollection** [5] - 524:9, 525:2, 579:13, 579:14, 586:23
**recollections** [1] - 524:19
**recommends** [2] - 513:11, 513:12
**record** [9] - 465:7, 467:19, 478:17, 478:20, 478:23, 495:14, 500:12, 582:24, 592:4
**recorded** [2] - 495:22, 530:3
**recording** [12] - 474:7, 474:9, 474:16, 476:8, 482:16, 482:22, 482:24, 483:3, 483:6, 483:21, 530:11, 543:1
**recordings** [4] - 530:1, 530:6, 530:9
**records** [2] - 576:23, 577:1
**recover** [1] - 486:19
**recovered** [2] - 499:12, 563:18
**RECROSS** [1] - 464:2
**Red** [2] - 513:11, 513:12
**red** [2] - 479:11, 569:18
**redirect** [1] - 493:19
**REDIRECT** [2] - 464:2, 493:20
**redistributing** [1] - 565:16
**refer** [2] - 517:5, 517:6

**reference** [8] - 490:13, 508:9, 512:21, 512:23, 518:9, 559:24, 559:25, 560:1
**referenced** [3] - 475:9, 502:13, 503:2
**referencing** [1] - 513:19
**referred** [3] - 466:4, 494:7, 559:14
**referring** [3] - 479:25, 483:17, 558:15
**reflect** [6] - 466:1, 466:5, 466:7, 478:21, 478:23, 562:10
**reflected** [1] - 539:15
**refuse** [1] - 517:17
**regarding** [3] - 537:9, 544:9, 544:16
**regular** [1] - 589:13
**rejoin** [1] - 589:12
**relate** [1] - 514:14
**related** [3] - 468:4, 560:1, 560:2
**relates** [1] - 548:25
**relating** [2] - 466:2, 505:14
**relation** [8] - 531:7, 539:17, 540:3, 540:16, 540:18, 540:25, 559:1, 571:5
**released** [1] - 553:17
**relevant** [3] - 508:10, 529:22, 543:4
**reliable** [1] - 577:19
**rely** [4] - 518:20, 530:9, 536:22, 536:23
**Remagen** [2] - 501:1, 519:9
**remain** [3] - 543:25, 557:7, 591:9
**remainder** [1] - 467:4
**remained** [1] - 589:5
**remains** [1] - 520:13
**remember** [29] - 470:6, 477:18, 484:14, 485:8, 485:21, 488:23, 491:25, 498:24, 499:22, 524:18, 549:15, 550:5, 552:6, 552:14, 554:19, 556:8, 556:15, 561:10, 573:19, 575:12, 578:6, 578:9, 582:12, 584:20, 584:25, 586:8, 586:25, 588:23
**remind** [4] - 511:2, 544:25, 545:13, 589:25
**reminded** [2] - 511:12, 543:19
**reminder** [1] - 510:17
**reminding** [1] - 510:24
**render** [2] - 501:4, 501:10
**rendered** [1] - 517:11
**renew** [1] - 504:15
**repeated** [1] - 512:8
**repeating** [1] - 512:20
**replace** [1] - 518:19
**replaces** [2] - 542:22, 542:23
**report** [1] - 589:22
**Report'** [1] - 502:12
**REPORTER** [1] - 592:1
**Reporter** [1] - 463:20
**reporters** [1] - 552:3
**reports** [4] - 482:4, 488:15, 545:1, 545:6
**represent** [2] - 505:22, 542:14
**represents** [1] - 523:7
**request** [9] - 472:15, 474:19, 483:10, 487:23, 495:25, 507:6, 507:24, 510:21
**requested** [1] - 507:1

610

**require** [4] - 520:17, 521:13, 522:17, 534:16
**required** [7] - 529:17, 532:23, 536:10, 536:24, 538:16, 541:9, 543:5
**research** [2] - 545:19, 589:16
**resell** [3] - 555:1, 583:20, 584:6
**reselling** [1] - 583:8
**residence** [2] - 584:20, 585:11
**resolve** [1] - 535:14
**resources** [1] - 580:5
**respect** [5] - 469:15, 530:21, 531:1, 540:19, 544:14
**respond** [2] - 560:13, 560:14
**responds** [2] - 550:9, 559:14
**response** [3] - 549:21, 549:24, 550:15
**responsibility** [3] - 517:20, 518:8, 523:8
**responsible** [8] - 536:4, 536:13, 537:10, 537:13, 554:7, 557:1, 560:24, 587:25
**rest** [2] - 589:5, 589:24
**rests** [2] - 500:12, 544:22
**results** [1] - 525:6
**resume** [2] - 466:18, 591:5
**retire** [2] - 545:12, 589:24
**retires** [1] - 590:7
**retiring** [1] - 588:20
**retrieve** [4] - 480:14, 480:16, 489:11, 587:5
**retrieved** [3] - 480:17, 481:13, 487:19
**return** [10] - 496:19, 517:10, 530:17, 530:24, 530:25, 534:25, 535:8, 538:11, 542:15, 544:6
**returned** [1] - 480:8
**retyped** [2] - 465:18, 465:24
**reveal** [1] - 546:5
**review** [2] - 483:6, 580:18
**reviewed** [1] - 474:9
**reviewing** [1] - 588:20
**rid** [5] - 513:2, 553:18, 576:12, 576:19, 584:7
**riled** [2] - 578:9, 578:10
**RMR** [1] - 463:20
**road** [2] - 479:21, 485:10
**roadways** [1] - 472:25
**rock** [1] - 565:3
**rocket** [1] - 576:25
**rocks** [1] - 569:7
**role** [3] - 494:8, 494:9, 584:3
**room** [11] - 518:15, 543:11, 543:25, 544:4, 544:6, 545:12, 549:15, 555:6, 588:14, 588:20, 589:24
**Room** [1] - 463:21
**Rosenberg** [14] - 465:9, 465:18, 467:5, 475:13, 502:21, 511:18, 512:13, 549:5, 554:14, 554:21, 556:18, 560:9, 582:14, 585:3
**ROSENBERG** [76] - 463:14, 465:8, 467:7, 467:13, 469:14, 469:17, 470:23,

470:24, 472:14, 472:21, 474:18, 474:25, 475:3, 475:14, 475:15, 475:20, 476:12, 478:20, 478:24, 480:22, 481:16, 481:20, 481:22, 483:9, 483:18, 483:20, 484:10, 487:3, 487:6, 487:22, 488:3, 488:11, 488:12, 489:4, 489:6, 493:21, 494:23, 495:10, 495:24, 496:6, 498:9, 498:15, 499:7, 500:10, 500:15, 502:23, 503:4, 503:6, 503:9, 503:12, 503:15, 503:18, 503:21, 503:24, 504:1, 504:4, 507:19, 507:23, 508:15, 509:3, 509:10, 509:24, 510:7, 510:17, 510:23, 512:15, 513:1, 514:7, 515:16, 515:20, 516:1, 585:7, 590:10, 590:12, 590:14, 590:18
**Rosenberg's** [1] - 585:2
**rotate** [1] - 568:19
**rough** [1] - 474:12
**roughly** [1] - 493:10
**rounds** [2] - 571:10, 572:16
**row** [5] - 479:23, 479:25, 485:9, 485:21
**rows** [1] - 485:7
**rule** [1] - 517:13
**ruled** [1] - 523:14
**rules** [1] - 544:8
**run** [3] - 477:7, 582:10, 586:2
**ruse** [4] - 577:21, 577:23, 578:4

## S

**sadly** [1] - 587:3
**sale** [1] - 485:24
**sat** [2] - 532:2, 576:11
**saved** [1] - 498:22
**saw** [15] - 465:14, 480:2, 494:10, 499:1, 522:3, 522:6, 522:7, 546:19, 551:24, 554:12, 575:23, 577:25
**scales** [3] - 562:23, 566:14, 569:3
**scary** [1] - 566:2
**scene** [1] - 533:5
**science** [2] - 527:21, 577:1
**Sciences** [4] - 500:24, 501:8, 501:12, 519:14
**scientists** [1] - 501:15
**Scott** [2] - 488:24, 492:23
**screen** [3] - 497:17, 551:21, 551:24
**scroll** [2] - 472:22, 473:7
**search** [9] - 481:8, 496:10, 562:20, 562:21, 566:15, 566:18, 584:19, 584:21, 585:4
**searched** [18] - 471:3, 474:3, 481:5, 482:15, 482:18, 482:19, 486:21, 497:21, 564:16, 564:17, 578:22, 579:3, 579:4, 579:14, 579:17, 587:6
**searching** [2] - 471:8, 486:23
**seat** [4] - 478:7, 478:8, 486:11, 506:19
**seated** [4] - 465:12, 478:14, 516:15, 558:5
**seats** [3] - 589:4, 589:6
**second** [15] - 482:5, 485:9, 486:23,

509:18, 514:7, 532:13, 533:11, 534:14, 540:3, 541:23, 548:24, 572:13, 576:14, 576:15, 585:15
**seconds** [3] - 478:12, 554:17, 576:17
**secret** [1] - 553:21
**security** [1] - 543:25
**see** [28] - 472:24, 477:10, 477:13, 478:4, 478:14, 479:21, 486:5, 486:9, 493:4, 497:22, 500:17, 506:14, 508:9, 524:25, 543:7, 554:6, 555:10, 555:18, 557:10, 557:18, 562:19, 576:21, 576:22, 576:23, 577:1, 583:10, 584:1, 590:22
**seeing** [1] - 498:24
**seek** [1] - 585:15
**seem** [2] - 554:12, 578:19
**segments** [2] - 508:4
**seize** [1] - 499:16
**seized** [5] - 498:3, 500:22, 501:5, 501:11, 536:25
**select** [2] - 544:7, 544:9
**selected** [1] - 589:3
**selecting** [2] - 522:22, 544:12
**selection** [1] - 589:2
**sell** [2] - 553:9, 562:5
**selling** [11] - 504:22, 508:16, 556:16, 561:10, 562:7, 562:8, 562:9, 564:2, 572:15, 574:10, 586:10
**sells** [3] - 553:12, 553:13, 561:4
**send** [12] - 510:10, 510:20, 510:25, 511:7, 511:21, 517:10, 545:22, 584:4, 590:11, 590:20, 590:21
**sending** [4] - 543:11, 549:16, 559:12, 590:4
**sense** [10] - 514:20, 547:18, 552:2, 556:25, 581:14, 587:1, 587:3, 587:6, 587:22, 588:16
**sent** [6] - 481:23, 500:22, 501:5, 501:11, 514:23, 549:23
**sentence** [13] - 507:13, 507:16, 509:18, 511:6, 511:10, 512:1, 526:9, 544:21, 554:19, 554:20, 554:21, 554:23, 586:16
**sentencing** [2] - 526:7, 572:24
**separate** [6] - 530:14, 530:17, 568:7, 568:8, 568:10, 574:3
**separately** [2] - 530:15, 537:25
**September** [1] - 574:21
**Sergeant** [7] - 527:22, 548:8, 552:6, 552:14, 583:14, 586:2, 586:3
**serial** [1] - 497:12
**series** [1] - 471:19
**serious** [3] - 566:1, 566:3, 566:4
**seriously** [1] - 566:3
**served** [1] - 521:3
**service** [3] - 496:17, 496:20, 589:21
**SESSION** [1] - 558:1
**set** [5] - 471:14, 473:12, 482:14, 483:2, 583:11
**setting** [1] - 470:11

**several** [3] - 487:13, 565:2, 569:9
**share** [2] - 562:4
**sheet** [1] - 514:23
**sheets** [3] - 562:23, 569:4, 569:6
**Sheriff's** [1] - 468:12
**shifts** [1] - 520:16
**shipped** [1] - 561:17
**ships** [1] - 561:17
**shirt** [1] - 478:19
**shoot** [1] - 551:24
**shopping** [1] - 473:20
**shorthand** [1] - 547:20
**shortly** [1] - 590:5
**shot** [4] - 473:9, 551:21, 582:7, 586:12
**show** [19] - 471:19, 479:18, 480:18, 487:7, 491:3, 497:14, 498:19, 505:12, 532:5, 533:7, 540:10, 541:9, 542:9, 547:24, 549:9, 549:20, 556:9, 570:11, 577:9
**showed** [3] - 491:6, 498:20, 552:2
**showing** [2] - 489:18, 490:3
**shown** [3] - 525:14, 532:12, 533:11
**shows** [5] - 552:5, 552:13, 553:1, 553:19, 569:18
**shred** [1] - 560:5
**shy** [2] - 473:4, 490:6
**side** [4] - 479:20, 515:25, 523:4, 525:16
**sides** [1] - 508:19
**sidetracking** [1] - 560:23
**sight** [1] - 564:17
**sign** [2] - 506:18, 572:25
**signature** [2] - 506:15, 515:2
**signed** [4] - 506:14, 545:23, 545:25, 572:25
**similar** [1] - 532:5
**similarly** [1] - 519:25
**simple** [8] - 539:13, 548:10, 553:9, 553:14, 570:1, 570:8, 570:16, 570:22
**simply** [7] - 546:17, 553:4, 556:23, 556:25, 570:6, 587:14, 587:24
**sit** [4] - 466:14, 511:3, 553:7, 560:8
**sits** [2] - 575:8, 575:20
**sitting** [5] - 478:6, 552:12, 571:18, 573:5, 574:15
**situation** [1] - 473:19
**six** [1] - 478:12
**sleep** [1] - 522:7
**slick** [1] - 568:18
**slow** [2] - 477:22, 572:2
**small** [12] - 548:11, 548:13, 548:15, 579:22, 581:7, 581:17, 583:1, 585:21, 585:23, 587:2, 587:12, 589:19
**smaller** [1] - 548:14
**smoke** [1] - 564:6
**smooth** [1] - 568:19
**snitch** [3] - 550:1, 552:24, 582:24
**snitching** [2] - 550:2, 583:1
**snow** [4] - 522:3, 522:5, 522:7, 522:8

**snowed** [1] - 522:10
**soda** [4] - 475:22, 476:3, 476:6, 554:15
**sold** [9] - 536:17, 536:20, 554:2, 554:5, 554:25, 568:2, 568:6, 586:8, 586:20
**sole** [3] - 517:19, 518:7, 523:21
**solely** [4] - 509:16, 518:2, 544:23, 545:6
**someone** [8] - 491:1, 491:12, 492:12, 531:16, 559:22, 561:4, 564:24, 581:10
**something's** [1] - 578:19
**sometime** [1] - 482:5
**sometimes** [4] - 523:3, 543:3, 582:22, 584:10
**somewhere** [1] - 514:12
**soon** [1] - 545:10
**sophisticated** [1] - 558:22
**sorry** [5] - 466:22, 497:20, 498:25, 503:25, 580:25
**sort** [5] - 466:5, 469:19, 473:2, 507:23, 581:10
**sound** [1] - 528:1
**source** [3] - 484:22, 485:11, 485:13
**sources** [1] - 562:5
**South** [1] - 561:18
**south** [1] - 473:4
**Southeast** [1] - 469:1
**space** [2] - 479:19, 484:15
**spaces** [3] - 479:21, 479:22, 485:5
**spared** [1] - 558:11
**speakers** [3] - 475:24, 530:6, 555:8
**Special** [1] - 467:25
**specific** [3] - 512:2, 544:8, 570:12
**specifically** [3] - 504:20, 505:5, 530:18
**specifying** [1] - 537:3
**speculate** [3] - 475:11, 523:12, 527:14
**spell** [2] - 467:18, 495:13
**spent** [1] - 579:23
**spill** [1] - 553:3
**spoken** [1] - 530:11
**spokesperson** [1] - 544:8
**Stafford** [1] - 468:11
**stand** [10] - 467:8, 524:6, 549:18, 554:22, 560:8, 564:11, 573:20, 580:1, 586:22, 588:15
**standard** [1] - 499:15
**standing** [2] - 477:13, 580:15
**start** [4] - 532:25, 547:22, 549:9, 558:14
**started** [1] - 477:10
**starting** [4] - 572:23, 573:1, 574:11
**starts** [4] - 553:3, 566:24, 567:2, 574:21
**state** [4] - 467:18, 495:13, 501:16, 529:25
**statement** [21] - 508:7, 509:12, 509:14, 509:19, 509:23, 526:17, 528:11, 528:13, 528:16, 528:18, 528:20, 528:22, 528:24, 529:3, 529:4, 529:14, 534:2, 543:6, 543:8

**statements** [8] - 506:25, 519:23, 528:6, 528:9, 533:20, 534:4, 534:6, 546:12
**States** [13] - 465:5, 465:9, 498:4, 500:18, 500:23, 508:14, 556:23, 562:12, 565:22, 566:3, 579:23, 580:3, 587:16
**STATES** [3] - 463:1, 463:3, 463:10
**states** [1] - 558:21
**station** [4] - 491:6, 547:3, 549:3, 578:22
**stay** [1] - 591:12
**staying** [1] - 510:2
**steal** [2] - 481:10, 486:25
**step** [1] - 500:7
**steps** [1] - 488:13
**Steven** [6] - 561:9, 562:3, 562:6, 575:17, 576:1, 576:4
**sticking** [1] - 578:7
**still** [4] - 478:1, 557:14, 579:21, 589:16
**stipulate** [7] - 500:16, 500:20, 500:25, 501:6, 501:14, 502:10, 502:18
**stipulated** [5] - 519:2, 519:4, 519:8, 519:12, 519:16
**stipulation** [7] - 501:6, 501:13, 502:19, 502:21, 519:5, 538:16, 549:5
**stipulations** [2] - 500:12, 535:13
**stop** [11] - 497:11, 497:13, 498:4, 499:4, 505:13, 550:2, 567:13, 577:20, 578:4, 582:25
**Stop** [1] - 549:24
**stopped** [4] - 546:20, 555:24, 577:21, 577:23
**straight** [4] - 550:15, 550:16, 551:16
**Street** [1] - 463:15
**street** [2] - 552:2, 568:22
**stricken** [1] - 523:14
**strike** [6] - 469:10, 507:15, 507:21, 509:16, 510:1, 565:8
**strip** [5] - 578:22, 579:3, 579:4, 579:14, 579:17
**strip-searched** [5] - 578:22, 579:3, 579:4, 579:14, 579:17
**strong** [2] - 510:11, 588:14
**stronger** [2] - 476:9, 476:10
**stuck** [1] - 587:4
**stuff** [3] - 562:15, 567:4, 572:11
**subject** [2] - 478:7, 500:10
**submarines** [1] - 561:18
**submit** [6] - 559:8, 565:5, 568:10, 569:1, 569:5, 569:23
**submitted** [1] - 504:25
**subpoena** [1] - 496:17
**subpoenaed** [1] - 564:8
**substance** [41] - 501:19, 501:21, 501:23, 501:25, 502:2, 502:4, 502:6, 502:8, 505:10, 511:24, 512:2, 513:7, 513:10, 514:11, 514:13, 531:18, 532:1, 532:7, 532:11, 534:19, 534:20, 535:2, 535:3, 535:6, 535:10, 535:17, 535:23,

535:25, 537:18, 537:20, 538:2, 538:5,
538:9, 538:12, 538:18, 538:20, 539:1,
539:8, 539:11, 539:14, 539:19
  **substances** [18] - 501:5, 501:11,
501:18, 534:13, 537:1, 537:8, 537:15,
540:1, 540:8, 540:17, 540:20, 540:23,
541:1, 541:4, 541:6, 541:14, 541:17,
558:12
  **substantially** [2] - 481:13, 487:19
  **substantive** [4] - 508:23, 509:15,
513:21, 565:7
  **successful** [1] - 553:22
  **Sudley** [3] - 484:16, 485:4, 485:10
  **sufficiency** [1] - 504:14
  **sufficient** [4] - 505:4, 505:11, 527:25,
531:10
  **suggest** [1] - 542:21
  **suggested** [1] - 505:12
  **suggestion** [1] - 465:15
  **Suite** [1] - 463:18
  **summarize** [2] - 482:11, 577:13
  **summary** [1] - 534:7
  **summon** [1] - 589:12
  **supervisor** [1] - 477:6
  **supper** [1] - 583:19
  **supply** [1] - 584:3
  **supported** [1] - 525:12
  **supporting** [1] - 528:1
  **suppose** [2] - 548:12
  **supposed** [1] - 569:23
  **surrounding** [3] - 524:16, 529:13,
541:7
  **surveillance** [8] - 473:19, 473:25,
477:1, 477:4, 482:12, 485:2, 563:21,
567:21
  **suspect** [1] - 499:16
  **sustained** [3] - 523:10, 562:1, 573:8
  **switch** [2] - 560:19, 560:25
  **sworn** [3] - 467:10, 495:7, 518:25
  **sympathy** [2] - 517:25, 587:23
  **system** [1] - 555:5

# T

  **tab** [2] - 475:17, 483:18
  **table** [2] - 465:12, 573:6
  **taker's** [1] - 518:21
  **talks** [2] - 562:12, 563:22
  **tally** [3] - 562:23, 569:4, 569:6
  **tangible** [1] - 541:19
  **tape** [3] - 510:9, 530:5, 566:21
  **tapes** [4] - 510:12, 511:7, 511:14,
530:5, 543:21, 565:11
  **Tara** [2] - 501:1, 519:9
  **target** [13] - 473:1, 482:9, 482:10,
483:21, 484:4, 496:14, 496:19, 497:9,
497:10, 499:5, 499:17, 567:24, 576:7
  **task** [3] - 468:23, 492:18, 544:10
  **tasked** [1] - 468:3
  **tear** [1] - 589:8

  **technically** [1] - 509:10
  **technician** [1] - 519:13
  **technicians** [1] - 519:9
  **technique** [1] - 499:22
  **telephone** [1] - 591:2
  **television** [1] - 545:2
  **tempted** [1] - 545:4
  **termination** [1] - 534:5
  **terms** [1] - 490:16
  **terrific** [1] - 590:20
  **territory** [1] - 473:17
  **testified** [17] - 467:10, 483:7, 489:20,
492:20, 495:7, 519:11, 519:15, 519:17,
520:3, 522:4, 523:20, 523:25, 524:2,
524:11, 525:23, 527:22, 578:13
  **testifies** [1] - 575:8
  **testify** [20] - 493:1, 501:16, 505:19,
505:24, 506:3, 506:6, 506:12, 506:16,
507:4, 526:5, 526:23, 527:12, 527:16,
527:17, 552:20, 554:12, 583:5, 586:13,
587:9
  **testifying** [5] - 524:6, 558:12, 574:25,
586:5
  **testimony** [51] - 494:25, 505:6, 507:7,
509:20, 518:25, 519:2, 519:8, 519:12,
519:16, 520:2, 521:24, 522:4, 522:8,
523:19, 524:22, 524:23, 524:24,
525:10, 525:17, 525:20, 525:22,
525:25, 526:1, 526:11, 526:13, 526:24,
527:1, 527:3, 527:7, 527:8, 528:12,
528:15, 528:21, 528:25, 529:6, 529:9,
535:13, 536:23, 538:15, 539:4, 554:8,
554:10, 559:11, 562:7, 562:10, 567:13,
568:24, 569:10, 569:14, 578:2, 586:14
  **testing** [1] - 481:24
  **tests** [1] - 558:12
  **text** [15] - 545:17, 549:11, 549:16,
549:18, 549:19, 550:7, 551:24, 559:3,
559:12, 559:19, 559:24, 582:9, 582:10,
582:12
  **texting** [1] - 549:25
  **THE** [121] - 463:1, 463:10, 465:4,
465:10, 465:13, 466:7, 466:9, 466:11,
469:11, 469:16, 470:22, 472:18, 475:1,
475:4, 475:7, 478:23, 480:21, 481:19,
483:14, 483:17, 487:5, 488:1, 488:10,
489:7, 489:15, 493:19, 494:24, 495:2,
495:5, 496:4, 498:12, 500:7, 500:8,
500:14, 502:17, 502:25, 503:2, 503:5,
503:7, 503:10, 503:13, 503:16, 503:19,
503:22, 503:25, 504:2, 504:5, 504:7,
504:11, 504:17, 505:25, 506:4, 506:5,
506:7, 506:8, 506:10, 506:11, 506:14,
506:17, 506:18, 507:12, 507:15,
507:20, 508:2, 508:6, 508:12, 508:20,
508:23, 509:6, 509:18, 510:1, 511:4,
511:17, 511:20, 512:13, 512:24, 513:2,
513:11, 513:16, 514:2, 514:6, 514:9,
514:18, 514:22, 514:24, 515:1, 515:15,
515:17, 515:23, 516:3, 516:7, 516:12,

516:14, 516:19, 516:23, 557:3, 557:13,
558:4, 562:1, 573:8, 578:25, 579:6,
579:9, 579:11, 580:11, 580:21, 580:24,
581:2, 584:23, 585:10, 585:19, 588:2,
588:4, 588:9, 590:8, 590:11, 590:13,
590:20, 591:1, 591:12, 591:17
  **theme** [1] - 581:5
  **theory** [3] - 512:9, 512:10, 560:24
  **therefore** [2] - 505:16, 530:15
  **thinking** [3] - 511:4, 529:12, 572:12
  **thinks** [3] - 572:9, 572:10, 573:11
  **third** [2] - 540:14, 570:14
  **three** [6] - 479:22, 505:21, 535:4,
538:7, 565:12, 567:18
  **throughout** [4] - 473:25, 476:8,
520:14, 520:16
  **throw** [1] - 550:17
  **Thursday** [4] - 466:13, 466:22, 506:25,
587:8
  **ticket** [1] - 577:23
  **tied** [1] - 566:6
  **Tiffany** [2] - 500:25, 519:9
  **tinted** [1] - 478:2
  **today** [11] - 474:12, 478:14, 483:7,
490:14, 491:18, 494:25, 551:16,
552:22, 571:19, 583:22, 591:10
  **together** [7] - 532:3, 532:4, 555:14,
562:5, 562:19, 562:20, 563:2
  **toll** [2] - 576:23, 577:1
  **tomorrow** [2] - 591:7, 591:10
  **took** [6] - 482:17, 486:13, 506:23,
531:3, 531:7, 549:17
  **total** [1] - 535:22
  **totem** [1] - 587:4
  **touch** [1] - 558:14
  **touching** [1] - 565:4
  **toward** [1] - 524:13
  **towards** [1] - 485:22
  **town** [1] - 576:7
  **toyed** [1] - 511:25
  **tractor** [1] - 561:16
  **trade** [1] - 571:22
  **traffic** [2] - 505:13, 577:23
  **trafficking** [19] - 468:25, 505:7,
505:13, 514:4, 515:5, 527:23, 531:7,
539:18, 539:21, 547:25, 548:22, 552:1,
570:16, 570:17, 570:21, 570:22, 571:5,
571:7, 572:21
  **trailers** [1] - 561:16
  **training** [2] - 501:3, 501:9
  **transaction** [9] - 471:14, 473:22,
474:13, 482:12, 483:4, 483:12, 484:12,
524:25, 565:10
  **transactions** [1] - 482:21
  **transcript** [11] - 474:12, 474:21, 475:2,
475:16, 476:13, 483:6, 483:11, 483:17,
511:12, 543:18, 592:4
  **TRANSCRIPT** [1] - 463:9
  **transcription** [1] - 474:16
  **transcripts** [10] - 474:23, 510:11,

510:14, 511:13, 530:3, 530:7, 530:8, 530:10, 530:12, 543:20
**transfer** [4] - 534:22, 535:5, 538:8
**transport** [5] - 578:6, 578:8, 578:14, 578:16
**transported** [2] - 587:1, 587:2
**transporting** [1] - 578:17
**treat** [1] - 554:9
**treats** [1] - 528:6
**TREVOR** [1] - 463:10
**trial** [29] - 466:6, 466:17, 467:4, 498:6, 500:21, 501:16, 504:16, 506:3, 509:22, 517:12, 517:21, 518:13, 518:17, 518:24, 519:3, 519:7, 520:6, 520:14, 520:16, 523:10, 525:16, 528:12, 528:21, 529:1, 529:21, 543:2, 545:8, 545:14
**TRIAL** [1] - 463:9
**trick** [1] - 472:7
**tried** [2] - 499:13, 558:10
**trip** [2] - 560:19, 560:25
**tripling** [1] - 586:12
**true** [9] - 508:17, 509:23, 521:5, 525:11, 528:18, 529:3, 548:20, 559:20, 576:13
**truth** [5] - 524:10, 525:19, 526:15, 573:22
**truthful** [3] - 524:7, 562:13, 562:14
**truthfully** [2] - 523:25, 526:5
**try** [4] - 488:10, 545:24, 571:15, 586:2
**trying** [5] - 508:24, 555:14, 573:3, 574:15, 575:1
**turn** [4] - 516:7, 526:11, 576:17, 589:22
**twice** [8] - 512:9, 552:25, 567:3, 573:25, 578:22, 579:3, 579:5, 587:7
**two** [46] - 469:15, 469:22, 478:10, 479:22, 491:10, 492:19, 493:10, 508:4, 512:17, 513:14, 521:20, 524:24, 531:24, 533:18, 534:9, 534:20, 535:3, 537:11, 538:6, 538:24, 539:23, 541:20, 542:3, 542:4, 546:20, 547:5, 551:18, 552:11, 555:23, 555:24, 556:3, 556:11, 556:12, 560:21, 565:7, 565:12, 566:25, 569:7, 572:6, 579:23, 585:13, 586:8, 589:8
**two-minute** [1] - 508:4
**type** [5] - 474:6, 499:14, 538:17, 538:20, 579:18
**types** [2] - 521:20, 526:21
**typo** [1] - 507:9

## U

**U.S** [2] - 463:14, 463:21
**UC** [5] - 490:9, 490:10, 490:14, 494:7
**unable** [2] - 488:7, 537:11
**unanimous** [3] - 537:11, 542:17, 546:7
**unanimously** [1] - 537:11
**unaware** [1] - 491:5

**unclear** [2] - 584:9, 584:10
**uncommon** [1] - 525:2
**unconditional** [1] - 506:3
**under** [9] - 498:22, 501:16, 509:4, 509:11, 524:20, 526:15, 526:18, 541:12, 546:4
**undercover** [4] - 480:12, 486:18, 489:20, 494:7
**underlying** [1] - 541:3
**understood** [1] - 585:10
**undisputed** [2] - 502:20, 519:5
**unfortunately** [1] - 467:1
**unidentified** [1] - 486:9
**unimportant** [1] - 525:5
**unintelligible** [1] - 474:15
**unit** [8] - 467:23, 468:2, 468:3, 468:5, 468:8, 468:9, 468:21, 491:11
**UNITED** [3] - 463:1, 463:3, 463:10
**United** [13] - 465:5, 465:9, 498:4, 500:18, 500:23, 508:14, 556:23, 562:12, 565:22, 566:3, 579:23, 580:3, 587:15
**units** [2] - 473:19, 473:25
**unknowingly** [1] - 533:8
**unlawful** [2] - 532:20, 532:22
**unless** [4] - 520:14, 530:18, 549:17, 591:4
**unlikely** [2] - 584:12, 589:11
**unreasonableness** [1] - 525:9
**unsolved** [1] - 561:20
**up** [53] - 466:16, 466:25, 468:6, 470:11, 473:12, 477:14, 479:6, 480:13, 481:8, 483:2, 484:19, 485:11, 485:13, 486:18, 488:21, 491:3, 491:6, 491:22, 496:7, 499:3, 515:1, 515:7, 522:8, 529:19, 544:9, 544:15, 553:18, 559:18, 560:9, 560:13, 561:15, 561:17, 563:21, 564:6, 565:21, 565:23, 566:6, 567:5, 567:17, 568:23, 571:16, 572:14, 573:20, 575:6, 575:11, 576:11, 576:15, 576:17, 579:21, 582:9, 583:16, 585:25, 587:10
**updated** [2] - 465:18, 515:23
**usable** [1] - 567:7
**useful** [3] - 588:13, 588:19, 588:22
**usefulness** [1] - 541:5
**useless** [1] - 565:11
**user** [1] - 583:14
**uses** [2] - 540:5, 583:19
**utilized** [1] - 567:21

## V

**value** [3] - 534:24, 535:8, 538:11
**VanDeMark** [2] - 501:1, 519:9
**vehicle** [16] - 477:3, 477:5, 477:7, 477:15, 477:20, 477:24, 478:13, 480:4, 480:8, 485:14, 485:20, 485:22, 486:13, 486:17
**verdict** [26] - 514:23, 517:11, 518:7,

522:18, 522:24, 522:25, 523:2, 530:20, 530:25, 537:2, 537:6, 539:11, 539:15, 542:14, 542:15, 542:16, 542:18, 542:21, 543:1, 544:11, 544:22, 546:7, 587:24, 588:16, 589:18
**verdicts** [4] - 530:17, 530:24, 543:14, 543:18
**version** [1] - 514:3
**versus** [1] - 465:5
**via** [1] - 545:20
**Vice** [1] - 468:1
**vice** [1] - 468:4
**vice-related** [1] - 468:4
**video** [9] - 482:22, 482:24, 507:22, 507:25, 516:20, 562:18, 571:24, 575:3, 575:23
**videotape** [1] - 574:13
**videotaped** [1] - 496:1
**view** [1] - 473:10
**viewed** [2] - 484:3, 504:18
**views** [1] - 544:16
**violated** [2] - 572:5, 572:7
**violation** [2] - 539:18, 562:12
**Virginia** [22] - 471:18, 473:1, 473:11, 481:23, 500:24, 501:8, 504:23, 519:14, 548:20, 553:1, 553:14, 558:16, 558:20, 558:22, 564:4, 565:6, 565:9, 565:9, 572:4, 583:16, 583:20
**visible** [1] - 479:8
**voice** [5] - 476:2, 476:5, 476:8, 476:21, 588:14
**voices** [1] - 476:18
**VOLUME** [1] - 463:9
**voluntarily** [6] - 506:11, 532:21, 534:20, 535:3, 538:6, 538:25
**vote** [2] - 546:10, 588:20
**voting** [1] - 546:6

## W

**wait** [2] - 550:2, 582:24
**walk** [2] - 473:22, 482:13
**Walter** [2] - 467:8, 467:20
**WALTER** [2] - 464:3, 467:9
**wants** [8] - 511:8, 555:18, 556:3, 573:21, 583:2, 586:3, 587:12, 591:4
**warn** [1] - 513:13
**warrant** [2] - 496:10, 566:18
**warrants** [3] - 562:20, 562:21, 584:20
**Washington** [9] - 463:6, 463:15, 463:18, 463:22, 469:1, 472:11, 472:25, 473:5, 488:21
**watch** [9] - 545:5, 562:18, 571:25, 574:13, 574:18, 575:3, 577:12, 584:9
**water** [1] - 554:16
**Wayne** [6] - 496:15, 496:19, 498:20, 551:15, 562:3, 582:17
**ways** [3] - 541:20, 565:13, 586:25
**weapon** [5] - 541:10, 558:17, 559:1, 571:10

614

**weapons** [2] - 543:13, 543:22
**wear** [3] - 549:24, 552:24, 582:19
**wearing** [2] - 478:17, 550:4
**wears** [1] - 550:6
**Wednesday** [1] - 466:1
**week** [1] - 466:16
**weekend** [1] - 466:12
**weeks** [1] - 469:9
**weigh** [5] - 550:20, 578:12, 578:21, 578:22
**weighed** [1] - 490:6
**weighing** [1] - 525:3
**weight** [13] - 517:22, 519:21, 522:14, 522:16, 525:21, 526:1, 527:1, 527:8, 528:5, 535:23, 535:24, 550:14, 550:21
**welcome** [4] - 466:11, 516:14, 558:4, 581:22
**whatsoever** [2] - 471:12, 487:2
**whips** [1] - 572:3
**White** [7] - 468:22, 469:8, 491:9, 491:11, 491:12, 491:23, 491:24
**whittle** [1] - 575:9
**whole** [9] - 466:6, 508:3, 517:8, 517:16, 551:2, 576:2, 577:12, 583:8, 584:8
**William** [12] - 467:21, 467:23, 468:13, 471:18, 472:11, 473:2, 482:25, 491:14, 492:17, 552:23, 552:25, 583:21
**willing** [2] - 507:1, 574:24
**window** [2] - 522:3, 522:6
**windows** [1] - 478:2
**wine** [1] - 583:18
**wire** [12] - 496:14, 496:18, 497:9, 497:10, 498:6, 499:5, 549:24, 550:4, 552:24, 563:3, 571:16, 582:19
**wiretap** [3] - 496:15, 555:2, 582:17
**wiretaps** [1] - 505:6
**wish** [6] - 515:10, 516:16, 518:16, 543:22, 545:13, 577:24
**wishes** [1] - 505:19
**withdraw** [2] - 573:9, 579:7
**witness** [60] - 466:24, 467:6, 467:8, 480:20, 487:3, 507:8, 508:7, 508:21, 508:25, 509:8, 509:12, 509:17, 509:21, 510:3, 520:5, 521:22, 523:13, 523:23, 523:25, 524:2, 524:4, 524:5, 524:6, 524:7, 524:8, 524:9, 524:10, 524:12, 524:20, 524:23, 525:10, 525:11, 525:14, 525:18, 525:19, 525:20, 525:23, 525:25, 526:12, 526:14, 526:16, 526:19, 526:22, 526:24, 527:7, 527:8, 527:17, 528:13, 528:17, 528:23, 529:1, 529:4, 536:24, 549:17, 554:22, 559:9, 564:11
**WITNESS** [2] - 464:2, 500:8
**Witness** [2] - 495:1, 500:9
**witness's** [12] - 509:14, 509:20, 521:24, 523:24, 524:6, 524:15, 524:18, 528:14, 528:24, 529:5, 578:12
**witnesses** [11] - 466:22, 495:3, 517:23, 518:25, 520:2, 523:19, 523:22, 524:23, 526:21, 527:19, 530:2
**witnessing** [1] - 524:25
**woke** [1] - 522:8
**wonder** [3] - 574:19, 583:4, 583:5
**woods** [1] - 491:3
**words** [9] - 474:15, 530:11, 530:12, 536:10, 542:16, 549:10, 552:24, 582:22, 583:3
**workplace** [1] - 563:10
**works** [2] - 577:13, 583:20
**world** [1] - 521:11
**write** [1] - 589:9
**writing** [3] - 546:2, 546:8, 581:25
**written** [2] - 543:24, 553:6

## Y

**year** [4] - 468:7, 486:4, 563:6, 563:8
**years** [11] - 552:7, 562:8, 562:9, 562:11, 571:9, 572:15, 572:22, 574:10, 574:17, 575:4
**Yo** [2] - 550:8, 551:7
**young** [1] - 578:15
**yourself** [5] - 469:24, 583:6, 583:10, 584:9, 586:14
**yourselves** [3] - 465:6, 544:3, 555:8